# EXHIBIT A

## COMMERCIAL LEASE

This Commercial Lease ("**Lease**") is entered into as of this 26ᵗʰ day of June, 2014 (the "**Effective Date**"), by and between **PARKWAY PROPERTIES L.P.**, a Delaware limited partnership ("**Landlord**"), and **RAYMOND JAMES & ASSOCIATES, INC.**, a Florida corporation ("**Tenant**"). In consideration of the mutual covenants set forth herein, Landlord and Tenant agree as follows:

1. **Terms and Definitions.** The following definitions and terms apply to this Lease (other words are defined elsewhere in the text of this Lease):

    (a)    "**Tenant's Current Address**": 50 North Front Street, Memphis, Tennessee 38103.

    (b)    "**Premises**": On the Commencement Date, defined below, the Premises, defined below, shall consist of approximately 237,167 rentable square feet ("**RSF**") of space in the building commonly known as Raymond James Tower (the "**Building**"), located on land with an address of 50 North Front Street, Memphis, Tennessee, 38103 (the "**Land**"), and comprised of the following spaces in the Building (each, a "**Suite**"; in the plural, "**Suites**," and collectively the "**Existing Space**"; the premises leased by Tenant from time to time under this Lease are referred to as the "**Premises**"):

**Suites comprising Existing Space**

| Suites | Rentable Square Footage |
|---|---|
| 300, 450, 750, 1270, 1400, 1500, 1600, 1700, 1800, 1900, 2000, 2100 | 159,910 |
| 775, 780 | 3,796 |
| 220 | 5,771 |
| 1200, 1299, 1300 | 28,964 |
| 730 | 902 |
| 772 | 284 |
| 770a | 1,983 |
| 600a | 4,044 |
| 600b | 3,197 |
| 770 | 2,084 |
| 1055, 1075 | 3,398 |
| 1000 | 15,268 |
| 700, 710 | 7,566 |
| **Aggregate RSF of Existing Space:** | **237,167** |

Effective April 1, 2016 (the "**Reduction Date**"), as provided in Paragraph 3 of the Addendum of Special Stipulations attached to this Lease, the Premises comprise the following Suites (sometimes collectively referred to herein as the "**Reduced Premises**"):

*[Chart of Suites comprising Premises as of Reduction Date appears on next page]*



**Suites constituting the Reduced Premises**

| Suites | Rentable Square Footage |
|---|---|
| 300, 750, 1270, 1400, 1500, 1600, 1700, 1800, 1900, 2000 | 134,306 |
| 775, 780 | 3,796 |
| 220 | 5,771 |
| 1200, 1299, 1300 | 28,964 |
| 730 | 902 |
| 772 | 284 |
| 770a | 1,983 |
| 770 | 2,084 |
| 700, 710 | 7,566 |
| **Aggregate RSF of Premises as of Reduction Date:** | **185,656** |

(c) "**Rentable Area of the Premises**": 237,167 RSF until the Reduction Date; 185,656 as of the Reduction Date.

(d) "**Rentable Area of the Building**": 334,668 RSF.

(e) "**Pro-rata Share**": The ratio of the Rentable Area of Premises divided by the Rentable Area of Building; until the Reduction Date, Tenant's Pro-Rata Share shall be 70.866%; effective as of the Reduction Date, Tenant's Pro-Rata Share shall be reduced to 55.475%.

(f) "**Term**": a period of one hundred seventeen (117) months beginning on the Commencement Date and expiring at 6 o'clock PM local time on the Expiration Date.

(g) "**Lease Year**": each successive twelve- (12-) month period throughout the Term; the first Lease Year shall commence on the Commencement Date and expire on the last day of the month preceding the first anniversary of the Commencement Date; each subsequent Lease Year shall commence on the day following the expiration of the previous Lease Year; and, the last Lease Year (which, unless the Term is extended as provided below, shall contain 9 months) shall expire upon the expiration of the Term.

(h) "**Commencement Date**": July 1, 2014.

(i) "**Expiration Date**": March 31, 2024 (unless the Term is extended as provided below).

(j) "**Base Rent**": the amounts specified in the chart below, to be paid by Tenant according to the provisions hereof:

**Base Rent prior to Reduction Date**
237,167 RSF

| Period | Base Rent per RSF | Monthly Amount | Periodic Amount |
|---|---|---|---|
| 07/01/14-06/30/15 | $20.65 | $408,124.88 | $4,897,498.56 |
| 07/01/15-03/31/16 | $20.70 | $409,113.08 | $3,682,017.72* |

*Based on a 9-month period*



**Base Rent as of Reduction Date**
185,656 RSF

| Period | Base Rent per RSF | Monthly Amount | Periodic Amount |
|---|---|---|---|
| 04/01/16-03/31/17 | $17.09 | $264,405.09 | $3,172,861.08* |
| 04/01/17-03/31/18 | $17.43 | $269,665.34 | $3,235,984.08* |
| 04/01/18-03/31/19 | $17.78 | $275,080.31 | $3,300,963.72* |
| 04/01/19-03/31/20 | $18.14 | $280,649.99 | $3,367,799.88 |
| 04/01/20-03/31/21 | $18.50 | $286,219.67 | $3,434,636.04 |
| 04/01/21-03/31/22 | $18.87 | $291,944.06 | $3,503,328.72 |
| 04/01/22-03/31/23 | $19.25 | $297,823.17 | $3,573,878.04 |
| 04/01/23-03/31/24 | $19.64 | $303,856.99 | $3,646,283.88 |

*\* Subject to the Abated Rent provision provided below.*

Tenant's monthly installment of Base Rent shall be abated during the thirty-three (33) month period commencing on the Reduction Date (the "**Abatement Period**") as follows: (a) in the amount of Two Hundred Sixty Four Thousand, Four Hundred Five and 09/100 Dollars ($264,405.09) per month during the first twelve (12) months of the Abatement Period; (b) in the amount of Two Hundred Sixty-nine Thousand, Six Hundred Sixty-five and 34/100 Dollars ($269,665.34) per month during the next twelve (12) months of the Abatement Period; and (c) in the amount of Two Hundred Seventy-five, Eighty and 31/100 Dollars ($275,080.31) during the last nine (9) months of the Abatement Period, for a total abatement of Base Rent in the amount of Eight Million, Eight Hundred Eighty-four Thousand, Five Hundred Sixty-seven and 95/100 Dollars ($8,884,567.95) (the "**Abated Rent**"). The principal amount of the Abated Rent, together with interest thereon calculated at the Default Rate, defined below, shall be amortized evenly over the remainder of the Term existing as of the expiration of the Abatement Period. So long as no Monetary Default occurs under this Lease, then upon Landlord's receipt of the final monthly installment of Rent, defined below, Tenant shall have no liability to Landlord for the repayment of any portion of the Abated Rent. Upon the occurrence of a Monetary Default, Tenant shall become immediately liable to Landlord for the unamortized portion of the Abated Rent existing as of the date of such Monetary Default, and interest shall accrue thereon at the Default Rate.

(k)     "**Base Year**": Calendar year 2016.

(l)     "**Initial Improvements**": the improvements to be made to the Premises by Tenant in accordance with the work letter attached hereto as **Exhibit D** (the "**Work Letter**").

(m)     "**Security Deposit**": N/A.

(n)     "**Guarantor**": N/A.

(o)     "**Parking Spaces**": Spaces in the 99 Tower Garage adjacent to the Building, as provided in Section 48 below.

(p)     "**Tenant's Broker**" is: DTZ Americas, Inc. (Attention: Todd Brandon, Senior Vice President), 4301 West Boy Scout Boulevard, Suite 690, Tampa, Florida 33607 (813.241.3838).

(q)     "**Landlord's Broker**" is: Parkway Realty Services, LLC, which is an affiliate of Landlord.

(r)     "**Laws**" shall mean any and all laws, ordinances, rules, regulations and building and other codes of any governmental or quasi-governmental entity or authority with jurisdiction over the Project ("**Governmental Authority**") now in force or hereafter enacted, applicable to the subject matter hereof, including, without limitation, all Laws relating to disabilities, health, safety or the environment.

(s)     "**Project**": shall mean the Building and the Land.

(t)     "**Common Areas**" means those portions of the Project provided for the common use of all tenants and occupants of the Building, including, but not limited to, the Building lobby and corridors, elevators, restrooms, risers and chases, walkways, greenspace, plaza and common areas, and related equipment, fixtures and improvements.

(u)     "**Building Standard**": The quantity and quality of materials, finishes and workmanship from time to time specified by Landlord for use throughout the Building. "**Above Standard**" means all improvements, fixtures, materials, finishes and workmanship which exceed Building Standard in terms of quantity or quality (or both), including but not limited to Supplemental HVAC Equipment, defined below; water heaters, instant hot faucets, garbage disposals, dishwashers, stoves, microwaves, refrigerators, ice machines, coffee machines, washing machines, dryers or other appliances; and sinks, sink fixtures, sink drain lines, appliance drain lines, water source plumbing, ground fault interrupters, dedicated outlets or other similar plumbing and/or electrical fixtures or items.

(v)     "**Building Systems**": The mechanical, electrical, plumbing, sanitary, sprinkler, heating, ventilation and air conditioning ("**HVAC**"), security, life-safety, elevator and other service systems or facilities of the Building; provided, however, that such HVAC .

3



(w) "**Comparable Buildings**":  Commercial office buildings located in Memphis, Tennessee, managed by reputable professional management firms, that are of similar age, character, quality, height, size and location to, with similar permitted uses and tenants (both in nature and in number), and which have rental rates and amenities that are comparable to, the Building; as used in this paragraph, the term "rental rates" shall mean the quoted rental rates that are generally applicable for new leases in the Building, as compared to the quoted rental rates that are generally applicable for new leases in such other buildings, lease extensions or expansions (as applicable for the comparison being made) at the time the comparison between the Building and other buildings is being made hereunder.  The parties acknowledge that not all such criteria will likely be materially similar to other such buildings and certain criteria may need to be excluded (such exclusion to be made as is reasonably appropriate for the purpose of such comparison), in effort to identify Comparable Buildings for the purposes described herein.

2.  **Premises**.  Subject to and in accordance with the provisions hereof, Landlord leases to Tenant and Tenant leases from Landlord the Premises as designated on **Exhibit A**.  The Suites constituting the Premises shall consist of the areas of such Suites between the unfinished floor and the drop ceiling grid (with the ceiling tiles being part of the Premises), and the area between the unfinished interior surface of the curtain walls and windows and the unfinished surface of walls demising the Premises from the Common Areas of the Building or space leased by other tenants), but excluding structural elements, vertical penetrations for Building Systems (and not for cabling, internal staircases or other penetrations for connecting portions of the Premises for Tenant's exclusive use), any portion of Building Systems, and Common Areas such as elevator lobbies, restrooms (exclusive of the restrooms installed by Tenant within the Premises on the Twelfth (12th) and Fourteenth (14th) Floors of the Building for Tenant's exclusive use (the "**Tenant's Restrooms**"), electrical and telecommunications closets unless for the exclusive use of Tenant, and risers and chases.  Tenant agrees that, except as expressly stated herein, no representations or warranties relating to the condition of the Project or the Premises and no promises to alter, repair or improve the Premises have been made by Landlord.  Except as otherwise expressly provided in this Lease, Tenant agrees to accept the Premises in their current "**AS IS, WHERE IS**" condition and acknowledges that **LANDLORD MAKES NO WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, HABITABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE, IN CONNECTION WITH THE PREMISES**.  Tenant shall also have the non-exclusive right, subject to the terms hereof, to use the Common Areas of the Project.

3.  **Authorized Use**.  Tenant shall use the Premises solely for general business office purposes, consistent with the uses of office buildings (the "**Authorized Use**"), and for no other purpose.

4.  **Term**.  This Lease shall constitute a legally binding and enforceable agreement between Landlord and Tenant as of the Effective Date.  The Term of this Lease is stated in Section 1(f), and the Commencement Date is stated in Section 1(h).

5.  **Rental Payment**.  Commencing on the Commencement Date, Tenant agrees to pay Rent (defined below) in monthly installments on or before the first day of each calendar month during the Term, in lawful money of the United States of America to the following address or to such other address as Landlord may designate from time to time in writing:  Parkway Properties LP, Raymond James Tower, P.O. Box 676453, Dallas, Texas 75267-6453.  Tenant agrees to timely pay all Base Rent, Additional Rent, defined below, and all other sums of money which become due and payable by Tenant to Landlord hereunder (collectively "**Rent**"), without abatement, demand, offset, deduction or counterclaim, except as expressly permitted by the terms of this Lease.  If Tenant fails to pay part or all of the Base Rent or the regularly scheduled monthly payment of Additional Rent (defined below), within five (5) business days after it is due, or if Tenant fails to pay any other sum due under this Lease and such failure continues for more than five (5) business days after Tenant's receipt of written notice from Landlord that such payment is past due, then Tenant shall also pay (i) interest at the Default Rate, defined below, on the unpaid Rent, plus (ii) a late charge equal to five percent (5%) of the unpaid Rent or the maximum then allowed by law, whichever is less; provided, however, that no interest or late charges shall be assessed for the first late payment received by Landlord during any twelve (12) month period, provided that such payment is received by Landlord within ten (10) days after it is due.  Interest calculated from the date payment was due and late charges shall be assessed on every payment that is more than ten (10) days late, and for the second and each subsequent late payment during a twelve (12) month period.  Landlord may assess a reasonable fee to Tenant for any checks made payable to Landlord that are returned unpaid by Tenant's bank for any reason.

6.  **Rent**.  Tenant shall pay to Landlord the Base Rent for the Premises in the amounts set forth in Section 1.  Base Rent as of the Reduction Date includes a component attributable to Operating Expenses (defined below) for the Base Year as specified in Section 1 ("**Base Operating Expenses**"), and to Taxes (defined below) for the Base Year ("**Base Taxes**").  Prior to January 1 of each year in the Term (or as soon thereafter as it is reasonably able to do so), Landlord shall provide Tenant with an estimate of Operating Expenses and Taxes for the next calendar year in the Term (each, an "**Operating Period**").  Commencing January 1, 2017 (but in no event sooner than 15 days after receipt of Landlord's estimate of Operating Expenses and Taxes), if Operating Expenses during any Operating Period, as reasonably estimated by Landlord, exceed Base Operating Expenses, Tenant shall pay to Landlord for such Operating Period an amount equal to the product of (a) the difference between Operating Expenses for such

4



Operating Period and the Base Operating Expenses, multiplied by (b) the Pro-rata Share; and if Taxes during any Operating Period, as estimated by Landlord, exceed Base Taxes, Tenant shall pay to Landlord for such Operating Period an amount equal to the product of (i) the difference between Taxes for such Operating Period and the Base Taxes, multiplied by (ii) the Pro-rata Share (the sum of (such amounts referred to herein as "**Additional Rent**"); such Additional Rent shall be paid in monthly installments of one twelfth (1/12) of the Additional Rent owed from Tenant for such Operating Period, with such installments being due at the same time and in the same manner as Tenant's monthly payments of Base Rent.  Provided, however, that notwithstanding the actual amount of Operating Expenses paid or incurred by Landlord during any Operating Period, for purposes of calculating Tenant's Additional Rent, the portion of the Operating Expenses for such Operating Period that consists of "Controllable Operating Expenses," as defined below, shall be limited to the lesser of (i) the actual Controllable Operating Expenses for such Operating Period, as adjusted in accordance with Section 7(a) below if less than ninety-five percent (95%) of the Rentable Area of the Building is actually occupied; (ii) the amount that the Controllable Operating Expenses for such Operating Period would have been if Controllable Operating Expenses had increased at the rate of four percent (4%) per year for each year following the Base Year, subject to the adjustment provided in Section 7(a) below if less than ninety-five percent (95%) of the Rentable Area of the Building is actually occupied, compounded annually; or (iii) one hundred ten percent (110%) of the Controllable Operating Expenses for the immediately preceding Operating Period, as adjusted in accordance with Section 7(a) below if less than ninety-five percent (95%) of the Rentable Area of the Building is actually occupied.  As used herein, the term "**Controllable Operating Expenses**" shall mean all Operating Expenses except expenses for utilities (defined as water, sewer, waste disposal, gas, electricity and power for heating, lighting, air conditioning and ventilation), insurance, snow removal and Taxes (as hereinafter defined).

7.  **Operating Expenses and Taxes**.

(a)  Definition of Operating Expenses.  Subject to the exclusions set forth in Section 7(b) below, "**Operating Expenses**," shall mean all expenses, costs and disbursements of every kind and nature relating to or incurred or paid during any Operating Period in connection with the operation, repair and maintenance of the Project, including, but not limited to, wages and salaries of all employees engaged in the operation, maintenance or security of the Project, whether billed directly or through a common or master association, including taxes, insurance and benefits relating thereto; the cost of all labor, supplies, equipment, materials and tools used in the operation and maintenance of the Project; management fees; the cost of all legal and accounting expenses incurred in connection with the management and operation of the Project; the cost of all utilities for the Project, including, but not limited to, the cost of HVAC, water, sewer, waste disposal, gas, and electricity; the cost of all maintenance and service agreements for the Project, including but not limited to, security service, window cleaning, elevator maintenance and janitorial service; the cost of all insurance relating to the Project and Landlord's personal property used in connection therewith, plus the cost of all deductible payments made by Landlord in connection therewith; the cost of all license and permit fees; the cost of repairs, replacements, refurbishing, restoration and general maintenance; a reasonable amortization charge on account of any capital expenditure incurred in an effort (i) to comply with any Laws, except as and to the extent specifically excluded below, or (ii) to reduce the Operating Expenses of the Project; costs billed to the Building, Project or Landlord through a declaration or any cross-easement agreement which encumbers the Project, or any declaration of condominium or other like instrument that encumbers any or all of the improvements on the Project; costs or assessments required to be paid by Landlord in connection with any community improvement district; and, all other items constituting operating and maintenance costs in connection with the Project according to generally accepted accounting principles.  Landlord and Tenant intend that the increase in Operating Expenses paid by Tenant under this Lease reimburse Landlord for Tenant's Pro-rata Share of any actual increase in costs incurred by Landlord over Base Year Operating Expenses but not provide a profit to Landlord.  In no event shall the increase in Operating Expenses per rentable square foot over Base Year Operating Expenses per rentable square foot, as determined by Landlord for any Operating Period, multiplied by the rentable area of the Building, exceed one hundred percent (100%) of the actual increase in Operating Expenses over Base Year Operating Expenses incurred by Landlord for such Operating Period.

(b)  Exclusions from Operating Expenses.  Operating Expenses shall not include the following:

i.      any cost for depreciation, except as specifically permitted to be included in Operating Expenses,

ii.     leasing commissions, attorney's fees, costs and disbursements and other expenses incurred in connection with negotiations or disputes with tenants or prospective tenants,

iii.    repairs and restorations insured under any insurance policy maintained by Landlord (or which would have been insured had Landlord maintained the insurance required under this Lease), in excess of any deductible amounts applicable under such insurance policy,

iv.     income and franchise taxes other than that portion, if any, of income and franchise taxes which may hereafter be assessed and paid in lieu of or as a substitute in whole or in part for Taxes,

v.      the cost of repairs made as a result of any condemnation to the extent Landlord is reimbursed for such cost by the condemning authority or any insurance,

vi.     costs incurred in tenant build-out, tenant work letters or contributions for tenant's work, renovating or otherwise improving or decorating , painting, or redecorating space for tenants or prospective tenants, including without

5



limitation, permits, license, design, space planning, and inspection costs, but exclusive of such costs incurred in connection with space in the building utilized for the operation or maintenance of the Building, or for an amenity made available to all tenants of the Building,

vii. except as expressly permitted to be included in Operating Expenses under clauses (i) or (ii) of Section 7(a) above, costs of a capital nature, including, but not limited to, capital improvements, capital replacements, capital repairs, capital equipment and capital tools, and other capital items, all in connection with generally accepted real estate accounting principles,

viii. expenses in connection with services or other benefits of a type which are not made available to Tenant but which are provided to another tenant,

ix. all costs (including penalties, fines and legal expenses) incurred due to violation by Landlord or any tenant of the terms and conditions of this Lease or any other lease,

x. costs or fees or other compensation paid to subsidiaries or affiliates of Landlord for services on or to the Building, to the extent that the costs of such services exceed competitive costs of such services were they not so rendered by a subsidiary or affiliate of Landlord,

xi. interest on debt or amortization payments on any mortgage(s), and rental payments on any ground lease or other underlying lease,

xii. Landlord's general partnership or corporate overhead and general administrative expenses,

xiii. compensation paid to clerks, attendants, or other persons in commercial concessions operated by Landlord,

xiv. rentals and other related expenses incurred in leasing, in lieu of purchasing, air conditioning systems, elevators, or other equipment ordinarily considered to be of capital nature, except equipment which is used in providing janitorial services and which is not fixed to the Building,

xv. all items and services for which Tenant directly reimburses Landlord or pays third persons,

xvi. advertising, promotional and marketing costs and leasing commissions, attorneys' fees and other related costs and expenses in connection with the negotiation and preparation of correspondence, deal memos, letters of intent, leases, subleases, assignments, space planning costs, and other costs and expenses incurred in connection with lease, sublease and assignment negotiations and transactions with present or prospective tenants of the Building,

xvii. expenses incurred in the operation and maintenance of any parking facilities,

xviii. costs, fines, penalties, legal fees or costs of litigation incurred due to violations by Landlord, its employees, agents, contractors or assigns, of any governmental rule or authority, except if incurred by Landlord in good faith in order to preserve Landlord's rights or to reduce Operating Expenses,

xix. costs for sculpture, paintings or other objects of art,

xx. wages, salaries and compensation paid by Landlord to officers and executives of Landlord above the level of Regional Property Manager, and to any other employee involved in the operation of buildings other than the Building; provided, however, that the compensation paid to such other employees, and to Landlord's Regional Property Manager, Regional Chief Engineer and Technical Services Manager may be included in Operating Expenses, provided that such compensation shall be limited to the percentage of such compensation that is based on a reasonable allocation of such person's wages, salaries and compensation to the Project,

xxi. except as expressly permitted to be included in Operating Expenses under clauses (i) or (ii) of Section 7(a) above, costs of replacements of the roof, foundation, structure, and exterior walls of the Building,

xxii. except as expressly permitted to be included in Operating Expenses under clauses (i) or (ii) of Section 7(a) above, costs of replacements of any equipment or component of the Building caused by deficient design, selection of materials, or construction,

xxiii. interest, late fees or penalties due to late payments of taxes, utility bills and other costs, except if incurred by Landlord in good faith in order to preserve Landlord's rights or to reduce Operating Expenses or Taxes,

xxiv. any operating expense in excess of Landlord's actual costs (consequently, Landlord may not pass on to the Tenant any cost which Landlord did not actually incur), except for Landlord's right to adjust operating expenses based on occupancy levels in the Building as provided in this Lease, and except for management fees included in Operating Expenses, as provided above,

xxv. cost of any additional security provided for any particular tenant,

xxvi. overtime HVAC charges paid by any tenant of the Building,

xxvii. compensation or benefits provided to clerks, attendants, or other persons in commercial concessions operated by Landlord,

xxviii. entertainment or travel costs;

xxix. costs of gifts,

xxx. costs of signs in or on the Building or Land identifying any particular tenant of the Building, other than an affiliate of Landlord, and other than the costs of a Building directory identifying all tenants of the Building,

xxxi. costs incurred in connection with upgrading the Building to comply with applicable laws (including without limitation, the Americans with Disabilities Act and similar accessibility laws, life, fire and safety codes) enacted

6



prior to the Commencement Date, to the extent that written notice of the violation of such laws was provided to Landlord by any governmental agency with jurisdiction over the Building prior to the Commencement Date,

xxxii. costs arising from Landlord's charitable or political contributions,

xxxiii. cost of any separate electrical meter installed to measure the use of electricity by any tenant of the Building,

xxxiv. any bad debt loss, rent loss, reserves for bad debts or rent loss, or other reserves (until such reserves are expended for items permitted to be included in Operating Expenses),

xxxv. asset management fees, exclusive of Project management fees,

xxxvi. costs incurred in the removal, encapsulation, or other treatment of Hazardous Materials, defined below, to the extent that written notice of the presence of Hazardous Materials in the Project in violation of any Environmental Laws, defined below, was provided to Landlord by any governmental agency with jurisdiction over the Project prior to the Commencement Date,

xxxvii. management costs or fees to the extent such costs or fees exceed competitive costs for third-party management of Comparable Buildings, defined below, where such costs or fees for third-party management of Comparable Buildings are solely for management of such Comparable Buildings and not for any other services (such as construction management),

xxxviii. rent and other costs incurred in connection with a leasing office or Landlord's regional or corporate offices, except to the extent that any regional or corporate office by Landlord located in the Building is for management and services provided solely for the Project,

xxxix. the cost of repairs in or to a tenant's premises incurred by reason of a breach by such tenant of its lease, and

xxxx. costs incurred in the removal, encapsulation, replacement, or other treatment of Hazardous Materials.

(c) <u>Non-Manipulation</u>. If any assessment (special assessment or otherwise) that is part of Taxes, defined below, is permitted by the taxing authority or by applicable law to be paid in installments (without penalty or interest) that would become due in both the Operating Period during which such assessment is made and in one or more subsequent Operating Periods, but Landlord elects instead to pay the entire amount of such assessment in the Operating Period during which such assessment is made, then the amount of such assessment that may be included in Operating Expenses for the Operating Period during which such amount was paid, and during subsequent Operating Periods during which such installments are permitted to be paid, shall be limited to the minimum amount of the installments required by such taxing authority or applicable law to be paid during such Operating Period. If Landlord elects to pay for any insurance premiums, or for services or materials, during an Operating Period in advance of (i) the Operating Period during which such insurance, services or materials are provided and (ii) the Operating Period when Landlord's obligation to pay for such insurance, services or materials accrues, then the amount of such insurance premiums, and the cost of such services or materials, that may be included in Operating Expenses for the Operating Period during which such premiums or cost was paid, and during subsequent Operating Periods when such premiums, or payment for such services or materials, would otherwise have been due, shall be limited to the amount of such premiums, or the cost of such services or materials, reasonably allocated to the Operating Period(s) during which insurance, services or materials are provided. Operating Expenses and Taxes for each Operating Period will be determined in a manner consistent with the determination of Operating Expenses and Taxes for the Base Year (for example, if Taxes are paid in time to receive a discount in the Base Year, Taxes for subsequent Operating Periods will be calculated at the same discount). If, during any Operating Period, Landlord (x) furnishes any material service that was not furnished or included in the Base Year, which service was provided in calendar year 2016 by Comparable Buildings, or (y) materially increases the level of any service for any Operating Period above the level of service for the Base Year, the Operating Expenses for the Base Year will be deemed to be increased by an amount equal to the additional Operating Expenses which would reasonably have been incurred during the Base Year by Landlord if it had furnished such work or service or increased level of service during the Base Year. In no event will Landlord introduce new services or materially increase the level of services provided by Landlord if such change increases Tenant's Operating Expenses to more than an immaterial amount without Tenant's written consent.

(d) <u>Definition of Taxes</u>. "**Taxes**," as used herein, means all ad valorem taxes, personal property taxes, and all other taxes, assessments, and all other similar charges, if any, which are levied, assessed, or imposed upon or become due and payable in connection with, or a lien upon, the Project or any portion thereof or facilities used in connection therewith, and all taxes of whatsoever nature that are imposed in substitution for or in lieu of any of the taxes, assessments, or other charges included in this definition of Taxes, such as taxes paid through a private agreement with respect to the Project as a part of or in connection with an inducement resolution with a development authority and all costs, expenses and fees associated or incurred by Landlord in connection with that inducement resolution and transaction involving a development authority; but excluding, however, taxes and assessments attributable to the personal property of tenants and paid by such tenants as a separate charge. In the event Landlord shall retain any consultant to negotiate the amount of taxes, tax rate, assessed value or other factors influencing the amount of Taxes, then the aggregate of all such reasonable third-party fees (including, without limitation, reasonable attorneys' and appraisers' fees) and all disbursements, court costs and other items paid or incurred by Landlord during the applicable tax year with respect to such proceedings shall be included in Taxes. Tenant shall not institute any proceedings with respect to the assessed valuation of the Building, Project, or the Property or any part thereof for the purpose of seeking or securing a tax reduction. If a



rental tax, gross receipts tax or sales tax on Rent is imposed on Landlord by any Governmental Authority, Tenant shall, as additional Rent, reimburse Landlord, at the same time as each monthly payment of Rent is due, an amount equal to all such taxes Landlord is required to pay by reason of the Rent paid hereunder. To the extent that Taxes assessed to Landlord during the Base Year or any Operating Period reflect a reduction in Taxes due to any governmentally sponsored abatement or incentive program, then Taxes for the Base Year and such Operating Period shall be adjusted to reflect an assessment of such Taxes that would have been made had such abatement or incentive program not been applicable.

(e) Adjustments to Operating Expenses and Taxes. If less than ninety-five percent (95%) of the Rentable Area of the Building is actually occupied during the Base Year or any Operating Period, Operating Expenses and Taxes shall be the amount that such Operating Expenses and Taxes would have been for such Base Year or Operating Period had ninety-five percent (95%) of the Rentable Area of the Building been occupied during all such Base Year or Operating Period, as reasonably determined by Landlord.

(f) Additional Rent. Landlord shall, within one hundred twenty (120) days after the end of each Operating Period (or as soon thereafter as it is reasonably able to do so), furnish Tenant with a statement of the Operating Expenses and Taxes during such year and a computation of the Additional Rent owed by Tenant for such Operating Period ("Expense Statement"). Failure of Landlord to provide such statement within such time period shall not be a waiver of Landlord's right to collect any Additional Rent; however, Landlord will be deemed to have waived any claim for Additional Rent not set forth on an Expense Statement delivered to Tenant within one year after the expiration of the pertinent Operating Period. If such statement shows that the actual amount Tenant owes for such Operating Period is more than the estimated Additional Rent paid by Tenant for such Operating Period, Tenant shall pay the difference within fifteen (15) days after Tenant's receipt of the Expense Statement. If the Expense Statement shows that Tenant paid more in estimated Additional Rent than the actual amount of Additional Rent owed by Tenant for such Operating Period, Tenant shall receive a credit therefor. The credit shall be applied to future monthly payments attributable to the Additional Rent, or if this Lease has expired, such amount shall be refunded to Tenant. Unless adjusted as a result of an audit by Tenant conducted pursuant to the express terms of this Lease, the Operating Expenses, Taxes and Additional Rent set forth in the Expense Statement shall be binding upon Tenant. Provided, however, that in the event that the Term of this Lease expires, or is terminated pursuant to the terms of this Lease, on a date other than December 31, then, at the option of Landlord, Landlord may, either prior to the date on which the Term expires, or within thirty (30) days thereafter, elect to provide Tenant with a revised estimate of the Operating Expenses and Taxes for the Operating Period in which such expiration or termination date occurs and the Additional Rent that will be due from Tenant for such Operating Period, which estimated Additional Rent shall be prorated to reflect the portion of such Operating Period that is contained within the Term of the Lease (the "Final Expense Estimate"). In the event that Landlord elects to deliver a Final Expense Estimate to Tenant, then (i) Tenant shall pay the prorated Additional Rent reflected in such statement within fifteen (15) days after Tenant's receipt of such estimate; (ii) the estimated amount of the Additional Rent for the final Operating Period shall be binding upon Landlord and Tenant; and (iii) Landlord shall not thereafter seek from Tenant any additional payment of Additional Rent if the actual Operating Expenses and Taxes for such Operating Period are greater than those reflected in the Final Expense Estimate, nor shall Landlord have any obligation to refund to Tenant any excess funds paid by Tenant to Landlord should the actual Operating Expenses and Taxes for such Operating Period be less than those reflected in the Final Expense Estimate. In the event that Landlord elects not to provide Tenant with a Final Expense Estimate, then it shall be presumed that Landlord will provide Tenant with an Expense Statement within one hundred twenty (120) days after the end of the final Operating Period contained in the Term, as provided above, and the Additional Rent shown in such Expense Statement shall be due from Tenant to Landlord within fifteen (15) days after Tenant's receipt of such statement.

(g) Tenant's Audit. Tenant shall have the right to have Landlord's books and records pertaining to Operating Expenses and Taxes for each Operating Period reviewed, copied (provided Landlord is reimbursed for the cost of such copies) and audited ("Tenant's Audit"), provided that: (a) such right shall not be exercised more than once during any calendar year; (b) if Tenant elects to conduct Tenant's Audit, Tenant shall provide Landlord with written notice thereof ("Tenant's Audit Notice") no later than one hundred eighty (180) days following Tenant's receipt of the Expense Statement for the year to which Tenant's Audit will apply; (c) Tenant may not conduct Tenant's Audit during any period in which an uncured Default by Tenant exists either at the time of Landlord's receipt of Tenant's Audit Notice or at any time during Tenant's Audit; (d) no subtenant shall have any right to conduct an audit and no assignee shall conduct an audit for any period during which such assignee was not in possession of the Premises; (e) conducting Tenant's Audit shall not relieve Tenant from the obligation to timely pay Base Rent or the Additional Rent, pending the outcome of such audit; (f) Tenant's right to conduct such audit for any calendar year shall expire one hundred eighty (180) days following Tenant's receipt of the Expense Statement for such year, and if Landlord has not received Tenant's Audit Notice within such one hundred eighty (180) day period, Tenant shall have waived its right to conduct Tenant's Audit for such calendar year; provided, however, that with respect to any audit of Operating Expenses and Taxes for the Base Year, Tenant's right to conduct an audit for such year shall expire the earlier of one hundred twenty (120) days following Tenant's receipt of the Expense Statement for the Base Year or one hundred twenty (120) days following Tenant's receipt of the first Expense Statement forwarded by Landlord to Tenant for any Operating Period during the Term; (g) Tenant's Audit shall be conducted by a Certified Public Accountant whose compensation is not contingent upon the results of Tenant's Audit or the amount of any refund received

8



by Tenant, and who is not employed by or otherwise affiliated with Tenant; (h) Tenant's Audit shall be conducted at Landlord's office where the records of the year in question are maintained by Landlord, during Landlord's normal business hours; (i) Tenant's Audit shall be completed within sixty (60) days after the date after Landlord provides to Tenant access of Landlord's books and records that Tenant begins such audit, and a complete copy of the results thereof shall be delivered to Landlord within sixty (60) days after Tenant completes such audit; and (j) Tenant's Audit shall be conducted at Tenant's sole cost and expense. If Tenant's Audit is completed and submitted to Landlord in accordance with the requirements of this Section and such audit establishes that Landlord has overstated the Operating Expenses or Taxes for the year audited, then Landlord shall reimburse Tenant for any overpayment, and if such Operating Expenses or Taxes (in the aggregate) have been overstated by more than five percent (5%), then Landlord shall also reimburse Tenant for Tenant's actual, reasonable cost incurred in conducting Tenant's Audit (not to exceed $17,500.00), together with interest at the Default Rate calculated from the date such reimbursement is owed, with such reimbursement(s) to be made within thirty (30) days after the amount of such overpayment has been established.

(h) Confidentiality. Tenant hereby agrees to keep the results of Tenant's Audit confidential and to require the auditor conducting Tenant's Audit, including its employees and each of their respective attorneys and advisors, to keep the results of Tenant's Audit in strictest confidence. In particular, but without limitation, Tenant agrees that: (a) Tenant shall not disclose the results of Tenant's Audit to any past, current or prospective tenant of the Building; and (b) Tenant shall require that its auditors, attorneys and anyone associated with such parties shall not disclose the results of Tenant's Audit to any past, current or prospective tenant of the Building; provided, however, that Landlord hereby agrees that nothing in items (a) or (b) of this subparagraph shall preclude Tenant from disclosing the results of Tenant's Audit in any judicial or quasi-judicial proceeding, or pursuant to court order or discovery request, or to any current or prospective assignee or subtenant of Tenant, or to any agent, representative or employee of Landlord who or which request the same. If Tenant intends to disclose the results of Tenant's Audit in any judicial or quasi-judicial proceeding, or if Tenant receives notice that it may be required in any such proceeding by either the order of any judicial, regulatory or other governmental entity presiding over such proceeding, or by a discovery request made in such proceeding, to disclose the results of Tenant's Audit, then Tenant shall (i) promptly provide Landlord with sufficient prior written notice of Tenant's intent to make such disclosure, or such order or request for such disclosure, in order to permit Landlord to contest such intended disclosure, order or request; and (ii) cooperate with Landlord, at Landlord's expense, with Landlord's efforts to seek a protective order or other remedy to limit the disclosure of such results to the extent reasonably required to adjudicate the matters at issue in such proceeding. If required by Landlord, Tenant shall execute and require Tenant's auditor to execute a reasonable confidentiality agreement reflecting the terms of this Section as a condition precedent to Tenant's right to conduct Tenant's Audit.

**8. Security Deposit**. [*Text intentionally deleted*]

**9. Initial Improvements**. All Initial Improvements to the Premises shall be installed by Tenant, at Tenant's sole expense, in accordance with the terms and conditions of this Lease and the terms set forth in the Work Letter attached hereto as **Exhibit D** and incorporated herein by this reference, and Landlord shall have no obligation to improve or otherwise modify the Premises for Tenant's occupancy.

**10. Maintenance and Repair**. Landlord shall maintain and operate the Building: (i) in at least the form, manner and quality as exists at the Building on the Effective Date (the "**Current Standard**") as it relates to Building maintenance and operation, and (ii) substantially in accordance with the manner and quality of the maintenance and operation of Comparable Buildings at the time a comparison between the Building and Comparable Buildings is made hereunder. Landlord shall make such improvements, repairs or replacements as may be necessary to maintain the Building Systems serving the Premises, the exterior and the structural portions of the Building (including structural portions of the Building within the Premises) and the Common Areas in accordance with Current Standards and the standards applicable for maintaining such items in Comparable Buildings. Subject to the terms of Section 7, the maintenance and repairs to be performed by Landlord hereunder shall be at Landlord's expense, unless the need for such maintenance or repairs was caused by the negligence or willful misconduct of Tenant, its employees, agents, contractors or invitees, in which event Tenant shall reimburse Landlord for the cost of such maintenance or repairs, plus a construction oversight fee as is described in Section 16 for the cost and expense of such maintenance or repairs. Except to the extent that Landlord is obligated to restore and repair the Premises pursuant to Section 23, Tenant, at its sole cost, shall maintain and repair the Premises and otherwise keep the Premises in good order and repair. Any repair or maintenance performed on behalf of Tenant by third-party contractors shall be undertaken in accordance with the provisions and requirements of Section 16. Landlord is not responsible for replacing and/or repairing Tenant's Above Standard fixtures or any Above Standard improvements. Except as expressly provided in this Lease, Tenant shall accept the Premises including any existing appliances and Above Standard fixtures in their "**AS IS, WHERE IS**" condition as of the Effective Date. For purposes of this Lease, all Above Standard improvements and Above Standard fixtures existing in the Premises as of the Effective Date shall be deemed to be Tenant's property until the expiration or earlier termination of this Lease or Tenant's right to possession of the Premises under this Lease, at which time such Above Standard improvements and Above Standard fixtures shall become the property of Landlord and shall be surrendered to Landlord with the Premises.

9



11. <u>Services</u>.

(a) <u>Services provided by Landlord</u>. Tenant shall have access to the Building and the Premises twenty-four (24) hours per day, seven (7) days per week, subject to any interruptions in access provided for in this Lease. Landlord shall furnish Tenant during Tenant's occupancy of the Premises the following services, all of which will be provided in no less than the Current Standard: (i) Cleaning and Janitorial Services (defined in **Exhibit B**), (ii) domestic water at those points of supply provided for general office use of tenants in the Building, (iii) electricity for normal, Building Standard office uses subject to Section 12, (iv) elevator service at the times and frequency reasonably required for normal business use of the Premises, (v) lamp and ballast replacement for Building Standard light fixtures, (vi) HVAC service within the ranges stated below between 7:00 o'clock a.m. and 6:00 o'clock p.m. on Monday through Friday, and between 8:00 o'clock a.m. and noon on Saturday ("**Building Standard Hours**"), except on New Year's Day, Memorial Day, July 4, Labor Day, Thanksgiving Day, Christmas Day and other holidays observed by a majority of the tenants of the Building ("**Holidays**"); and security services for the Building, as provided below. Landlord shall not be responsible for cleaning or maintaining any Above Standard improvements or Above Standard fixtures in the Premises; Tenant shall, at Tenant's expense, be responsible for cleaning and maintaining any Above Standard improvements or Above Standard fixtures, including Above Standard Tenant Work, defined below, and Above Standard Initial Improvements, in the Premises. In the summer, with sustained occupancy of the Premises by no more than one person per one hundred (100) square feet of floor area, and in the absence of computer and other electronic equipment in the Premises that is in excess of computer and other electronic equipment generally installed by tenants of the Building and by tenants in Comparable Buildings for general office purposes which could affect the temperature that would otherwise be maintained in the Premises, the HVAC system for the Building will maintain average room temperatures not in excess of 76 degrees Fahrenheit dry bulb and fifty percent (50%) relative humidity when the outside conditions do not exceed 94 degrees Fahrenheit dry bulb or 77 degrees Fahrenheit wet bulb. In the winter, the HVAC system will maintain average room temperatures of not less than 68 degrees Fahrenheit dry bulb when the outside temperature is not less than 10 degrees Fahrenheit dry bulb. In the summer, in the event that the outside temperature exceeds 94 degrees, but it is not in excess of 105 degrees, Fahrenheit dry bulb, the HVAC system for the Building will maintain average room temperatures not in excess of 80 degrees Fahrenheit dry bulb; and in the winter, in the event that the outside temperature is below 10 degrees, but not below zero degrees, Fahrenheit dry bulb, the HVAC system for the Building will maintain average room temperatures not below 64 degrees Fahrenheit dry bulb. Notwithstanding the foregoing, in the event that the outside temperature in the summer exceeds 94 degrees Fahrenheit dry bulb, Landlord shall use commercially reasonable efforts to maintain average room temperatures in the Premises not in excess of 76 degrees Fahrenheit dry bulb, and in the event that the outside temperature in the winter is below 10 degrees Fahrenheit dry bulb, Landlord shall use commercially reasonable efforts to maintain average room temperatures in the Premises of not less than 68 degrees Fahrenheit dry bulb. Landlord acknowledges that such commercially reasonable effort may include operating the HVAC system in the Building outside of Building Standard Hours in order to achieve the temperature ranges stated in this provision.

(b) <u>Overtime HVAC Services</u>. Tenant may request, and Landlord shall furnish HVAC service on days and at times other than those referred to above, provided Tenant requests such service in accordance with the Project Rules, defined below, then in effect, and agrees to reimburse Landlord for this service at the rate of Fifty Dollars ($50.00) per hour per floor of the Building (the "**Overtime HVAC Rate**"), subject to increase as provided in this paragraph. The Overtime HVAC Rate will only be increased to the extent that the Actual Cost, defined below, of providing overtime HVAC services to the Premises increases. The term "**Actual Cost**" shall mean the cost of the applicable utilities, plus a reasonable allocation of maintenance and depreciation costs attributable to the equipment utilized to provide such services, and an administrative fee of five percent (5%) of all such costs to reimburse Landlord for its reasonable expenses in providing such services. If Tenant utilizes services provided by Landlord hereunder in either quantity and/or quality exceeding the quantity and/or quality customarily utilized by normal office uses of comparable premises in the Building, then Landlord may separately meter or otherwise monitor Tenant's use of such services, and charge Tenant a reasonable amount for such excess usage; such amount shall constitute additional Rent due hereunder within fifteen (15) days of Tenant's receipt of Landlord's statement for such excess.

(c) <u>Required Security Services</u>. Throughout the Term of this Lease, Landlord shall continue to provide the Existing Security Services, defined below, and such other security services that are comparable to security services provided for Comparable Buildings at the time a comparison between the Building and Comparable Buildings is made hereunder (collectively, the "**Required Security Services**"). The following security services are provided to the Building as of the Effective Date of this Lease: on-site security services provided by a professional security services firm, consisting of at least one (1) guard twenty-four (24) hours per day, seven (7) days per week, and at least two (2) guards Mondays through Fridays (exclusive of Holidays) during the hours of 7:00 a.m. until 3:00 p.m. (collectively, the "**Existing Security Services**"). The cost of providing the Required Security Services shall be included in Operating Expenses. To the extent Tenant requests security services beyond the Required Security Services, Tenant shall reimburse Landlord for the entire cost of providing such excess security services as Additional Rent due under this Lease. As part of such additional security services, Landlord shall exert commercially reasonable efforts to limit access to the elevator bank of the Building serving the Twelfth (12th) and above Floors of the Building to tenants occupying such

10



floors (and their agents, employees, and contractors), except in the case of visits by guests of such tenants, emergency situations, cleaning access, maintenance access, and the like. Tenant shall reimburse Landlord as Additional Rent due under the Lease for additional costs incurred by Landlord in providing such limited access.

    (d)  <u>Access control</u>.

    (i)  <u>Card Access System</u>. The parties acknowledge that, as of the Effective Date, Landlord maintains a card access control system for the Building (the "**Existing Card Access System**"). A new card access system for the Building to be reasonably selected by Landlord with Tenant's input, will be installed by Landlord in a timely manner following the Commencement Date (the "**New Card Access System**"; the Existing Card Access System, the New Card Access System, and any replacements or upgrades thereto, are collectively referred to herein as the "**Card Access System**"). The functionality of the New Card-Access System will meet or exceed the functionality of the IP-based Electronic Access Control System made by Infinias and priced by Parkway during 2013. Tenant shall reimburse Landlord for Tenant's Pro-rata Share of the cost of purchasing and installing the New Card Access System within thirty (30) days after Tenant's receipt of Landlord's statement for such cost. The Card Access System shall continue to limit access to cardholders by requiring card usage on stairwell doorways at all floors leased by Tenant in the Building at all hours; and after Building Standard Hours, on all exterior doors on Floors 1 and 2 of the Building, passenger elevator call stations on Floors 1, 2 and 12, and freight elevator vestibule doors on floors occupied by full floor tenants of the Building. Landlord shall maintain the Card Access System for the Building. Landlord shall also have the right to modernize or upgrade the Card Access System in its sole discretion so long as such upgrade does not adversely affect the coverage of the then existing Card Access System. The cost of maintaining the Card Access System, and the cost of any future alterations, upgrades or reconfigurations of the Card Access System after installation of the New Card Access System shall be included in Operating Expenses. Landlord shall provide Tenant with one (1) access card per employee as requested in writing by Tenant, with additional and replacement cards in addition to the original one (1) card per employee to be supplied as requested by Tenant at any time thereafter upon payment of a fee for such service equal to Landlord's actual cost. Tenant assumes full responsibility for distribution of access cards to its employees, and for collection and return of such cards to Landlord as no longer needed. Upon Tenant's request, from time to time, no more often than once in each calendar week, Landlord shall supply Tenant with a report reflecting card access usage and activity in the Premises for a designated period.

    (ii)  <u>Tenant's Access Control Desks</u>. At any time during the Term, as the same may be extended from time to time, subject to the provisions hereof, Tenant shall have a license to use certain designated Common Areas of the First (1st), Second (2nd) and/or Twelfth (12th) Floor elevator lobbies, for Tenant's installation, operation and maintenance of access control desks (each, an "**Access Control Desk**"; collectively "**Access Control Desks**"). Tenant's license to install Access Control Desks is subject to the prior written approval of all tenants utilizing the upper floors elevator bank (the "**Upper Floor Tenants**") and is further subject to the other conditions and restrictions set forth herein. The Access Control Desks shall be installed, operated and maintained solely at Tenant's expense, except to the extent other tenants of the Building expressly elect to participate in sharing such expenses. The design and location of each Access Control Desk, and the uniforms of desk personnel shall be subject to the prior written approval of Landlord, which approve shall not be unreasonably withheld or delayed. Landlord agrees to provide reasonable assistance to Tenant in preparing the form of the written request for approval, and obtaining the consent, of Upper Floor Tenants. At Landlord's option, Landlord may prepare the written request letter, the form and substance on which shall be subject to Tenant's approval. Except as set forth above, Landlord shall have no responsibility for obtaining the consent of Upper Floor Tenants. Tenant waives any claim against Landlord in the event Tenant is unable to obtain such consent. Tenant shall be fully responsible for operation, maintenance and staffing of the Access Control Desks and compliance with the terms of this provision. Tenant shall obtain additional insurance coverage and shall require any independent contractor Access Control Desk personnel to provide proof of insurance and bonding, as may be reasonably acceptable to Landlord. Access Control Desk personnel shall not carry firearms. Landlord shall have no responsibility for the operation, maintenance and staffing of Access Control Desks by Tenant, its employees or independent contractors and Tenant shall indemnify, hold harmless and defend Landlord against claims, costs, (including reasonable attorneys' fees and expenses) expenses, liability, lawsuits, damages or injury arising from the installation, maintenance, use of operation of the Access Control Desks. Tenant shall neither cause nor permit the Access Control Desks to create a nuisance or annoyance to other tenants of the Building.

    (iii)  <u>Tenant's Additional Access Control Systems</u>. At Tenant's expense, Tenant shall be permitted to install and supply its own access control systems and personnel within the Premises, as it may deem appropriate, including, without limitation, a card access system for exterior doors of the Premises compatible with Landlord's Card Access System, as the same may exist from time to time, subject to the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed ("**Additional Access Control Systems**"). Any such Additional Access Control Systems shall not create annoyance or danger to other tenants of the Building, nor shall such systems conflict with or inhibit the Card Access System for the Building or any other access control systems of the Building. Tenant may design such Additional Access Control Systems for the purpose of restricting unauthorized access to or unauthorized activities within the Premises; provided, however, Tenant shall reimburse Landlord for any



additional cost for providing maintenance or services to the Premises, and Landlord shall be permitted and shall have the means to access all areas of the Premises in the event of emergency.

(e) <u>Interruption of Essential Service</u>. Landlord shall not be liable for any damages directly or indirectly resulting from, nor shall any Rent be abated (except as otherwise provided below) by reason of, the installation, use or interruption of use of any equipment in connection with furnishing any of the foregoing services, or failure to furnish or delay in furnishing any such service except when such failure or delay is caused by the gross negligence or willful misconduct of Landlord. The failure to furnish any such services shall not be construed as an eviction of Tenant or relieve Tenant from any of its obligations under this Lease. If Landlord shall fail to provide any Essential Service, defined below, to Tenant, or perform any maintenance to or repair of the Common Areas or Premises, that Landlord is expressly required to provide or perform under the terms of this Lease, and such failure shall continue for a period of five (5) consecutive business days after Landlord's receipt of written notice from Tenant of the existence of such failure, and such failure is not due to a Force Majeure Event (provided [and to the extent] that Landlord doesn't actually receive proceeds from any applicable insurance for rental loss the cost of which is included in Operating Expenses), and as a result of such failure, the Premises or a portion thereof shall be substantially unusable by Tenant, then, commencing with the expiration of such five (5) consecutive business day period, Tenant's Base Rent and Additional Rent shall abate in the proportion that the rentable square footage of the portion of the Premises rendered substantially unusable by such failure bears to the total Rentable Area of the Premises then leased hereunder for the period of time that such portion is substantially unusable. The term "Essential Service" shall mean HVAC service (exclusive of HVAC provided by any Supplemental HVAC Equipment), electrical service, water and sewer service, and at least one (1) passenger or freight elevator providing access to the floors of the Building on which the Premises are located.

(f) <u>Critical Failure</u>. If (i) Landlord shall fail to provide any service or perform any maintenance or repair to the Building or Building Systems that Landlord is expressly required to provide or perform under the terms of this Lease, other than a repair involving any structural portion of the Building (repairs to structural portions of the Building being expressly excluded from the provisions of this paragraph); (ii) Landlord fails to commence to restore such service or perform such maintenance or repair within two (2) business days after the effective date of written notice from Tenant of the existence of such failure, forwarded to Landlord in accordance with the notices provision of this Lease (as such two (2) business day period is extended to the extent Landlord is unable to commence due to a Force Majeure Event), and thereafter diligently pursues such cure ("**commence**" to restore a service or to perform maintenance or a repair means performance of the first step towards such restoration or performance of such maintenance or repair as is reasonable under the circumstances, such as inspecting the area where the problem is located, assessing the nature of the problem, and which could include, for example, contacting experts to assess the nature of the problem and suggest necessary action, and contacting contractors after Landlord has determined the nature of the problem and the appropriate contractors to be contacted); (iv) as a result of such failure, Tenant's use of a material portion of the Premises is materially and adversely impaired (such failure deemed a "**Critical Failure**"); (v) Tenant at its election may provide Landlord with written notice pursuant to the notices provision of this Lease (the "**Critical Failure Notice**") that Tenant intends to cure such Critical Failure (a "**Critical Repair**"), and seek reimbursement from Landlord for the actual reasonable cost of effecting such Critical Repair in accordance with the terms of this paragraph; and (vi) Landlord fails to commence (as defined above) to cure such Critical Failure within four (4) consecutive calendar days after the effective date of the Critical Failure Notice, then Tenant may proceed to perform the Critical Repair and recover reimbursement from Landlord for the actual reasonable cost thereof in accordance with the terms of this paragraph. Landlord shall endeavor to address any Critical Failure as quickly as possible, and in any event, within the time frames set forth above. Landlord shall promptly and in good faith respond to inquiries by Tenant's Representative, defined below, regarding Landlord's plan for assessing the Critical Failure and the anticipated timing for curing such Critical Failure, provided such communication does not materially interfere with or compromise Landlord's cure efforts; impose unreasonable timeframes on Landlord's time for response; or otherwise impose unreasonable demands upon Landlord; such communication shall be limited to information Tenant needs to know for Tenant's legitimate business reasons; and in no event shall Landlord be required to include any proprietary or confidential information of Landlord or any third party.

If Tenant elects to make a Critical Repair in accordance with the terms of this paragraph, (a) Tenant shall use a contractor that is approved by Landlord for making comparable repairs in the Building and such contractor shall provide Landlord with a certificate of insurance that complies with the terms of this Lease regarding work to be performed by any contractor engaged by Tenant to perform work in the Premises; (b) such Critical Repair shall be made substantially in accordance with the Project Rules then in effect for the Building, to the extent practical under the circumstances; (c) such Critical Repair shall be made in a good and workmanlike manner; (d) Tenant shall be responsible for all damage to the Building, including any Building System, caused by or resulting from such Critical Repair; (e) Tenant shall be responsible for the timely payment of all costs of such Critical Repair (the preceding not to be construed as a forfeiture of Tenant's rights to be reimbursed for such costs, as provided herein) and for ensuring that no lien is filed against the Project or any portion thereof as a result of the making of such Critical Repair, and for removing any such lien that is filed against the Project or any portion thereof; (f) such Critical Repair shall be made in accordance with all applicable Laws and building codes; (g) Tenant shall not, with respect to any Critical Repair within the Premises, interfere with the use and occupancy of any other portion of the Project by any other tenant or occupant of the Project; and (h) with respect to any

12



Critical Repair in any portion of the Common Areas that affects both the Premises and other areas of the Building, if Tenant elects to make such Critical Repair for the Premises, and such Critical Repair can also be made by Tenant for the benefit of such other areas at substantially the same time as Tenant makes such Critical Repair for the Premises, without any material additional cost, then, such Critical Repair shall be made for such other areas of the Building; provided, however that nothing contained herein shall be interpreted to make any other tenant of the Building a third-party beneficiary of Tenant's obligations hereunder.  Tenant shall exert commercially reasonable efforts to minimize any disruption to the use and occupancy of any other portion of the Project by any other tenant or occupant of the Project.  Upon the completion of such Critical Repair by Tenant in accordance with the provisions of this section, Landlord shall reimburse Tenant for all actual reasonable costs and expenses, exclusive of any attorneys' fees, but including architectural, engineering, consulting and permitting fees, incurred by Tenant in making such Critical Repair, within thirty (30) days after Landlord's receipt of Tenant's invoice and other documentation reasonably acceptable to Landlord supporting Tenant's claim for reimbursement, including lien waivers, if requested by Landlord, from the contractor(s) performing the Critical Repair in a form reasonably acceptable to Landlord to release all lien rights of such contractor(s).  From time to time (including as part of the Critical Failure Notice), Tenant may request a list of contractors approved for making repairs in the Building, and Tenant may inquire whether specific contractors are approved for making repairs in the Building.  In the event that Landlord fails to reimburse Tenant for such costs and expenses within such thirty (30) day period, and Landlord does not cure such failure within five (5) business days after Landlord's receipt of written notice from Tenant of the existence of such failure, then Tenant may deduct the amount of such costs and expenses from the Rent next falling due under this Lease until such costs and expenses have been reimbursed in full.

(g)  Tenant's Restrooms.  The parties acknowledge that Tenant, with Landlord's prior approval, installed the Tenant's Restrooms, defined above, within the Premises for Tenant's exclusive use.  For so long as Tenant's Restrooms are part of the Premises, Landlord shall maintain Tenant's Restrooms, and provide janitorial services to Tenant's Restrooms, in substantially the same manner as Landlord maintains and provides janitorial services to restrooms located in the Common Areas, except as otherwise provided in this paragraph; provided, however, that Landlord's actual costs incurred in maintaining and providing janitorial services to Tenant's Restrooms shall be assessed to and paid by Tenant as Additional Rent due under this Lease, with such costs being due from Tenant within the later of ten (10) days after Tenant's receipt of Landlord's statement for such costs, or the date on which the next installment of Base Rent is due after Tenant's receipt of such statement.  Tenant shall supply all Building Standard replacement light bulbs and ballasts required for the lighting fixtures in Tenant's Restrooms, and Landlord shall replace them at Tenant's cost in the same manner as the other costs of maintaining Tenant's Restrooms.  Upon the expiration or earlier termination of this Lease, or upon any reduction in the Premises of an area containing either or both of Tenant's Restrooms, Tenant shall, at Tenant's expense, remove Tenant's Restroom(s) located in the area(s) to be surrendered unto Landlord, and restore such the area(s) to the Building Standard condition existing prior to the installation of Tenant's Restroom(s), ordinary wear and tear excepted.

12.  **Electrical Usage**.  Landlord shall supply sufficient electrical capacity to a panel box located in the core of each floor for lighting and for Tenant's office equipment to the extent that the total demand load at 100% capacity of such lighting and equipment does not exceed six (6) watts per RSF in the Premises ("**Electrical Design Load**").  If Tenant utilizes any portion of the Premises on a regular basis beyond Building Standard Hours or in any manner in excess of the Electrical Design Load, Landlord shall have the right to separately meter such space and charge Tenant for all excess usage; additionally, Landlord shall have the right to install and maintain, at Tenant's expense, a separate meter any Above Standard fixture(s) in the Premises, such as water heaters, and to charge Tenant for the electricity consumed by such fixture(s).  Tenant shall pay to Landlord the actual cost of all electricity consumed in excess of six (6) watts per RSF in the Premises for the number of hours in the Building Standard Hours for the relevant period, plus any actual accounting expenses incurred by Landlord in connection with the metering or calculation thereof.  Tenant shall pay the cost of installing, maintaining, repairing and replacing all such meters.  In the event that the level of occupancy of the Premises, or any machinery or equipment located in the Premises, creates unusual demands (as compared to the demands of other general office tenants of the Building) on the HVAC system serving the Premises, then Tenant may install, and Landlord may require that Tenant install, its own supplemental HVAC unit(s) ("**Supplemental HVAC Equipment**") in the Premises, and in either event the installation, maintenance and removal of the Supplemental HVAC Equipment shall be governed by the terms of **Exhibit F** attached hereto and incorporated herein by this reference.  All Supplemental HVAC Equipment whether installed after or existing as of the Effective Date hereof, including the two (2) Trane Air Cooled Chillers that serve the Premises as of the Effective Date hereof, shall comply with and be subject to the Supplemental HVAC Equipment terms and conditions attached hereto as Exhibit F; provided however, that the parties acknowledge that installation of all Supplemental HVAC Equipment serving the Premises as of the Effective Date (the "**Existing Equipment**") has previously been approved by Landlord.  The Existing Equipment shall, however, be subject to being separately metered in accordance with the terms of Exhibit F, and shall be subject to the maintenance, operation and removal requirements for all Supplemental HVAC Equipment set forth in Exhibit F.

13.  **Communication Lines**.  Tenant has the right to use up to its Pro Rata Share of Building risers and chases to install, maintain, replace, remove or use communications or computer wires and cables which service the Premises (collectively, "**Lines**"), provided: (a) Tenant shall obtain Landlord's prior written consent, which shall not be unreasonably withheld, and shall use contractors approved in writing by Landlord, (b) all such Lines shall be plenum rated and neatly bundled, labeled and attached to

13



beams and not to suspended ceiling grids, (c) any such installation, maintenance, replacement, removal or use shall comply with all Laws applicable thereto, including, but not limited to the National Electric Code, and shall not interfere with any then existing Lines at the Building, and (d) Tenant shall pay all costs and expenses in connection therewith. Landlord reserves the right to require Tenant to remove any Lines located in or serving the Premises which violate this Lease or represent a dangerous or potentially dangerous condition, within three (3) business days after written notice. Tenant shall remove all Lines installed by or on behalf of Tenant upon termination or expiration of this Lease. Any Lines that Landlord expressly permits to remain at the expiration or termination of this Lease shall become the property of Landlord without payment of any type. Under no circumstances shall any Line problems not caused by Landlord's gross negligence or willful acts be deemed an actual or constructive eviction of Tenant, render Landlord liable to Tenant for abatement of Rent, or relieve Tenant from performance of Tenant's obligations under this Lease.

**14. Prohibited Use**. Tenant shall not do or permit anything to be done within the Project nor bring, keep or permit anything to be brought or kept therein, which is prohibited by any Laws now in force or hereafter enacted or promulgated, or which is prohibited by any insurance policy or which may increase the existing rate or otherwise affect any insurance which Landlord carries on the Project (except that Tenant's use of the Premises for the Authorized Use will be deemed not to violate this sentence). Tenant shall not do or permit anything to be done in or about the Premises which will in any way obstruct or interfere with the rights of other tenants, or injure them or use or allow the Premises to be used for any unlawful purpose. Tenant shall not commit or suffer to be committed any waste to, in or about the Premises or Project.

**15. Legal Requirements; Project Rules**.

(a) Definitions. Laws shall include, without limitation, the Americans With Disabilities Act, and all amendments and regulations promulgated thereto (collectively, "**ADA**"). "**Hazardous Materials**" shall mean (i) each and every substance included within the term "hazardous substance" "hazardous material" or "hazardous waste" as defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C.A. Section 9601 et seq. (as amended); the Hazardous Materials Transportation Act of 1975, 49 U.S.C.A. Section 1801 et seq. (as amended); the Resource Conservation and Recovery Act of 1976, 42 U.S.C.A. Section 6901 et seq. (as amended); or in any other applicable Laws; and (ii) all substances to which the rules and regulations promulgated by any federal or state agency pursuant to any one or more of such statutes apply (collectively, "**Hazardous Materials Laws**").

(b) Landlord's compliance obligations. Landlord will be responsible for compliance with Laws (including the ADA) in the Common Areas and all portions of the Building other than portions of tenants' premises for which tenants are responsible. In no event will Tenant be obligated to perform Landlord's compliance obligations hereunder, and Landlord shall indemnify Tenant against any claims relating to Landlord's failure to comply with Laws relating to the Building or Building Systems (except for Laws for which Tenant is responsible as provided below). In the event that the Common Areas, or any Building System, are not in compliance with any applicable Laws, and any Governmental Authority requires that modifications be made to any portion of the Common Areas or any of the Building Systems in order to bring such portion of the Common Areas or Building Systems into compliance with applicable Laws, then such modifications shall be made by Landlord, the initial cost of which shall be incurred by Landlord, and which cost may be included in Operating Expenses to the extent permitted under the terms of Section 7 of this Lease. Landlord represents that to its actual knowledge as of the Effective Date without inquiry, the Building's life safety system complies with applicable Laws; however, Landlord makes no other representation that the Building and Building Systems comply as of the Effective Date with all Laws. Landlord represents that to its actual knowledge as of the Effective Date without inquiry, the Building is free of Hazardous Materials. Landlord will indemnify and hold Tenant harmless from any and all claims, demands, actions, liabilities, costs, expenses, damages and obligations of any nature arising from, or as a result of the presence or use of any Hazardous Materials anywhere in the Project, Building or the Premises if such materials were used or placed there by Landlord or Landlord's predecessor-in-title, or either or their employees, agents or contractors, and that if Tenant is unable to use any portion of the Premises as a result of such Hazardous Materials, Rent will equitably abate during the period Tenant is unable to use such portion of the Premises.

(c) Tenant's compliance obligations. Tenant shall comply with all Laws relating to the use or occupancy of the Premises, and with all Laws regulating the condition of area contained within the Suites, and shall indemnify, defend (with counsel reasonably acceptable to Landlord) and hold Landlord and its directors, officers, partners, members, shareholders, employees and agents harmless from any and all obligations, claims, administrative proceedings, judgments, damages, fines, penalties, costs, and liabilities, including reasonable attorneys' fees (collectively, "**Costs**") incurred by Landlord as a result of the failure by Tenant, its employees, agents or contractors to comply with such Laws. Tenant shall cause its employees, agents and contractors to comply with, and shall use reasonable efforts to cause its invitees to comply with, all Laws applicable to the Project. Tenant shall not use, generate, store, release or dispose in or about the Premises or the Project any Hazardous Materials in violation of Hazardous Materials Laws. Tenant shall comply with, and cause its employees, agents and contractors to comply with, and shall use its reasonable efforts to cause its invitees to comply with, the reasonable and customary rules and regulations of the Project adopted by

14



Landlord from time to time for the safety, care and cleanliness of the Premises and the Project ("**Project Rules**"), provided no such rule limits any right or remedy of Tenant, or imposes any cost upon Tenant beyond the limits or costs imposed under this Lease. In the event of any conflict between this Lease and the Project Rules, the provisions of this Lease shall control. Landlord shall uniformly enforce all Project Rules against all Building occupants, but shall not have any liability to Tenant for any failure of any other tenants to comply with the Project Rules. The Project Rules in effect as of the Effective Date are attached hereto as **Exhibit C**. In the event that any Governmental Authority, ordinance or other Law applicable to the Project requires either Landlord or Tenant to establish and implement a transportation management plan designed to reduce the number of single-occupancy vehicles being used by employees and other permitted occupants of the Building for commuting to and from the Building, then Tenant shall cooperate with Landlord in establishing and implementing such plan.

      16. <u>**Alterations, Additions and Improvements**</u>. After the Commencement Date, Tenant shall not permit, make or allow to be made any construction, alterations, physical additions or improvements in or to the Premises without obtaining the prior written consent of Landlord, which shall not be unreasonably withheld ("**Tenant Work**"), nor place any signs in the Premises which are visible from outside the Premises, without obtaining the prior written consent of Landlord, which may be withheld in Landlord's sole discretion. Notwithstanding the foregoing, Landlord will not unreasonably withhold its consent to Tenant Work that: (i) is non-structural and does not adversely affect any Building Systems or improvements, (ii) is not visible from the exterior of the Premises, (iii) does not affect the exterior of the Building or any Common Areas, (iv) does not violate any provision of this Lease, (v) does not violate any Laws, and (vi) will not interfere with the use and occupancy of any other portion of the Project by any other tenant or occupant of the Project. Tenant's plans and specifications and all contractors, subcontractors, vendors, architects and engineers (collectively, "**Outside Contractors**") shall be subject to Landlord's prior written approval. Tenant shall pay Landlord a construction oversight fee (as also referenced in Section 10) in an amount equal to three percent (3%) of the cost and expense of any Tenant Work whether undertaken by Landlord or Tenant; provided, however, that no construction oversight or management fee shall be applicable to the Initial Improvements. Landlord may hire outside consultants to review such documents and information furnished to Landlord, and Tenant shall reimburse Landlord for the cost thereof, including reasonable attorneys' fees, upon demand. Neither review nor approval by Landlord of any plans or specifications shall constitute a representation or warranty by Landlord that such documents either (i) are complete or suitable for their intended purpose, or (ii) comply with applicable Laws, it being expressly agreed by Tenant that Landlord assumes no responsibility or liability whatsoever to Tenant or any other person or entity for such completeness, suitability or compliance. Tenant shall furnish any documents and information reasonably requested by Landlord, including "as-built" drawings (both in paper and in electronic format acceptable to Landlord) after completion of such Tenant Work; provided, however, that "as-built" drawings shall not be required for Tenant Work that is cosmetic and which does not affect any Building Systems, involve movement or installation of any walls, or result in the installation of any Above Standard fixtures or Above Standard improvements. Landlord may impose such conditions on Tenant Work as are reasonably appropriate, including without limitation, compliance with reasonable and customary construction rules adopted by Landlord from time to time, requiring Tenant to furnish Landlord with security for the payment of all costs to be incurred in connection with such Tenant Work, builder's risk and liability insurance, plans and specifications, and permits for such Tenant Work; provided, however, that plans shall not be required for any Tenant Work for which "as-built" drawings are not required, as provided above, or for any Minor Alterations, defined below. All Building Standard Tenant Work shall become the property of Landlord upon completion and shall be surrendered to Landlord upon the expiration or earlier termination of this Lease or Tenant's right to possession of the Premises under this Lease, unless Landlord shall require removal or restoration of such Tenant Work by Tenant. All Tenant Work that is Above Standard shall be and remain the property of Tenant, and shall be maintained by Tenant in good condition and repair throughout the Term, until the expiration or earlier termination of this Lease or Tenant's right to possession of the Premises under this Lease, at which time such Tenant Work shall become the property of Landlord and shall be surrendered to Landlord with the Premises, unless Landlord specifies, at the time of the approval of the installation of such Above Standard Tenant Work, that Landlord will require Tenant to remove same upon the expiration or earlier termination of the Lease or Tenant's right to possession of the Premises under the Lease. Any Tenant Work that Tenant is required to remove from the Premises upon the expiration or earlier termination of this Lease or Tenant's right to possession of the Premises under this Lease shall be removed at Tenant's sole expense, and Tenant shall, at Tenant's expense, promptly repair any damage to the Premises or the Building caused by such removal. Tenant shall not allow any liens to be filed against the Premises or the Project in connection with any Tenant Work. If any liens are filed, Tenant shall cause the same to be released within fifteen (15) days after Tenant's receipt of written notice of the filing of such lien by bonding or other method acceptable to Landlord. All Outside Contractors shall maintain insurance in amounts and types required by, and in compliance with, Section 20. ACORD certificates of insurance in the most recent edition available evidencing such coverage shall be provided to Landlord prior to commencement of any Tenant Work. All Outside Contractors shall perform all work in a good and workmanlike manner, in compliance with all Laws and all applicable Project Rules and Building construction rules. No Tenant Work shall be unreasonably disruptive to other tenants. Prior to final completion of any Tenant Work, Landlord shall prepare and submit to Tenant a punch list of items to be completed, and Tenant shall diligently complete all such punch list items. Anything in this Lease to the contrary notwithstanding, Tenant has the right, upon prior written notice to Landlord, to make Minor Alterations (as hereinafter defined) to the Premises without Landlord's consent and without liability to Landlord for a construction oversight fee. "**Minor Alterations**" means alterations, improvements or additions in the Premises which (1) are not structural in nature, (2) do not affect the HVAC



system of the Building, including but not limited to the HVAC system serving the Premises; (3) do not materially or adversely affect any other Building Systems, (4) are not visible from outside the Premises (provided, however, that any painting, wall covering installation, carpeting installation and removal of cabling and lighting fixtures will not be deemed visible from outside of the Premises for purposes of this paragraph), (5) do not require a building permit, and (6) do not exceed Fifty Thousand Dollars ($50,000.00) per floor in any six (6) month period. If any Tenant Work affects the HVAC system serving the Premises, then upon the completion of such Tenant Work, Tenant shall, at Tenant's expense, have the HVAC system serving the portion of the Premises affected by such Tenant Work independently tested and balanced by a licensed HVAC contractor reasonably acceptable to Landlord who shall submit a certified test and balance report to Landlord, and Tenant shall, at Tenant's sole expense, correct any deficiencies noted in such report.

17. **Tenant's Equipment**. Except for personal computers, facsimile machines, copiers and other similar office equipment using 120-volt power and not requiring a dedicated circuit, Tenant shall not install (after the Effective Date) within the Premises any fixtures, equipment or other improvements until the plans and location thereof have been approved by Landlord. The location, weight and supporting devices for any libraries, central filing areas, safes and other heavy equipment shall in all cases be approved by Landlord prior to initial installation or any relocation. Landlord may prohibit any article, equipment or any other item that may exceed the load capacity of the Building from being brought into the Building.

18. **Taxes on Tenant's Property**. Tenant shall pay all ad valorem and similar taxes or assessments levied upon all equipment, fixtures, furniture and other property placed by Tenant in the Premises (but only to the extent that other Building tenants pay such taxes on their personal property) and all license and other fees or taxes imposed on Tenant's business. If any improvements installed or placed in the Project by, or at the expense of, Tenant result in Landlord being required to pay higher Taxes with respect to the Project than would have been payable otherwise, Tenant shall pay to Landlord, within fifteen (15) days after demand, the amount by which such excess Taxes are reasonably attributable to Tenant (but only to the extent that other Building tenants pay such excess Taxes on their improvements).

19. **Access**. Landlord shall have the right to enter the Premises during regular business hours upon reasonable prior notice under the circumstances (except that no such prior notice shall be required to perform routine janitorial services to the Premises) informing Tenant of the reason for such access, (except in case of emergency, in which event Landlord shall use commercially reasonable efforts to give Tenant notice prior to such entry), in order to inspect the condition, show the Premises, determine if Tenant is performing its obligations hereunder, perform the services or make the repairs that Landlord is obligated or elects to perform hereunder, make repairs to adjoining space, cure any Defaults of Tenant hereunder that Landlord elects to cure, and remove from the Premises any improvements or property placed therein in violation of this Lease. Landlord shall use commercially reasonable efforts to minimize any disruption to or interference with Tenant's business operations in the Premises during any such entry.

20. **Tenant's Insurance**. At all times after the execution of this Lease, Tenant will carry and maintain, at its expense with insurance companies reasonably acceptable to Landlord that are rated no less than A-, Class VII, by A.M. Best Company: (i) a commercial general liability insurance policy, including products/completed operations and insurance against assumed or contractual liability under this Lease, for liability arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto, including any portion of the Common Areas used by Tenant, Tenant's invitees, contractors, employees or agents, to afford protection with respect to bodily injury, death or property damage (including loss of use) of not less than One Million Dollars ($1,000,000) each occurrence/Two Million Dollars ($2,000,000) aggregate; the ACORD certificate of insurance shall reflect that Landlord, Parkway Properties, Inc. and Parkway Realty Services, LLC, and their direct and indirect parent companies and subsidiaries and any of their affiliated entities, successors and assigns, as well as their respective current or future directors, officers, employees, partners, members and agents, are additional insureds under such policy; (ii) a property insurance policy insuring all Above Standard improvements, fixtures and Specialty Alterations in the Premises, and all personal property located within the Premises, on the "Special Form," including theft coverage, written at replacement cost value, covering all of the Tenant's property, and business interruption coverage in an amount that will reimburse Tenant for direct or indirect loss of earnings attributable to the perils insured against under section (i) above and this section (ii), and other perils commonly insured against by prudent business owners, or attributable to prevention of access to the Premises, for a period of at least eighteen (18) months; provided, however, that the property and business interruption insurance required under this section (ii) can be provided under a blanket policy maintained by Tenant, and Tenant may elect to retain or self-insure for the risks that are the subject of this section (ii), and in the event that Tenant elects to retain or self-insure for such risks, then (a) all amounts which Tenant pays or is required to pay hereunder as its self-insurer shall be subject to the waiver of subrogation provisions of this Lease and shall not limit Tenant's indemnification obligations under this Lease; (b) Landlord shall not be liable for any damage to Tenant's property or for interruption to Tenant's business, except as otherwise specifically provided in this Lease; and (c) unless otherwise agreed by the parties at the time of an assignment of this Lease, an assignee of Tenant that is not a Permitted Transferee shall not be entitled to self-insure under this provision; (iii) a worker's compensation insurance policy with applicable statutory limits, including employers liability insurance with limits of not less than One Million Dollars ($1,000,000.00); (iv) automobile liability insurance



with single limit coverage of at least $1,000,000 for all owned, leased/hired or non-owned vehicles; (v) if Tenant will serve or sell alcohol at the Project, a liquor liability insurance policy with minimum coverage of One Million Dollars ($1,000,000.00); and (vi) an excess/umbrella liability policy "following form" of not less than Four Million Dollars ($4,000,000), including a "drop down" feature in case the limits of the primary policy are exhausted. Landlord may also require all Outside Contractors to provide in addition to the insurance coverages referenced above such other insurance in amounts and types and with such companies as may be reasonably requested by Landlord, including, without limitation, construction all risk/builder's risks (including loss of revenue) insurance, owners and contractors protective liability insurance, professional errors and omissions liability insurance, and insurance covering such contractor's equipment and tools. Tenant's insurance shall be considered primary, not excess, and non-contributory with Landlord's insurance policies, and deductible amounts, if any, under such policies shall be commercially reasonable. ACORD certificates of such insurance in the most recent edition available shall be furnished to Landlord on or before the earlier of the Commencement Date or ten (10) days after execution of the Lease, reflecting the limits and terms required herein (including the waiver of subrogation required under Section 22 below), and renewal ACORD certificates shall be delivered to Landlord not later than fifteen (15) days after the expiration date of any policy. Tenant shall provide Landlord with thirty (30) days' prior written notice of nonrenewal or a material change in coverage, and ten (10) days' prior written notice of cancellation for all other reasons. Landlord agrees to cooperate with Tenant to the extent reasonably requested by Tenant to enable Tenant to obtain such insurance. Tenant shall pay all premiums and charges for all of said policies, and, if Tenant shall fail to make any such payment when due or carry any such policy, Landlord may, but shall not be obligated to, make such payment or carry such policy, and the amount paid by Landlord, with interest thereon at the Default Rate, shall be repaid to Landlord by Tenant within ten (10) days following demand therefor, and all such amounts so repayable, together with such interest, shall be deemed to constitute additional Rent hereunder. Payment by Landlord of any such premium, or the carrying by Landlord of any such policy, shall not be deemed to waive or release Tenant from any remedy available to Landlord under this Lease.

**21. Landlord's Insurance**. Landlord shall maintain, during the Term of this Lease, (i) a commercial general liability insurance policy of not less than One Million Dollars ($1,000,000) each occurrence/Two Million Dollars ($2,000,000) aggregate, and (ii) a property insurance policy on the "Special" Perils policy form, including theft coverage, written at full replacement cost value and with replacement cost endorsement, covering the Project, including the Building and all Building Standard improvements and fixtures in the Premises, but specifically excluding any Above Standard improvements, fixtures and Specialty Alterations until such time as such Above Standard improvements, fixtures and Specialty Alterations shall become the property of Landlord as provided above, and all personal property, fixtures and improvements therein belonging to Landlord, and (iii) an excess liability policy "following form" of not less than Four Million Dollars ($4,000,000), including a "drop down" feature in case the limits of the primary policy are exhausted. Landlord shall not be obligated to insure any property of Tenant.

**22. Waiver of Subrogation; Mutual Waiver of Liability**. All policies of insurance required to be carried by either party hereunder shall include a waiver by the insurer (by endorsement or otherwise) of all right of subrogation against the other party in connection with any loss, injury or damage thereby insured against. The waiver of subrogation shall apply regardless of any deductible (or self-insured retention) or self-insurance carried by either party. Any additional premium for such waiver shall be paid by the primary insured. To the full extent permitted by law, Landlord and Tenant each waive all rights of recovery against the other (and any tenants, officers, directors, partners, employees, agents and representatives of the other), and agree to release the other from liability, for loss or damage to the extent such loss or damage is covered by insurance in effect covering the party seeking recovery at the time of such loss or damage or would be covered by the insurance required to be maintained under this Lease by the party seeking recovery. If the release of either party, as set forth above, should contravene any law with respect to exculpatory agreements, the liability of the party in question shall be deemed not released but shall be secondary to the liability of the other's insurer.

**23. Casualty**. If the Premises or the Project is damaged or destroyed, in whole or in part, by fire or other casualty at any time during the Term and if, after such damage or destruction, Tenant is not able to use the portion of the Premises not damaged or destroyed to substantially the same extent and for the Authorized Use for which the Premises were leased to Tenant hereunder, then within sixty (60) days after Landlord's receipt of written notice from Tenant describing such damage or destruction, or such longer period as may reasonably be required to assess the extent of the damage or destruction and the availability of insurance proceeds, Landlord shall provide notice to Tenant as to whether, in Landlord's good faith determination, the Project and the Premises, as improved to the extent of the Building Standard improvements existing immediately prior to such destruction or casualty, can be repaired or rebuilt to the condition which existed immediately prior to such destruction or casualty within two hundred seventy (270) days following the date of such destruction or casualty. In the event Landlord's notice states that the Project and Premises cannot be repaired or rebuilt within that period, then either Landlord or Tenant may by written notice to the other within thirty (30) days following such notice by Landlord terminate this Lease. Unless such damage or destruction is the result of Tenant's intentional act, the Rent shall be abated for the period and proportionately to the extent that after such damage or destruction Tenant is not able to use all or a portion of the Premises for the Authorized Use and to substantially the same extent as Tenant used the Premises prior thereto. If this Lease is not terminated pursuant to the foregoing, then upon receiving the available insurance proceeds, Landlord shall restore or replace the damaged or destroyed portions of the Premises, as improved to the extent of the



Building Standard improvements existing immediately prior to such destruction or casualty, or Project; Tenant shall restore or replace the improvements to the Premises required to be insured by Tenant hereunder; and this Lease shall continue in full force and effect in accordance with the terms hereof except for the abatement of Rent referred to above, if applicable, and except that the Term shall be extended by a length of time equal to the period beginning on the date of such damage or destruction and ending upon completion of such restoration or replacement.  Landlord shall restore or replace the damaged or destroyed portions of the Premises or Project that Landlord is required to restore or replace hereunder within a reasonable time, subject to Force Majeure Events and the availability of insurance proceeds.  If either party elects to terminate this Lease as provided in this Section, this Lease shall terminate on the date which is thirty (30) days following the date of the notice of termination as if the Term hereof had been scheduled to expire on such date, and, except for obligations which are expressly stated herein to survive the expiration or earlier termination of this Lease, neither party shall have any liability to the other party as a result of such termination.  Landlord shall not be obligated to repair any damage to Above Standard improvements, fixtures or Specialty Improvements, Tenant's inventory, trade fixtures or other personal property.  Notwithstanding anything in this Section to the contrary, Landlord shall have no obligation to repair or restore the Premises or the Project on account of damage resulting from any casualty which occurs during the last twelve (12) months of the Term or if the estimated cost of such repair or restoration would exceed fifty percent (50%) of the reasonable value of the Building prior to the casualty, and, if Landlord is not required to repair or restore the Premises or the Project under the foregoing provisions of this sentence, and elects not to so repair or restore the Premises or the Project, then either party may terminate this Lease by notice to the other.  The abatement of Rent, if applicable hereunder, and termination of this Lease by Tenant, if applicable hereunder, are the sole remedies available to Tenant in the event the Premises or the Project is damaged or destroyed, in whole or in part, by fire or other casualty.

24. **Condemnation**.  If more than ten percent (10%) of the Premises or if a substantial portion of the Building is taken by the power of eminent domain, then either Landlord or Tenant shall have the right to terminate this Lease by written notice to the other within thirty (30) days after the date of taking; provided, however, that a condition to the exercise by Tenant of such right to terminate shall be that the portion of the Premises or Building taken shall be of such extent and nature as to substantially impair Tenant's use of the Premises or the balance of the Premises remaining and Landlord is unwilling or unable to provide reasonable replacement space within the Project. In the event of any taking, Landlord shall be entitled to any and all compensation and awards with respect thereto, except for an award, if any, specified by the condemning authority for any claim made by Tenant for Specialty Alterations and the value of any unexpired portion of the Term. In the event of a partial taking of the Premises which does not result in a termination of this Lease, the Rent shall be equitably reduced as to the square footage so taken.

25. **Waiver of Claims**.  Except for the willful misconduct or gross negligence of Landlord, its employees, agents or contractors, Landlord shall not be liable to Tenant for damage to person or property caused by defects in the HVAC, electrical, plumbing, elevator or other apparatus or systems, or by water discharged from sprinkler systems, if any, in the Building, nor shall Landlord be liable to Tenant for the theft or loss of or damage to any property of Tenant whether from the Premises or any part of the Building or Project, including the loss of trade secrets or other confidential information.  Landlord agrees to make commercially reasonable efforts to protect Tenant from interference or disturbance by third persons, including other tenants; however, Landlord shall not be liable for any such interference, disturbance or breach, whether caused by another tenant or tenants or by Landlord or any other person, nor shall Tenant be relieved from any obligation under this Lease because of such interference, disturbance or breach.  Landlord may comply with voluntary controls or guidelines promulgated by any governmental entity relating to the use or conservation of energy, water, gas, light or electricity or the reduction of automobile or other emissions without creating any liability of Landlord to Tenant under this Lease, provided that Tenant's use of the Premises and cost of occupancy are not affected.  In no event shall Landlord or Tenant or their affiliates, directors, officers, shareholders, partners, members, employees, or agents be liable in any manner for incidental, consequential or punitive damages, loss of profits, or business interruption. The waivers in this Section shall survive the expiration or earlier termination of this Lease.

26. **Indemnity**. Except for claims, rights of recovery and causes of action covered by the waiver of subrogation contained in Section 22 or waived in Section 25, Landlord shall indemnify and hold harmless Tenant and its agents, directors, officers, shareholders, partners, members, employees and invitees, from all claims, losses, costs, damages, or expenses (including reasonable attorneys' fees) in connection with any injury to, including death of, any person or damage to any property occurring in the Project and arising, wholly or in part, out of any action, omission, negligence or willful misconduct of Landlord or its directors, officers, shareholders, members, partners, employees, agents, or contractors, or any parties contracting with any such party.  If Tenant shall without fault on its part, be made a party to any action commenced by or against Landlord, for which Landlord is obligated to indemnify Tenant hereunder, then Landlord shall protect and hold Tenant harmless from, and shall pay all costs and expenses, including reasonable attorneys' fees, of Tenant in connection therewith.

Except for claims, rights of recovery and causes of action covered by the waiver of subrogation contained in Section 22, Tenant shall indemnify and hold harmless Landlord and its agents, directors, officers, shareholders, partners, members, employees and invitees, from all claims, losses, costs, damages, or expenses (including reasonable attorneys' fees) in connection with any injury to, including death of, any person or damage to any property occurring in the Project and arising, wholly or in part, out of any prohibited use of the Premises or other action, omission, or negligence or willful misconduct of Tenant or its Outside

18



Contractors, directors, officers, shareholders, members, partners, employees, agents, invitees, subtenants or guests, or any parties contracting with such party relating to the Project. If Landlord shall without fault on its part, be made a party to any action commenced by or against Tenant, for which Tenant is obligated to indemnify Landlord hereunder, then Tenant shall protect and hold Landlord harmless from, and shall pay all costs, expenses, including reasonable attorneys' fees, of Landlord in connection therewith.

Landlord's and Tenant's obligations under this Section shall not be limited by the amount or types of insurance maintained or required to be maintained under this Lease. The obligations under this Section shall survive the expiration or earlier termination of this Lease.

27. **Non-Waiver**. No consent or waiver, express or implied, to a party's breach of any of its obligations under this Lease shall be construed as or constitute a consent or waiver to any other breach by the other party. Neither the acceptance by Landlord of any Rent or other payment, whether or not any Default by Tenant is then known to Landlord, nor any custom or practice followed in connection with this Lease shall constitute a waiver of any of Tenant's obligations under this Lease. Failure by a party to declare that a default has occurred, irrespective of how long such failure may continue, shall not be deemed to be a waiver of any of rights hereunder. Time is of the essence with respect to the performance of every obligation in which time of performance is a factor. No payment or receipt of an amount less than the Rent or other amount due shall be deemed to be other than a partial payment of the amount due, nor shall any endorsement or statement of any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and the payee may accept such check or payment without prejudice to its right to recover the balance of such amount owed or pursue any other right or remedy. Except for the execution and delivery of a written agreement expressly accepting surrender of the Premises, no act taken or failed to be taken by Landlord shall be deemed an acceptance of surrender of the Premises.

28. **Quiet Possession**. Tenant shall peaceably and quietly hold and enjoy the Premises for the Term, subject to the provisions of this Lease.

29. **Notices**. Each notice required or permitted to be given hereunder shall be in writing and may be personally delivered ("**Hand Delivery**"), sent via nationally recognized overnight courier service ("**Overnight Mail**") or placed in the United States mail, via registered or certified mail, return receipt requested, addressed in each case at the addresses specified herein, with all costs of delivery or mailing of such notice to be paid by the sender. Either party may specify one (1) or two (2), but not more than two (2) addresses as the primary addresses where notices to such party are to be given (each, a "**Primary Address**"; collectively "**Primary Addresses**"), together with other addresses where copies of all notices to such party are to be given contemporaneously with the notices given to the Primary Addresses. If notice is given to a party at one (1) of two (2) Primary Addresses by Hand Delivery or Overnight Mail, then the party giving such notice shall deliver notice to the other Primary Address by either Hand Delivery or Overnight Mail. Except as otherwise provided below, a notice shall be deemed to have been received (a) upon the date of delivery or refusal thereof, if delivered by Hand Delivery or by Overnight Mail, or (b) if sent by registered or certified mail, (i) the date of delivery of such notice, as indicated on the duly completed United States Postal Service return receipt, if such receipt reflects delivery of such notice, (ii) on the date of refusal of such notice, if the refused notice reflects the date on which such notice is refused, or (iii) three (3) days after mailing of such notice, if the date of delivery of such notice cannot otherwise be established as provided above. Notice to a party specifying two (2) Primary Addresses shall be effective the later of the dates such notice is deemed to have been received by such party at such addresses, determined as provided above; provided, however, that notwithstanding the foregoing, if notice is properly given to a party at two (2) Primary Addresses, and notice is received by such party at one (1) of the Primary Addresses, but delivery to the other Primary Address either does not occur, or is delayed, through no fault of the sender, then notice to such party at such other Primary Address shall be deemed to occur when the addressee of such notice has actual knowledge of such notice and its contents. Either party may change its address(es) for notices by providing prior written notice to the other party in accordance with the provisions of this Section; provided, however, that neither party may specify more than two (2) Primary Addresses for notices. Until such time as either party shall provide notice of a change in its address(es) for notices, notices to the parties shall be addressed and given to the parties at the following addresses:

*[Addresses for notices appear on next page]*



If to Landlord:
*Primary Addresses:*

Parkway Properties LP
Attn:  Managing Director, Tennessee
3344 Peachtree Road NE, Suite 1625
Atlanta, Georgia 30326

and

Parkway Realty Services, LLC
Attn:  Property Manager, Raymond James Tower
50 North Front Street
Suite 110
Memphis, Tennessee 38103

*with a copy to:*

Parkway Properties LP
Attn: Chief Operating Officer
390 N. Orange Avenue, Suite 2400
Orlando, Florida 32801

If to Tenant
*Primary Address*:

Raymond James & Associates, Inc.
Attn:  Corporate Real Estate
880 Carillon Parkway
St. Petersburg, Florida 33716

Nothing contained in this Section 29 shall be construed to prohibit Landlord from providing notice to Tenant at the Premises or in any other manner if applicable law (i) requires that such notice be given to Tenant, and (ii) provides that such notice may be delivered to Tenant at the Premises or in such other manner (such as delivery of such notice to Tenant's registered agent in the State of Tennessee); if Landlord delivers any notice to Tenant at the Premises as permitted in this sentence, such notice shall be delivered to Tenant at Suite 700 of the Building.

30. **Landlord's Failure to Perform**.  If Landlord fails to perform any of its obligations hereunder, Landlord shall not be in default and Tenant shall not have any rights or remedies growing out of such failure unless Tenant gives Landlord written notice setting forth in reasonable detail the nature and extent of such failure and such failure is not cured within thirty (30) days following Landlord's receipt of such notice or such longer period as may otherwise be provided herein. If such failure cannot reasonably be cured within thirty (30) days, the length for curing shall be extended as reasonably required, provided Landlord commences to cure such default within such 30 day period and thereafter diligently prosecutes such cure to completion.  In no event shall Tenant's remedies for an alleged or actual failure of Landlord to perform its obligations under this Lease include the termination of this Lease.

31. **Tenant's Failure to Perform**. [*Intentionally omitted.*]

32. **Default**.  "Default" means the occurrence of any one or more of the following: (i) failure of Tenant to pay when due any Rent or other amount required to be paid hereunder, if such failure continues for more than five (5) business days after Tenant's receipt of written notice thereof from Landlord (a "**Monetary Default**"); (ii) failure of Tenant, after thirty (30) days written notice, or such other notice period specified in this Lease, to observe and fully perform all of Tenant's obligations hereunder, other than payment of Rent which is covered above (provided that if such failure cannot reasonably be cured within thirty (30) days (or other provided period), the length for curing shall be extended as reasonably required, provided Tenant commences to cure such default within such period and thereafter diligently prosecutes such cure to completion); (iii) the adjudication of Tenant to be bankrupt; (iv) the filing by Tenant of a voluntary petition in bankruptcy or other similar proceedings; (v) the making by Tenant of a general assignment for the benefit of its creditors; (vi) the appointment of a receiver of Tenant's interests in the Premises; (vii) any involuntary proceedings instituted against Tenant under any bankruptcy or similar laws, unless such proceeding is dismissed or stayed within sixty (60) days thereafter; or (viii) vacancy of the Premises for more than sixty (60) consecutive days without payment of Rent.

Upon the occurrence of a non-monetary Default, Landlord may, at its option, without terminating this Lease, and with required notice to Tenant, enter into and upon the Premises and, without being liable for any damages as a result thereof, cure such Default; and, in such event, Tenant shall reimburse Landlord immediately upon demand for any reasonable expenses which Landlord incurs in effecting Tenant's compliance under this Lease.

In addition, if a Default occurs, then or at any time thereafter while such Default continues, Landlord, at its option, may, without waiving any other rights available herein, at law, or in equity, either terminate this Lease or terminate Tenant's right to possession without terminating this Lease. In either event, Landlord may, pursuant to applicable law and without any additional notice other than such applicable law may require, reenter and repossess the Premises, and remove all persons and property therefrom in accordance with applicable Laws, and Tenant hereby waives any claim arising by reason thereof or by reason of issuance of any distress warrant and agrees to hold Landlord harmless from any such claims. Notwithstanding the foregoing, if Landlord is entitled to remove Tenant's property from the Premises without court proceedings, and Landlord elects to do so, then Landlord shall provide Tenant with written notice that such property is going to be removed from the Premises by Landlord, and if Tenant fails to remove such property from the Premises within ten (10) days after Tenant's receipt of such written notice, Landlord may, at Tenant's sole expense, move such property to a storage facility and provide Tenant with notice of the storage facility where such property is located, and payment of all fees applicable for such storage shall be Tenant's sole responsibility. If Landlord elects to terminate this Lease, it may treat the Default as an entire breach of this Lease and Tenant immediately shall become liable to Landlord for damages for the entire breach in an amount equal to the total Rent and all other payments due for the balance of the Term discounted at the rate of six percent (6%) per annum to the then present value, less the fair rental value of the Premises for the balance of the Term (taking into account, among other factors, the probability of reletting the Premises for all or part of the remainder of the Term, and the anticipated duration of the period the Premises will be unoccupied prior to reletting) similarly discounted to present value, plus the cost of repossessing, remodeling and re-renting the Premises and all unpaid Rent through the date of such termination. If Landlord elects to terminate Tenant's right to possession of the Premises without terminating this Lease, Landlord shall use commercially reasonable efforts to relet the Premises if, following a Default by Tenant that results in Landlord terminating Tenant's right to possession of the Premises, Tenant surrenders possession of the Premises unto Landlord in the condition required by the terms of this Lease for Tenant's surrender of the Premises upon the expiration of the Lease Term; provided further, however, that it shall not be unreasonable for Landlord to (a) decline to relet the Premises to any party that would be unacceptable as an assignee of Tenant's obligations hereunder, as provided in Section 38; (b) present other available space in the Building to prospective tenants prior to presenting the Premises; or (c) refuse to accept less than the then applicable market rate rent for the Premises. Upon any such reletting, Tenant shall be liable to Landlord for the amount, if any, by which the total Rent and all other payments herein provided for the unexpired balance of the Term exceed the net amount, if any, received by Landlord from such re-renting (as and when such amounts would have been due under the Lease), being the gross amount so received less the cost of repossession, re-renting, remodeling and other expenses relating thereto; Tenant shall be and remain liable for such net amount even after an eviction of Tenant from the Premises, should an eviction of Tenant from the Premises occur. Such sums shall be immediately due and payable by Tenant upon demand. In no event shall Tenant be entitled to any rents received by Landlord from reletting the Premises, even if Landlord relets the Premises for an amount exceeding the Rent due from Tenant for the remainder of the unexpired Term. Actions by Landlord to collect amounts due from Tenant as provided in this Section may be brought at any time, and from time to time, on one or more occasions, without the necessity of Landlord's waiting until the termination of this Lease. The remedies expressed herein are cumulative and not exclusive, and the election by Landlord to terminate Tenant's right to possession without terminating this Lease shall not deprive Landlord of the right, and Landlord shall have the continuing right, to terminate this Lease. Upon the occurrence of a Default, Landlord shall have the right to recover from Tenant all direct damages caused by Tenant's Default and to pursue all rights and remedies available at law or in equity.

33. **Surrender**.   Upon the expiration or earlier termination of the Term, Tenant shall surrender unto Landlord the Premises, broom clean and in materially similar condition to the condition of the Premises existing as of the Effective Date hereof (excluding any Initial Improvements, defined in the Work Letter, or as may be otherwise agreed to by the parties in writing), subject to damage caused by normal wear and tear, casualty and condemnation, free and clear of any and all liens or encumbrances of any type, and otherwise in the condition required by the terms of this paragraph. Tenant shall, at Tenant's expense, remove from the Premises (i) all items of Tenant's personal property, (ii) all cabling, supplemental HVAC equipment, raised floor areas and interior stairs and stairwells; (iii) any Specialty Alterations, defined below, that Tenant makes to the Premises, or applicable portion thereof, after the Effective Date hereof, provided that Landlord informs Tenant that it will require such removal at the time that Landlord approves the installation of such Specialty Alterations, or at the time Landlord becomes aware of the installation of such Specialty Alterations if such Specialty Alterations were installed without Landlord's approval; and (iv) Tenant's Restrooms, as provided in Section 11 above. The term "**Specialty Alterations**" shall mean alterations that are atypical of improvements and alterations found in general office premises in the Building and in Comparable Buildings which are reasonably anticipated to materially increase the cost of demolition of the improvements and alterations in the Premises. For any items that are to be removed from the Premises, or applicable portion thereof, Tenant shall repair all damage to the Premises or any portion of the Building caused by the installation or removal of such items. Except for items required to be removed from the Premises as stated in this paragraph or as expressly provided in any other provision of this Lease, Tenant shall not be required to remove any other improvements, alterations or modifications to the Premises or applicable portion thereof. In the event that Tenant fails to surrender possession of the Premises as required herein, Tenant shall be a tenant holding over as provided below, and Landlord, in addition to other remedies available to Landlord under this Lease, at law or in equity, may, without notice, enter upon, reenter, possess and repossess itself of the Premises, by summary proceedings, ejectment, or other process of law, and may dispossess and remove Tenant and all persons and property from the Premises; and Tenant waives any and all damages or claims for damages as a result

21



thereof. Such dispossession and removal of Tenant from the Premises shall not constitute a waiver by Landlord of any claims by Landlord against Tenant. In the event that Tenant surrenders possession of the Premises when required hereunder, but Tenant otherwise fails to fulfill its obligations under this section, and if such failure shall continue for fifteen (15) days after Tenant's receipt of written notice from Landlord of the existence of such failure, then Landlord may, at Tenant's expense, perform such obligations on Tenant's behalf, and Tenant shall reimburse Landlord for all costs Landlord reasonably incurs in performing such obligations.

34. **Holding Over**. If Tenant does not surrender possession of the Premises, or any part thereof that Tenant is required to surrender in accordance with the terms of this Lease, at the end of the Term or upon earlier termination of this Lease, at the election of Landlord, Tenant shall be a tenant-at-sufferance from day to day and the Rent due during the period of such holdover shall be one hundred fifty percent (150%) of the amount which Tenant was obligated to pay for the immediately preceding month, except as otherwise provided below. In the event that Landlord provides Tenant with written notice that Tenant will be required to vacate the Premises upon the expiration or earlier termination of the Term (or if such notice is provided during any period of holding over, within thirty (30) days after Tenant's receipt of such notice), and Tenant fails to surrender the Premises in the condition required hereunder by the later of thirty (30) days after (i) the expiration or earlier termination of the Term or (ii) Tenant's receipt of such notice, then effective upon the expiration of such thirty (30) day period, the holdover rate shall be three hundred percent (300%) of the amount which Tenant was obligated to pay for the month preceding any holding over by Tenant in the Premises. The parties acknowledge that Rent calculated in accordance with the holdover rates specified herein shall be in lieu of any damages sustained by Landlord as a result of such holding over, and provided that Rent calculated at the holdover rates specified herein is paid by Tenant in accordance with the terms of this provision, no additional damages can be assessed against Tenant as a result of such holding over. Nothing contained herein shall be construed to be a consent by Landlord to any holding over by Tenant in the Premises after the expiration or earlier termination of this Lease, and in the event of any such holding over by Tenant, Landlord may proceed immediately to regain possession of the Premises in accordance with applicable Laws.

35. **Removal of Tenant's Property**. Prior to the expiration or earlier termination of the Term, Tenant shall, at Tenant's expense, remove all of Tenant's removable trade fixtures and other items of personal property from the Premises. Tenant shall be responsible for any damage to the Premises or Project resulting from removal of any personal property, including Lines, of Tenant. If Tenant does not remove its property prior to termination, then, in addition to its other remedies at law or in equity, Landlord shall have the right to consider the property abandoned and such property may be removed by Landlord, at Tenant's expense, or at Landlord's option become its property, and Tenant shall have no further rights relating thereto or for reimbursement therefor. If Landlord elects to remove such abandoned property from the Premises, then Landlord shall provide Tenant with written notice that such property is going to be removed from the Premises, and if Tenant fails to remove such property from the Premises within fifteen (15) days after Tenant's receipt of such written notice, Landlord may, at Tenant's sole expense, move such property to a storage facility and provide Tenant with notice of the storage facility where such property is located, and payment of all fees applicable for such storage shall be Tenant's sole responsibility.

36. **Landlord's Lien**. Notwithstanding anything in the Lease or under applicable law to the contrary, Landlord hereby waives any statutory and common law lien it may have against Tenant's property, and under no circumstances shall Landlord have any lien or possessory interest in Tenant's work files, business papers and records, including, without limitation, the media on which those records and data are stored.

37. **Interest**. All amounts payable by Tenant to Landlord under this Lease, if not paid when due, shall bear interest from the date due (except as otherwise provided herein) until paid at a rate equal to the lesser of fifteen percent (15%) per annum, compounded monthly, or the then maximum lawful rate ("**Default Rate**").

38. **Assignment and Subletting**. Landlord shall have the right to transfer and assign in whole or in part, by operation of law or otherwise, its rights and obligations hereunder whenever Landlord, in its sole judgment, deems it appropriate without any liability to Tenant, and Tenant shall attorn to any party to which Landlord transfers its rights and obligations hereunder or the Building. Provided that Landlord's successor in interest assumes Landlord's obligations under this Lease arising from and after the effective date of such transfer, any sale, conveyance or transfer of the Building or Project will operate to release Landlord from liability from and after the effective date of such sale, conveyance, transfer or assignment upon all of the covenants, terms and conditions of this Lease, express or implied, except for those liabilities that arose prior to the effective date of such sale, conveyance, transfer or assignment. After such effective date, Tenant will look solely to Landlord's successor in interest in and to this Lease.

Tenant shall not assign, transfer, mortgage, pledge or otherwise encumber this Lease, or any interest herein, and shall not sublet the Premises or any part thereof, or any right or privilege appurtenant thereto, or permit any other party to occupy or use the Premises, or any portion thereof, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Landlord's consent shall not be considered unreasonably withheld if: (i) the proposed assignee's financial responsibility or insurance does not meet the same criteria Landlord uses to select comparable Building tenants; (ii) the proposed



subtenant's or assignee's business is not suitable for the Building considering the business of the other tenants and the Building's prestige; (iii) the proposed use is inconsistent with the Authorized Use permitted by Section 3; or (iv) the proposed subtenant or assignee is an occupant of the Building, or if the proposed subtenant or assignee, whether or not an occupant of the Building, is in discussions with Landlord regarding the leasing of space within the Building (but only in the event that Landlord is able to accommodate the occupancy needs of such occupant, proposed subtenant or assignee in the Building). Whether or not Landlord consents to any proposed assignment or subletting of any portion of the Premises, Tenant shall timely pay Landlord's review and processing fee of $750.00 ("**Sublease/Assignment Processing Fee**") in addition to any reasonable professional fees (including, without limitation, legal, architectural, engineering, and consulting fees) incurred by Landlord in connection with such proposed assignment or subletting ("**Sublease/Assignment Professional Fees**"). The Sublease/Assignment Processing Fee shall be paid by Tenant simultaneously with each request by Tenant to assign or sublease any portion of the Premises. The Sublease/Assignment Professional Fees shall, at Landlord's option, be paid by Tenant (a) prior to Landlord's denial or execution of a consent to the proposed assignment or subletting or (b) within ten (10) days of Tenant's receipt of an invoice from Landlord for such fees. Any subletting of the Premises or assignment of the Lease by Tenant in violation of the provisions of this Section 38 shall constitute a Default.

A "Change in Control" of Tenant shall be deemed for purposes of this Lease to constitute an assignment of this Lease by Tenant which shall require the consent of Landlord and entitle Landlord to exercise its options as provided hereunder (except to the extent Tenant is a publicly traded company or a subsidiary of a publicly traded company). As used in this Section, a "**Change in Control**" shall be deemed to have occurred when: (x) any person, after the date hereof, acquires directly or indirectly the Beneficial Ownership (as defined in Section 13(d) of the Securities Exchange Act of 1934, as amended) of any voting interests or equity interests of Tenant and immediately after such acquisition such person is, directly or indirectly, the Beneficial Owner of voting or equity interests representing 50% or more of the total voting interest or equity interest of all of the then-outstanding equity interests or voting interests of Tenant; (y) the stockholders, partners, members or other equity holders of Tenant shall approve a merger, consolidation, recapitalization, or reorganization of Tenant, or consummation of any such transaction if equity holder approval is not sought or obtained; or (z) the stockholders, partners, members or other equity holders of Tenant shall approve a plan of complete liquidation of Tenant or an agreement for the sale or disposition by Tenant of all or a substantial portion of such entity's assets (i.e., 50% or more of the total assets of such entity).

If Tenant desires to assign this Lease or sublease the Premises, Tenant shall provide Landlord notice in writing at least thirty (30) days in advance of the date on which Tenant desires such assignment or sublease to take effect. Tenant's notice shall include (A) the name and address of the proposed subtenant or assignee; (B) the nature of the proposed subtenant's or assignee's business it will operate in the Premises; (C) the terms of the proposed sublease or assignment; and (D) reasonable financial information so that Landlord can evaluate the proposed assignee. Landlord shall, within fifteen (15) days after receiving such information, give notice to the Tenant to (i) permit or deny the proposed sublease or assignment or (ii) terminate this Lease as to the space so affected as of the date specified in Tenant's notice (but this clause (ii) will apply to a proposed sublease only if the term of the proposed sublease is for the remainder of the Term of this Lease), and as to option (ii) only, Tenant will be relieved of all further obligations hereunder as to the terminated space. If Landlord does not give notice within the fifteen (15) period, then Landlord shall be deemed to have consented to the sublease or assignment upon the terms provided in Tenant's notice.

Notwithstanding an assignment or subletting (i) subleases and assignments by Tenant shall be subject to the terms of this Lease; (ii) Tenant shall remain liable for all of the obligations of "Tenant" under this Lease; (iii) consent to one sublease or assignment does not waive the consent requirement for future assignments or subleases; and (iv) fifty percent (50%) of the consideration received by Tenant from an assignment or sublease that exceeds the amount Tenant must pay Landlord hereunder, excluding reasonable leasing commissions paid by Tenant, payments attributable to the amortization of the cost of improvements made to the Premises at Tenant's cost for the assignee or sublessee, and other reasonable, out-of-pocket costs paid by Tenant directly related to Tenant's obtaining an assignee or sublessee, shall also be paid to Landlord. Tenant shall pay such amount to Landlord at the beginning of each calendar month. Landlord shall have the right to audit Tenant's books and records to verify the accuracy of the payments under this Section. If Tenant has sublet the Premises, and thereafter a Default occurs hereunder, Landlord may proceed to collect any rent thereafter becoming due to Tenant under the sublease directly from the subtenant; in which event such collected rent shall be applied by Landlord to the Rent due from Tenant to Landlord hereunder; provided, however, that the collection of rent from Tenant's subtenant shall not create a privity of contract between Landlord and such subtenant.

If the proposed sublessee or assignee is approved by Landlord and Tenant fails to enter into the sublease or assignment with the approved sublessee or assignee within one hundred twenty (120) days after the date Tenant submitted its proposal to Landlord, then Landlord's approval shall expire, and Tenant must comply again with the conditions of this Section. Notwithstanding the giving by Landlord of its consent to any sublease or assignment with respect to the Premises, no sublessee or assignee other than an assignee that is a Permitted Transferee, defined below (a "**Permitted Assignee**") may exercise any renewal options, expansion options, rights of first refusal or similar rights except in accordance with a separate written agreement entered into directly between the Landlord and such sublessee or assignee provided Tenant continues to be liable for the performance of all obligations hereunder, as increased or otherwise affected by the exercise of such rights. Tenant may not exercise any renewal options, expansion options, rights of first refusal or similar rights under this Lease if Tenant has assigned all of its interest in this Lease.

23



Notwithstanding the foregoing restrictions on Tenant's ability to assign the Lease or sublet the Premises, Tenant may assign its obligations and rights under this Lease or sublet all or a portion of the Premises (collectively, a "**Permitted Transfer**") to (i) any corporation, partnership or other entity directly or indirectly controlling, controlled by, or under common control with, Tenant; (ii) any other entity in connection with Tenant's merger with or acquisition by such other entity; (iii) any entity created in connection with the "spin off" of an operating division, group, or department of Tenant; or (iv) any entity which acquires a substantial portion of the business or assets of Tenant (collectively, a "**Permitted Transferee**"), without the requirement of obtaining Landlord's prior written consent, provided that (a) if the Permitted Transferee is the successor by merger to Tenant, the tangible net worth of the Permitted Transferee after an assignment of the Lease will equal or exceed that of Tenant prior to the assignment of the Lease; (b) the Premises will be used by the Permitted Transferee for the permitted uses of the Premises under this Lease; and (c) no later than fifteen (15) days prior to the effective date of the assignment of the Lease or the subletting of the Premises to a Permitted Transferee, Tenant provides Landlord with written notice of such assignment or subletting (unless prohibited from giving prior notice by law or contract, in which event notice will be given as soon as providing such notice is not prohibited by law or contract), including (i) the written acknowledgment of Tenant, if not merged out of existence, that Tenant remains fully liable for all of Tenant's obligations under this Lease until the expiration of the Term of the Lease, (ii) all documentation reasonably requested by Landlord in order to evaluate the Permitted Transfer, (iii) in the case of an assignment of the Lease to a Permitted Transferee that is a successor by merger to Tenant, the express assumption by the Permitted Transferee of all obligations of Tenant under this Lease, whether such obligation arose or will arise before, on or after the effective date of such assignment (the "**Assignment Date**") and the Permitted Transferee's express agreement to be bound by all terms and conditions of this Lease, and (iv) in the case of an assignment of the Lease to a Permitted Transferee other than a successor by merger to Tenant, the express assumption by the Permitted Transferee of all obligations of Tenant under this Lease arising on or after the Assignment Date, and the Permitted Transferee's express agreement to be bound by all terms and conditions of this Lease. As used herein, the term "control" means, with respect to a corporation, the right to exercise, directly or indirectly, fifty percent (50%) or more of the voting rights attributable to the shares of the controlled corporation, and, with respect to any entity that is not a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

39. **Merger of Estates**. The voluntary or other surrender of this Lease by Tenant or a mutual cancellation hereof, shall not work a merger, but shall, at the option of Landlord, terminate all or any existing subleases or subtenancies, or may, at the option of Landlord, operate as an assignment to Landlord of Tenant's interest in such subleases or subtenancies.

40. **Limitation of Liability**. Notwithstanding anything herein to the contrary, Tenant's sole and exclusive method of collecting on any judgment Tenant obtains against Landlord, or any other award made to Tenant in any judicial process requiring the payment of money by Landlord for the failure of Landlord to perform any of its obligations, shall be to proceed against the interests of Landlord in and to the Project. Therefore, Tenant hereby agrees that no personal or corporate liability of any kind or character whatsoever now attaches or at any time hereafter under any condition shall attach to Landlord for payment or performance of any obligations hereunder, including, without limitation, any Landlord indemnity obligations under Section 26. The obligations under this Section shall survive the expiration or earlier termination of this Lease.

41. **Subordination**. The rights and interests of Tenant under this Lease and in and to the Premises shall be subject and subordinate to that certain Lease Agreement dated December 27, 1984, as amended, by and between Memphis Center City Revenue Finance Corporation, a Tennessee public not-for-profit corporation, as lessor, and Landlord (as successor to One Court Square Investors Limited Partnership), Allstate Life Insurance Company and Morgan Properties, LLC, as lessee (the "**Ground Lease**"), and to all easements and recorded restrictions, covenants, and agreements pertaining to the Project, or any part thereof; and to all deeds of trust, mortgages, and other security instruments and to all renewals, modifications, consolidations, replacements and extensions thereof (individually, a "**Security Document**"; collectively, "**Security Documents**") heretofore or hereafter executed by Landlord covering the Premises, the Building or any part of the Project, to the same extent as if the Security Documents had been executed, delivered and recorded prior to the execution of this Lease. Landlord represents and warrants that nothing contained in the Ground Lease prohibits the use of the Premises for the Authorized Use hereunder or otherwise restricts Tenant's rights or increases Tenant's obligations under this Lease. Any disturbance of Tenant's right to quiet enjoyment of the Premises hereunder by the lessor under the Ground Lease, or by the holder under any of the "Loan Documents," as defined in the Ground Lease, under the Ground Lease, will constitute a breach by Landlord of Landlord's covenant of quiet possession set forth in Section 28 of this Lease. The parties acknowledge that, as of the Effective Date, the Project is encumbered by a Security Document executed by Landlord in favor of Massachusetts Mutual Life Insurance Company ("**Lender**"). Landlord, at its reasonable expense, shall promptly secure from Lender an agreement reasonably acceptable to Tenant, Lender and Landlord, whereby Lender agrees that Tenant's right to quiet enjoyment of the Premises hereunder will not be disturbed in the event of a foreclosure of Lender's interest under such Security Document, so long as a Default by Tenant does not occur hereunder (an "**SNDA**"). The SNDA to be secured by Landlord from Lender shall be substantially in the form attached hereto as **Exhibit G**, and otherwise reasonably cooperate with Tenant to obtain modifications the SNDA requested by Tenant that are acceptable to all



parties. As to any Security Document hereafter encumbering the Project or any portion thereof, the subordination of this Lease to such Security Document shall be contingent upon Landlord, Tenant and the holder of the security interest under such Security Document executing an SNDA that is reasonably acceptable to Landlord, Tenant and such holder. Any SNDA executed pursuant to this Section shall be in recordable form; provided, however, that it shall be Tenant's obligation, at Tenant's sole cost and expense, to record the SNDA, and following such recording, Tenant shall deliver a copy of such SNDA, containing the recording information, to Landlord. Upon Landlord's written request, Tenant shall deliver to the holder or holders of all Security Documents (identified in such written request) a copy of all notices to Landlord and shall grant to such holder or holders the right to cure all defaults, if any, of Landlord hereunder pursuant to and within the same time period provided in this Lease for curing such defaults by Landlord and, except with the prior written consent of the holder or holders of the Security Documents, shall not surrender or terminate this Lease except pursuant to a right to terminate expressly set forth in this Lease or under law. Tenant shall attorn to any holder of any Security Documents or its successor in interest by foreclosure or otherwise. The provisions of this subsection shall be self-operative and shall not require further agreement by Tenant; however, at the request of Landlord, Tenant shall execute such further documents as may be required by the holder of any Security Documents. At any time and from time to time upon not less than ten (10) days' prior notice by Landlord, Tenant shall execute, acknowledge and deliver to the Landlord a written estoppel certificate certifying: (i) the Rentable Area of the Premises, (ii) the Commencement Date and Expiration Date of this Lease, (iii) the Base Rent, Base Year and Additional Rent, (iv) that this Lease is unmodified and in full force and effect, or if there have been modifications, that the same is in full force and effect as modified and stating the modifications, (v) whether or not, to Tenant's actual knowledge, Landlord is in default in the keeping, observance or performance of any covenant, agreement, term, provision or condition of this Lease and, if so, specifying each such default, (vi) that Tenant has unconditionally accepted and occupied the Premises, (vii) that to Tenant's actual knowledge, all requirements of the Lease have been complied with and no charges, set-offs or other credits exist against any rentals, (viii) that Tenant has not assigned, pledged, sublet, or otherwise transferred any interest in this Lease; and (ix) such other factual certifications as Landlord may reasonably request, it being intended that any such statement may be relied upon by Landlord, any prospective purchaser, mortgagee or assignee of any mortgage of the Building or the Project or of the Landlord's interest therein. If requested by Tenant in connection with any financing to be provided to Tenant or any proposed assignment of the Lease or subletting of the Premises by Tenant, Landlord shall similarly execute and deliver to Tenant within twenty (20) days after request a statement similar to that described in the this paragraph, which may be relied upon by any entity providing financing to Tenant and/or any potential assignee or subtenant of Tenant.

42. **Legal Interpretation**. This Lease shall be interpreted and enforced in accordance with the laws of the state where the Project is located. The determination that any provision of this Lease is invalid, void, illegal, or unenforceable shall not affect or invalidate the remainder. All obligations of the parties requiring any performance after the expiration of the Term shall survive the expiration or earlier termination of this Lease and shall be fully enforceable in accordance with those provisions pertaining thereto. If Tenant consists of two or more parties, then all parties comprising the Tenant shall be jointly and severally liable for all obligations of Tenant hereunder. Should any provisions of this Lease require judicial interpretation, it is agreed that the court interpreting or construing the same shall not apply a presumption that the terms of any such provision shall be more strictly construed against one party or the other by reason of a rule of construction that a document is to be construed most strictly against the party who itself or through its agent prepared the same, it being agreed that the agents of both parties hereto have participated in the preparation of this Lease.

43. **Use of Names and Signage**. Tenant shall not have the right to use the name of the Project or Building except in connection with Tenant's address, and then such terms cannot be emphasized or displayed with more prominence than the rest of such address. Landlord shall have the right to change the name of the Building or Project whenever Landlord in its sole judgment deems appropriate without any consent of or liability to Tenant. Any signage of Tenant within its Premises is subject to the prior written approval of Landlord which shall not be unreasonably withheld, conditioned or delayed; provided in all cases, Tenant shall be solely responsible for ensuring that such signage complies with all applicable Laws and for all costs and expenses relating to any such signage, including, without limitation, design, installation, any operating costs, maintenance, cleaning, repair and removal. Tenant shall be obligated to pay the cost and expense of repairing any damage associated with the removal of any such signage. Tenant shall have no right to place any signage outside the Premises, on the exterior of the Building or elsewhere in the Project.

44. **Relocation**. [*Intentionally deleted*]

45. **Brokerage Fees**. Landlord's Broker represents Landlord's interests in connection with this transaction and shall be paid by Landlord for its services pursuant to a separate, written agreement fully executed by Landlord's Broker and Landlord prior to full execution of this Lease. Landlord's Broker does not represent Tenant in this transaction. If Tenant is represented by a broker in this transaction, as disclosed in Section 1(p) of this Lease, then Tenant's Broker represents Tenant's interests in connection with this transaction and shall be paid by Landlord for its services pursuant to a separate, written agreement fully executed by Tenant's Broker and Landlord prior to full execution of this Lease. Tenant warrants and represents that it has had no dealings with any broker in connection with the negotiation or execution of this Lease other than Landlord's Broker and, if applicable, Tenant's Broker. Except as expressly provided above, Landlord will not be responsible for, and Tenant will indemnify,

25



defend, and hold Landlord harmless from and against, any brokerage or leasing commission or finder's fee claimed by any party representing Tenant in connection with this Lease.

**46. Successors and Assigns**. This Lease shall be binding upon and inure to the benefit of Landlord and its successors and assigns, and Tenant and its permitted successors and assigns.

**47. Force Majeure**. Except for the payment of Rent or any other sum due hereunder, each party hereto shall be excused for the period of any delay and shall not be deemed in default with respect to the performance of any of its obligations when prevented from so doing by a cause beyond such party's reasonable control, including, without limitation, labor disputes, government regulations, fire or casualty, acts of terrorism, inability to obtain any materials or services, or acts of God (collectively, "**Force Majeure Events**").

**48. Parking**. Tenant acknowledges that Landlord leases space in the garage located adjacent to the Property, commonly known as 99 Tower Garage (the "**Garage**"), pursuant to that certain Lease Agreement dated July 1984, as amended June 5, 1986 and July 1, 1986, as assigned pursuant to the Assignment and Assumption of Interests in Leases and Agreements dated September 30, 1997, and as the same may be further amended (collectively, the "**Garage Lease**") by and between Avron B. Fogelman (as an original owner, and as assignee of Robert F. Fogelman; the "**Garage Owner**"), as lessor, and Landlord, as lessee (as successor in interest to One Court Square Investors Limited Partnership), and that Landlord does not own the Garage or control the availability of spaces in the Garage, or the operation or maintenance of the Garage. Tenant further acknowledges that Landlord makes no representations or warranties concerning the operation or condition of the Garage or the services provided, and that Landlord's obligation to provide Tenant with the use of the Parking Spaces, defined below, is subject to Landlord's continued rights to such spaces under the Garage Lease. Landlord covenants to fully and timely perform its obligations under the Garage Lease, and not to terminate the Garage Lease or amend or modify the Garage Lease in any way which adversely affects the parking rights granted Tenant under this paragraph. Until the Commencement Date, Tenant's right to use parking spaces in the Garage shall be determined in accordance with the terms of the Existing Lease; provided that Landlord agrees not to increase the rate applicable to Tenant's use of such spaces prior to the Commencement Date.

Commencing on the Commencement Date and continuing throughout the Term, so long as no Monetary Default exists under the Lease, and subject to the foregoing provisions of this Section, Tenant shall have the right to use one hundred fifty (150) of the unreserved parking spaces allocated to Landlord under the Garage Lease (the "**Parking Spaces**") in the Garage at Garage Market Rates, defined below. As used herein, "**Garage Market Rates**" shall mean the market rates paid by Landlord to the Garage Owner from time to time under the Garage Lease, without markup by Landlord, subject to the minimum rate of Seventy Dollars ($70.00) per unreserved space per month, as provided in the Garage Lease. As of the Effective Date hereof, the Garage Market Rates applicable under the Garage Lease are Ninety-seven Dollars ($97.00) per unreserved space per month, which are subject to adjustment in accordance with the terms of the Garage Lease. Effective as of the Commencement Date, Tenant shall pay Landlord, as additional Rent due under this Lease, the Garage Market Rates applicable to the Parking Spaces per month, without regard to the actual usage of the Parking Spaces by Tenant (collectively, "**Monthly Parking Space Rent**"). The Monthly Parking Space Rent shall be paid by Tenant at the time and in the manner as Tenant's payment of monthly Base Rent due hereunder. Landlord shall provide Tenant, from time to time at reasonable intervals, with any information available to Landlord regarding other available parking spaces within a four (4) block vicinity of the Building; provided, however, that Landlord shall have no obligation to make any such spaces available for Tenant's use hereunder or otherwise.

**49. Rooftop Antenna**. The parties acknowledge that, as of the Effective Date hereof, Tenant maintains an antenna on the roof of the Building. Tenant shall have the right to continue to maintain such antenna, and, subject to Landlord's prior written consent, which will not be unreasonably withheld, delayed or conditioned, may install an additional antenna on the roof of the building, provided that the maintenance, operation and removal of all antennae installed by or on behalf of Tenant, and the installation of any additional antennae, shall be subject to and governed by the terms of **Exhibit H** regarding Satellite Equipment attached to this Lease and incorporated herein by this reference.

**50. Attorneys' Fees**. If Tenant fails to pay any Rent or other sum due under this Lease, or fails to perform an obligation of Tenant hereunder, and Landlord engages an attorney to collect such sum or enforce such obligation, then, in addition to such sums, Tenant shall also pay Landlord's reasonable attorneys' fees and other reasonable costs and expenses incurred in such engagement. If Landlord and Tenant litigate any provision of this Lease or the subject matter hereof, the unsuccessful party will pay to the successful party all costs and expenses, including reasonable attorneys' fees and expenses and court costs, incurred by the successful party, including any cost incurred by the successful party on appeal; provided, however that a recovery of attorneys' fees by Landlord under this sentence shall include, but shall not duplicate, the recovery by Landlord of its reasonable attorneys' fees and other reasonable costs and expenses of collection permitted under the first sentence of this Section.

**51. Tenant Certification**. Each party certifies to the other that, as of the Effective Date hereof: (i) neither it nor its officers, directors, or controlling owners is listed as a "Specifically Designated National or Blocked Person" ("**SDN**") on the SDN

26



list maintained and updated from time to time on the United States Treasury Department's website (the "**SDN List**"), or is otherwise a banned or blocked person, entity, or nation pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control ("**OFAC**"), or is otherwise named by any Executive Order, the United States Department of Justice, or the United States Treasury Department as a terrorist; (ii) neither it nor its officers, directors, or controlling owners, is acting, directly or indirectly, for or on behalf of any person, group, entity, or nation that is listed on the SDN List or is otherwise named by any Executive Order, the United States Department of Justice, or the United States Treasury Department as a terrorist, SDN or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the OFAC; (iii) neither it nor its officers, directors, or controlling owners is engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation; (iv) neither it nor its officers, directors, or controlling owners is in violation of Presidential Executive Order 13224, the USA PATRIOT Act, the Bank Secrecy Act, the Money Laundering Control Act, or any regulations promulgated pursuant thereto (collectively, "**Anti-Terrorism Laws**"); and (v) neither it nor its officers, directors, or controlling owners is an entity with whom Landlord is prohibited from transacting business under any of the Anti-Terrorism Laws.

Each party further certifies to the other that, during the Term of this Lease (and any extensions thereof), it will not violate any of the Anti-Terrorism Laws, and it will not do business with any entity that violates any of the Anti-Terrorism Laws. Upon the request of the other party from time to time during the Term (and any extensions thereof), each party shall execute and return to Landlord a certificate stating that Tenant is then in compliance with the provisions of this section of the Lease.

Each party shall indemnify, defend (with counsel reasonably acceptable to the other party), and hold the other party and its directors, officers, partners, members, shareholders, employees, and agents harmless from any and all obligations, claims, administrative proceedings, judgments, damages, fines, penalties, costs, and liabilities, including reasonable attorneys' fees and costs, incurred by the other party or its directors, officers, partners, members, shareholders, employees, or agents as a result of the breach of the foregoing certification.

**52. Guaranty**. [*Intentionally deleted*]

**53. Memorandum of Lease**. Except for a memorandum of lease to be recorded at Landlord's request, neither this Lease, nor a memorandum of this Lease, shall be recorded in any public real estate records.

**54. Financial Statements**. Upon request, Landlord may require Tenant to provide Landlord with Tenant's then current financial statements; provided that Tenant shall have no requirement to provide Landlord with such financial statements so long as the stock of Tenant, or the parent company of Tenant, is publicly traded and such financial statements are publicly available. If required, such financial statements shall be prepared in accordance with generally accepted accounting principles, and, if it is required by law or it is the normal practice of Tenant, such financial statements shall be audited by an independent certified public accountant. If such financial statements are not audited, they shall be certified as being true and correct by Tenant's chief financial officer.

**55. Waiver of Jury Trial**. To the extent permitted by applicable law, in the event of any litigation between the parties hereto, to the extent that a trial by jury would be available as to any matters in such litigation, the parties hereby expressly waive the right to a trial by jury as to such matters, and hereby agree not to demand a jury trial as to any such matters in such litigation.

**56. Special Stipulations**. The terms of this Lease shall include the provisions of the Addendum of Special Stipulations attached hereto, and the same are incorporated herein by this reference. In the event of an inconsistency between the terms of this Lease and the terms of the Addendum of Special Stipulations, the terms of the Addendum of Special Stipulations shall control.

**57. Governing Law**. This Lease shall be performed in the state where the Premises are located, and the terms of this Lease shall be governed by and construed in accordance with the laws of such state.

**58. Entire Agreement**. No oral statements or prior written material not specifically incorporated herein shall be of any force or effect. Tenant agrees that in entering into this Lease and accepting the Premises, it relies solely upon the representations and agreements contained in this Lease, the exhibits attached hereto and the written agreements, if any, executed contemporaneously herewith. This agreement, including the Exhibits which are attached hereto and a part hereof, constitutes the entire agreement of the parties and shall in no way be conditioned, modified or supplemented except by a written agreement executed by both parties.

*[Signatures appear on next page]*

27



WITNESS WHEREOF, this Lease is executed and, except as otherwise expressly provided herein, all provisions shall be effective, as of the Effective Date.

**Landlord:**

**PARKWAY PROPERTIES LP,**
a Delaware limited partnership

By:    Parkway Properties General Partners, Inc.,
        a Delaware corporation, its sole general partner

    By: _____
        John V. Barton II, Senior Vice President
        and Managing Director

    By: _____
        M. Jayson Lipsey, Executive Vice President
        and Chief Operating Officer

**Tenant:**

**RAYMOND JAMES & ASSOCIATES, INC.,**
a Florida corporation

By: _____
    Derek S. Recer, Vice President,
    Corporate Real Estate

Attest: _____
      *[Signature]*

Typed Name: Deborah A. Hawke

Title: Assistant Secretary
*[Corporate Secretary or Assistant Secretary]*

    [CORPORATE SEAL]

J:\WPWIN60\data\Data\070\032\Raymond James\RJ new lease draft 8 converted

28

## ADDENDUM OF SPECIAL STIPULATIONS

1.　Existing Lease.  The parties acknowledge that they are also parties to that certain Lease Agreement dated September 30, 1997 (the "**Original Existing Lease**"), as amended by eighteen (18) amendments, the most recent of which, the Eighteenth Amendment to Lease Agreement, was dated April 30, 2013 (the Original Existing Lease and all eighteen (18) amendments thereto are collectively referred to as the "**Existing Lease**"), pursuant to which Landlord leases to Tenant the Existing Space defined in Section 1(b) of this Lease for a term (the "**Existing Term**") that commenced on October 1, 1997 and is scheduled to expire on March 31, 2016.  The Existing Lease shall be terminated effective June 30, 2014 (the "**Existing Lease Termination Date**"), as if the Existing Term had been scheduled to expire on such date.  Provided however, that Tenant shall not be required to surrender possession of the Existing Space upon the Existing Lease Termination Date, but rather shall remain in possession of such space until Tenant is required to surrender such space, or portions thereof, in accordance with the terms of this Lease.  The obligations of the parties regarding the Existing Space shall be governed by the terms of the Existing Lease through the Existing Lease Termination Date, and by the terms of this Lease from and after the Commencement Date of the Term of this Lease.  Except for obligations of the parties that the terms of the Existing Lease expressly provide will survive the expiration of the Existing Term, the obligations of the parties under the terms of the Existing Lease shall be terminated on the Existing Lease Termination Date.  If the Cancellation Option, defined below, is exercised by Tenant, then the Existing Lease shall not be terminated as set forth above, but rather shall remain in full force and effect through its scheduled expiration date as if this Lease had never been executed by the parties.

2.　Governmental Incentives.  The allocation and distribution of any real property-related (as opposed to labor-related or related to Tenant's personal property) governmental incentives available to Landlord or Tenant as a result of consummation of this Lease will be determined by Landlord and Tenant in good faith on an equitable, rational basis, taking into consideration the nature, magnitude, and other characteristics of the governmental incentives involved and the relevant facts applicable thereto.  Any disputes regarding such allocation or distribution will be resolved by arbitration in accordance with the Expedited Procedures of the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association, as amended and effective October 1, 2013, and as the same may be further amended and effective.

Subject to the terms of this special stipulation, Tenant shall have the option of cancelling this Lease (the "**Cancellation Option**") if Tenant and the City of Memphis, acting through the Economic Development Growth Engine ("**EDGE**"), have been unable to finalize, and Tenant has been unable to obtain approval of personal property tax abatements relating to this Lease (the "**Incentives**").

(a)　*Representations.*  In granting the Cancellation Option to Tenant hereunder, Landlord has relied on Tenant's express representations that (i) Tenant will diligently and in good faith pursue obtaining, and Tenant reasonably anticipates obtaining, the Incentives during the Cancellation Option Period, defined below; (ii) the Incentives, defined above, are the only matters Tenant is pursuing with EDGE; (iii) it is Tenant's intention in good faith to obtain the Incentives and continue Tenant's occupancy of the Building as provided for in this Lease; and (iv) the Cancellation Option was requested by Tenant in good faith solely to permit Tenant to cancel this Lease if the Incentives are not obtained during the Cancellation Option Period, and not to provide Tenant with additional time to pursue other leasing opportunities or the opportunity to occupy, either as a tenant or owner, a newly constructed building.

(b)　*Cancellation Option Period.*  The Cancellation Option shall be in effect for a period (the "**Cancellation Option Period**") commencing on the Effective Date of this Lease and expiring the earlier of (i) the date on which Tenant obtains the Incentives; or (ii) at 6:00 p.m. on July 31, 2014 (such earlier date being the "**Cancellation Option Expiration Date**").  Tenant shall immediately inform Landlord when the Incentives have been obtained by Tenant.  The Cancellation Option shall expire on the Cancellation Option Expiration Date, and may not thereafter be exercised by Tenant.

(c)　*Restrictions.*  During the Cancellation Option Period, Tenant (i) shall diligently and in good faith pursue obtaining the Incentives; (ii) shall keep Landlord reasonably informed regarding the status of Tenant's efforts to obtain the Incentives; (iii) shall not, whether through a broker or otherwise, engage in any discussions with any other landlord (or broker for such other landlord) regarding the potential lease by Tenant of office space in any building owned or controlled by such other landlord or an affiliate thereof; (iv) shall not sign any binding or non-binding proposal or letter of intent, or any other lease or other contract, for Tenant's occupancy, whether as a tenant or owner, of any property other than the Building that is the subject of this Lease with Landlord; or (v) engage in any discussions,



whether through a broker or otherwise, concerning Tenant's potential occupancy, as a tenant or owner, of a newly constructed building.

(d) *Exercise of Cancellation Option.* In the event that, despite Tenant's diligent and good faith efforts, Tenant is unable to obtain the Incentives, and Tenant elects to exercise the Cancellation Option, Tenant shall do so by timely delivering the Cancellation Notice and the Cancellation Fee to Landlord as set forth below.

(i) *Cancellation Notice.* Notice of Tenant's exercise of the Cancellation Option (the "**Cancellation Notice**") shall be delivered by Tenant to Landlord, in accordance with the Notices provision of the Lease, so that such notice is effective, as determined in accordance with the Notices provision of the Lease, no later than the last day of the Cancellation Option Period.

(ii) *Cancellation Fee.* In the event that Tenant elects to exercise the Cancellation Option, Tenant shall pay to Landlord a fee (the "**Cancellation Fee**") in an amount equal to the sum of (i) Five Hundred Thousand Dollars ($500,000.00); plus (ii) Landlord's reasonable costs, including but not limited to Landlord's reasonable attorneys' fees, incurred in connection with the transaction that is the subject of this Lease. The entire amount of the Cancellation Fee shall be paid by Tenant to Landlord contemporaneously with Tenant's delivery to Landlord of the Cancellation Notice. Upon Tenant's request, Landlord shall inform Tenant as to the amount of the Cancellation Fee, which amount shall be subject to adjustment in the event that Landlord thereafter incurs additional costs in connection with this transaction. The parties acknowledge that the Cancellation Fee is not a penalty; but rather is to compensate Landlord for the loss to be sustained by Landlord if Tenant exercises the Cancellation Option.

If Tenant does not provide the Cancellation Notice to Landlord within the time permitted hereunder, or fails to deliver the Cancellation Fee to Landlord within the time required hereunder, or if Tenant does not effectively exercise the Cancellation Option in accordance with the terms hereof, or if the terms and conditions set forth above for exercise of the Cancellation Option are not satisfied, then (a) Tenant shall continue to be bound by the terms of the Lease as if the Cancellation Option had not been exercised; and (b) the Cancellation Option Fee, or portion thereof, paid by Tenant, if any, shall be returned to Tenant, unless a Monetary Default then exists under this Lease, in which case Landlord may apply the Cancellation Fee, or portion thereof, paid by Tenant toward the amount then due under the Lease and return the balance, if any, to Tenant.

(e) *Obligations of the parties during Cancellation Option Period.* During the Cancellation Option Period, Tenant shall timely perform all of this obligations under this Lease. At Landlord's election, Landlord may defer the performance of any obligations of Landlord hereunder, other than Landlord's routine maintenance and repair obligations, until after the expiration of the Cancellation Option Period.

(f) *Effect of exercise of Cancellation Option.* If this Lease is cancelled by Tenant in accordance with the terms of this Cancellation Option, then the Existing Lease shall be and remain in full force and effect as if this Lease had never been executed, and upon Landlord's receipt of the entire amount of the Cancellation Fee, the respective obligations of the parties hereunder shall be terminated.

3. <u>Reduction of Premises</u>. Effective upon the Reduction Date, defined in Section 1(b) of this Lease, the Premises shall be reduced by eliminating from the Premises approximately 51,511 rentable square feet of space comprised of (i) Suite 450, containing approximately 17,572 rentable square feet of space on the Fourth (4th) Floor of the Building; (ii) Suites 600a and 600b, containing an aggregate of approximately 7,241 rentable square feet of space located on Sixth (6th) Floor of the Building; (iii) Suites 1000, 1055 and 1075, containing an aggregate of approximately 18,666 rentable square feet of space located on the Tenth (10th) Floor of the Building; and (iv) Suite 2100, containing approximately 8,032 rentable square feet of space located on the Twenty-first (21st) Floor of the Building (collectively, the "**Relinquished Space**"). No later than March 31, 2016 (the "**Surrender Date**"), which is the day preceding the Reduction Date, Tenant shall surrender the Relinquished Space broom clean and in substantially the condition existing as of the Effective Date hereof, subject to damage caused by normal wear and tear, casualty and condemnation, and otherwise in the condition required by the terms of this paragraph. No later than the Surrender Date, Tenant shall, at Tenant's expense, remove from the Relinquished Space all items of Tenant's personal property, all supplemental HVAC equipment and any raised flooring. In addition, Tenant shall, at Tenant's expense (subject to the terms of Paragraph 1 of the Work Letter) remove all cabling installed by or on behalf of Tenant in the Relinquished Space, or in any of the Common Areas of the Building serving the Relinquished Space and not serving the Premises after the Reduction Date. Tenant shall, at Tenant's expense, repair any damage to the Relinquished Space or such Common Areas caused by the installation or removal of all items Tenant is required to remove from the Relinquished Space by the terms of this paragraph. In the event that Tenant fails to surrender

2



possession of the Relinquished Space on or before the Surrender Date, Tenant shall be a tenant holding over as provided in Section 34 of the Lease as to such space, and Landlord, in addition to other remedies available to Landlord under this Lease, at law or in equity, may, without notice, enter upon, reenter, possess and repossess itself of the Relinquished Space, by summary proceedings, ejectment, or other process of law, and may dispossess and remove Tenant and all persons and property from the Relinquished Space; and Tenant waives any and all damages or claims for damages as a result thereof. Such dispossession and removal of Tenant from the Relinquished Space shall not constitute a waiver by Landlord of any claims by Landlord against Tenant. In the event that Tenant surrenders possession of the Relinquished Space on or before the Existing Expiration Date, but Tenant otherwise fails to fulfill its obligations under this section, and if such failure shall continue for five (5) business days after Tenant's receipt of written notice from Landlord of the existence of such failure, then Landlord may, at Tenant's expense, perform such obligations on Tenant's behalf, and Tenant shall reimburse Landlord for all costs Landlord reasonably incurs in performing such obligations.

4.  Storage Space. At Tenant's request, and provided that no Monetary Default exists at the time of such request, Landlord will accommodate Tenant's reasonable on-going storage-space needs in the Building during the Term of this Lease, subject to the terms of this special stipulation.

    (a)  *The Storage Space.* The storage space to be provided by Landlord hereunder (the "**Storage Space**") shall not exceed an aggregate of 5,000 rentable square feet of space at any one time, and may be contained in one (1) contiguous block of space or multiple blocks of space (provided no such space will contain less than 2,000 rentable square feet of space), the location of which shall be determined by Landlord in order to not adversely affect Landlord's ability to lease or utilize space in the Building, all of which shall be determined in Landlord's sole discretion. The Storage Space shall be provided to Tenant broom clean and free of all items of personal property, but otherwise in its then existing "as is" condition. Without Landlord's consent in each instance, Tenant shall make no improvements or modifications to the Storage Space.

    (b)  *Storage Space Term.* Tenant's lease of the Storage Space shall be for a term (the "**Storage Space Term**") commencing upon Landlord's delivery of Storage Space to Tenant, and shall expire upon the expiration or earlier termination of the Lease, unless sooner terminated as set forth below. All terms and conditions of the Lease regarding the surrender of the Premises upon the expiration or earlier termination of the Lease Term shall apply to Tenant's surrender of the Storage Space upon the expiration or earlier termination of the Storage Space Term. Tenant may terminate the Storage Space Term early by providing Landlord with written notice of such termination. Landlord may terminate the Storage Space Term early, or require Tenant to relocate its property from the Storage Space to other space in the Building, by providing Tenant with sixty (60) days' prior written notice of such termination or required relocation. In the event that either party terminates the Storage Space Term early, Tenant's removal of its property from the Storage Space, and any required relocation of Tenant's property to other space, shall be at Tenant's sole cost and expense.

    (c)  *Services to Storage Space.* With the exception of providing Building Standard lighting for the Storage Space, Tenant acknowledges that Landlord will provide no services, such as heating and air conditioning, cleaning services, or utilities, to the Storage Space.

    (d)  *Rent applicable to the Storage Space.* Provided Storage Space can be provided to Tenant at no cost to Landlord, there shall be no Rent applicable to Tenant's use and occupancy of the Storage Space. If Storage Space cannot be provided to Tenant at no cost to Landlord, then Landlord shall offer Storage Space to Tenant at Landlord's cost, and if Tenant elects to accept such offer, then Tenant shall pay the monthly charge therefor as Additional Rent under this Lease.

    (e)  *Applicability of Lease to Tenant's Lease of Storage Space.* Except as otherwise set forth in this special stipulation, all provisions of the Lease regarding Tenant's lease of the Premises shall apply to Tenant's lease of Storage Space.

    (f)  *Assignment and Subletting.* In no event shall Tenant assign its rights under this special stipulation, nor sublet all or any portion of the Storage Space.

5.  Food Service. Landlord will use commercially reasonable efforts to establish hot-food service for the Building by the Commencement Date. Landlord acknowledges that commercially reasonable efforts could theoretically, but do not necessarily, include providing financial inducements to the operator of the food service such as abated rent, below market rent, and an upfit allowance. Tenant agrees to facilitate such efforts by Landlord to the extent reasonably requested by

3



Landlord (e.g., requests for Tenant's feedback on potential operators, potential catering and other food-related commitments by Tenant to such operators).

6.     Generators.

(a)     *Existing Generator.* The parties acknowledge that, as of the Effective Date, Tenant maintains a 2005 Caterpillar 350 KW generator (the "**Existing Generator**") in the location shown on **Exhibit E** attached hereto and incorporated herein by this reference. By its execution of this Lease, Landlord hereby approves the installation and location of the Existing Generator. The parties further acknowledge that the Existing Generator and a generator owned by Landlord ("**Landlord's Generator**") share and both have access to an above ground diesel tank owned by Landlord (the "**Diesel Tank**"). For so long as the Existing Generator is connected to the Diesel Tank, Tenant shall reimburse Landlord for one-half (1/2) of (i) the cost of the diesel fuel consumed by the Existing Generator and Landlord's Generator; (ii) the cost of the service contract maintained by Landlord on the Diesel Tank; and (iii) all other reasonable costs incurred by Landlord in supplying diesel fuel to both the Existing Generator and Landlord's Generator and in maintaining the Diesel Tank.

(b)     *Additional Generator to be provided by Landlord.* During the first Lease Year, and after the expiration of the Cancellation Option Period, provided that no Monetary Default exists under this Lease, Landlord will provide Tenant with a Taylor Model DS550M2 550kW generator in good working order (but not new) at the time of delivery by Landlord ("**Additional Generator**") for Tenant's sole use. Landlord will use commercially reasonable efforts to provide Tenant with the prior service records for the Additional Generator, to the extent such records are reasonably available to Landlord. The Additional Generator will be located on the loading dock of the Building, as shown on Exhibit E, and Tenant will be responsible for any costs associated with the establishment of such location and connection of the Additional Generator to the Building. Tenant will be responsible for all aspects of connecting, maintaining, repairing, and (if necessary, as determined by Tenant) replacing the Additional Generator, with Tenant being under no obligation to replace the Additional Generator if it so chooses, with the express agreement that in no event will Landlord be required to the replace the Additional Generator. The Additional Generator will become Tenant's property when it is provided to Tenant by Landlord. If Tenant elects to replace the Additional Generator, the replacement generator will be owned by Tenant and such replacement of the Additional Generator shall be subject to all of the terms and conditions set forth below regarding the Generators, defined below. The rights granted to Tenant hereunder are personal to Tenant and any Permitted Transferee; however, a sublessee or assignee that is not a Permitted Transferee will not be precluded by Landlord from using the Generators.

(c)     *Operation of Generators.* Tenant shall operate the Existing Generator and the Additional Generator (each, a "**Generator**"; collectively, the "**Generators**") in strict compliance with all applicable Laws, at Tenant's own risk, and Tenant shall be solely responsible throughout the Term of this Lease for maintaining, servicing and repairing the Generators at Tenant's sole expense. Tenant shall take such precautions as may be reasonably necessary to ensure that its operation of the Generators does not cause a nuisance, nor unreasonably interfere with the rights of other tenants of the Project to the use and enjoyment of their premises. Specifically, any routine testing of the Generators shall be done by Tenant outside of Building Standard Hours, in order to minimize any disturbance that operating the Generators would cause to other tenants or occupants of the Building.

(d)     *Access to the Generator Area.* Landlord shall at all times have access to the areas where the Existing Generator and the Additional Generator are installed (each, a "**Generator Area**") for the purpose of operating, maintaining, repairing or improving the Project. Landlord agrees that Tenant shall also have continuous access to the Generator Area for the purpose of installing, operating, maintaining, repairing and removing the Generator. Landlord shall have no responsibility or liability for the conduct or safety of any of Tenant's representatives, repair, maintenance and engineering personnel while in any part of the Building or the Generator Area, and Tenant shall be solely liable for any injury to or death of any such person from any cause resulting from the operation, maintenance, repair, inspection, use or removal of the Generators by Tenant or its agents, employees, representatives, contractors or invitees, unless such injury or death is the direct result of the negligence or willful misconduct of Landlord, its agents, employees or contractors.

(e)     *Relocation of the Generators.* In the event that in the course of maintaining, repairing or improving the Building or the Common Areas, it shall become necessary for either or both of the Generators to be relocated in order for Landlord to perform such maintenance, repair or improvement, then upon reasonable prior notice from Landlord, Tenant shall, at Tenant's sole expense, relocate such Generator, either temporarily or permanently as required by the circumstances, to other space that is acceptable to both parties. In the event that either of the Generators is

4



permanently relocated to such other space, such other space shall then become the Generator Area, and the space from which such Generator was relocated shall cease to be the Generator Area.

(f)   *Insurance.* For purposes of fulfilling Tenant's requirements under the Lease with respect to insurance, the Generator Area shall be considered part of the Premises, and Tenant shall, at its sole cost and expense, obtain and keep in force during the Term of this Lease all forms of insurance required by the terms of the Lease covering the Generator Area and the Generators.

(g)   *Removal of Generators.* At Tenant's election, the Generators will be removed or abandoned at the expiration or earlier termination of the Term of the Lease, as the same may be extended from time to time. If either of the Generators is not removed by Tenant within thirty (30) days after such expiration or earlier termination, then such Generator will be deemed to be abandoned by Tenant and shall automatically become Landlord's property. If Tenant elects to remove either or both of the Generators, Tenant shall surrender the applicable Generator Area in substantially the same condition existing prior to the installation of the Generator that is removed, normal wear and tear unrelated to the installation, existence, operation, maintenance or removal of such Generator, and damage caused by casualty unrelated to the installation, existence, operation, maintenance or removal of such Generator, excepted. Tenant shall be liable for, and shall promptly reimburse Landlord for, the cost of repairing all damage done to the Generator Area or the Building by such removal.

(h)   *Indemnity.* Except with respect to Landlord's negligence or willful misconduct, Tenant shall indemnify and hold Landlord, its agents, employees, contractors and representatives, harmless from and against any and all costs, claims, damages, causes of actions and liability whatsoever which may arise out of or in any way be attributable to the installation, maintenance, repair, operation or removal of the Generators, including, without limitation, any claim or cause of action for injury to or death of any person or damage to any property, and Tenant shall defend any claim, cause of action or demand against Landlord, its agents and employees, arising out of any such occurrence. The obligations of Tenant under this subparagraph shall survive the expiration or earlier termination of this Lease.

7.   <u>Dual-Power Feed</u>. During the first Lease Year, Landlord will use commercially reasonable efforts to work with the applicable utility authorities to establish a dual-power feed at the Building, which would be reasonably acceptable to Tenant. The costs of establishing such feed shall be the responsibility of Tenant. This dual-power feed right is personal to Tenant and any Permitted Transferee. A sublessee or assignee that is not a Permitted Transferee will not be precluded by Landlord from using the dual-power feed in accordance with the terms and conditions of this Lease, to the extent such feed has already been established at the Building at the time such sublessee or assignee seeks to use it.

8.   <u>Special Signage Rights</u>. Provided Tenant's rights under this special stipulation have not been terminated, as provided below, Tenant shall have the following signage rights (the "**Special Signage Rights**"):

(a)   *Exterior Building Signage.* The parties acknowledge that signage displaying Tenant's name was installed on the exterior of the Building prior to the Effective Date of this Lease (the "**Exterior Building Signage**"). Subject to the terms hereof, Tenant shall continue to have the right to keep and maintain the Exterior Building Signage.

(i)   *Alterations to landscaping.* The parties acknowledge that, from time to time, trees located both on Land and on property adjacent to the Land not owned by Landlord ("**Adjacent Property**") may obscure the Exterior Building Signage. If, at any time, Tenant desires to have any of such trees removed or trimmed, it shall be Tenant's sole responsibility to obtain, at Tenant's expense, the approval required by any Governmental Authority ("**Governmental Approval**"), and permits required for the removal of any trees, whether located on the Property or the Adjacent Property, and Tenant shall provide Landlord with documentation that all such required approvals and permits have been obtained. The removal of any trees located on the Property shall be subject to Landlord's approval, which Landlord may withhold in its reasonable discretion, and such removal shall be done by Landlord or Landlord's contractor. In addition, Landlord will replace the removed trees on the Property with new trees of Landlord's selection that Landlord reasonably anticipates will not obscure the view of the Exterior Building Signage, and Tenant shall reimburse Landlord for all expenses incurred by Landlord in removing and replacing such trees, with such reimbursement to be made by Tenant within fifteen (15) days after Tenant's receipt of Landlord's invoice for such expenses. The removal of any trees located on the Adjacent Property shall also be at Tenant's sole expense. Landlord shall cooperate with Tenant in securing the approval of the owner of the Adjacent Property for the removal of such trees, but Tenant shall be solely responsible for securing such approval. If, for whatever reason, Tenant is unable to obtain Governmental Approval, or



the approval of the owner of the Adjacent Property, for the removal of the requested trees, the Lease shall, nonetheless, remain in full force and effect.

(ii)     *Maintenance and Repair of Exterior Building Signage.* As long as the Exterior Building Signage is displayed on the Building, Tenant shall, at Tenant's sole expense, maintain the Exterior Building Signage, and all portions thereof, in good condition and repair.

(iii)     *Removal of Exterior Building Signage.* Upon the expiration or earlier termination of the Lease or Tenant's Special Signage Rights, as set forth below, Landlord shall, at Tenant's sole cost and expense, remove the Exterior Building Signage, and repair all damage to the Building caused by the installation or the removal of such signage. Tenant's obligations under this paragraph shall survive the expiration or earlier termination of the Lease.

(iv)     *Changes to Signage.* In the event of any additional merger or acquisition (or other change in corporate identity), Tenant shall have the right to change the name, logo, and coloring on any approved signage, upon obtaining Landlord's prior approval of such changes, which approval may be withheld in Landlord's sole discretion.

(b)     *Monument Signage.* Tenant shall continue to have the right to have Tenant's name displayed on the Monument Sign of the Building (the "**Monument Sign**") in accordance with the terms of this paragraph. To the extent that the Monument Sign is a multitenant sign, the Monument Sign shall not contain more than the names of eight (8) tenants of the Building, and Tenant's name shall be the most prominently displayed tenant name on the Monument Sign. Provided, however, that Landlord may elect, in Landlord's sole discretion, to replace the Monument Sign, or change the design, fabrication, material, color, dimensions, location, lighting, or size of the Monument Sign, or the lettering or positioning of tenants' names on the Monument Sign, or, in Landlord's reasonable discretion, to relocate the Monument Sign at Landlord's sole cost, all without obtaining Tenant's prior consent, provided that, so long as there is a Monument Sign for the Building, Tenant's name remains the most prominently displayed tenant name on the Monument Sign. Landlord further reserves the right to remove the Monument Sign without replacing it in the event that (i) such removal is required by any Governmental Authority, and if Landlord is unable, despite Landlord's commercially reasonable efforts, to avoid such removal; or (ii) restrictions or requirements imposed by any such Governmental Authority cause the continued maintenance of the Monument Sign to no longer be commercially reasonable. If Tenant's name is the only name displayed on the Monument Sign, then all costs of maintaining the Monument Sign shall be at Tenant's sole expense. If the Monument Sign is a multitenant sign, then the cost of maintaining the Monument Sign shall be shared among the tenants, including Tenant, whose names appear on such sign.

(c)     *Building Name.* The parties acknowledge that, as of the Effective Date hereof, the Building is named, and is commonly known as, the Raymond James Tower. Unless Tenant's Special Signage Rights are terminated in accordance with the terms of this special stipulation, Landlord shall retain the Building name, "Raymond James Tower."

(d)     *Termination of Special Signage Rights.* Tenant's Special Signage Rights shall be terminated automatically if (i) this Lease, or Tenant's right to possession of the Premises under this Lease is terminated as a result of a Monetary Default by Tenant under the Lease, or (ii) and Tenant subleases the Premises or assigns the Lease to an entity not using Tenant's name, except in accordance with the provisions of subparagraph (a)(iv) of this special stipulation. In addition, at Landlord's election, Landlord may terminate Tenant's Special Signage Rights in the event that Tenant leases less than 100,000 rentable square feet of space in the Building. Upon the expiration or earlier termination of the Lease or Tenant's Special Signage Rights, Landlord shall, at Tenant's expense, remove the Exterior Building Signage and rename the Building, and remove Tenant's name from the Monument Sign.

(e)     *Special Signage Rights personal to Tenant.* The Special Signage Rights granted to Tenant hereunder shall be "personal" to Tenant and an assignee of Tenant that is a Permitted Transferee (a "**Permitted Assignee**"). In no event shall any subtenant, or assignee Tenant that is not a Permitted Transferee, have the Special Signage rights granted to Tenant hereunder, notwithstanding any prior approval by Landlord of the assignment of the Lease or the subletting of the Premises.

9.     Exclusivity. So long this Lease is in full force and effect, the following restrictions against leasing space in the Building to Direct Competitors, defined below, of Tenant shall apply:



(a)   *Direct Competitors.* During the Term hereof, as the same may be extended from time to time, Landlord will not lease space in the Building to any of the following entities ("**Direct Competitors**") or knowingly lease space to their successors or affiliates (nor knowingly approve a sublease or assignment to such entities, their successors or affiliates, where Landlord has the discretion to withhold such approval):

(1) STIFEL, NICOLAUS & COMPANY, INCORPORATED
(2) STERNE AGEE ASSET MANAGEMENT, INC.
(3) FIRST TENNESSEE ADVISORY SERVICES, INC.
   (formerly FIRST HORIZON ADVISORY SERVICES, INC.)
(4) DUNCAN-WILLIAMS, INC.
(5) WUNDERLICH CAPITAL MANAGEMENT, LLC
(6) D.A. DAVIDSON & CO.
(7) MORGAN STANLEY & CO. LLC
(8) VINING SPARKS INTEREST RATE PRODUCTS, LLC
(9) DIVERSIFIED TRUST COMPANY, INC.
(10) MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
(11) WELLS FARGO FINANCIAL, INC.
(12) UBS FINANCIAL SERVICES INC.
(13) STEPHENS, INC.

(b)   *Restrictions regarding assignment and subletting.* Landlord will insert in all leases of space in the Building with other tenants executed after the Effective Date of this Lease, a provision stating that Landlord has the right to reject any sublease or assignment by such other tenant to the above-listed Direct Competitors and their successors or affiliates unless any such sublease or assignment is the result of a future merger by any of such other tenants with, or purchase of any of such other tenants by, any Direct Competitor or a successor to or an affiliate of, any Direct Competitor.

(c)   *Termination of leasing restrictions.* The restrictions on leasing space in the Building to Direct Competitors shall be automatically terminated:

(i)     If this Lease or Tenant's right to possession of the Premises under the Lease is terminated as a result of an uncured Default by Tenant under this Lease;

(ii)    Immediately upon Tenant's exercise of the Termination Option set forth below;

(iii)   If Tenant assigns its rights under the Lease or sublets substantially all of the Premises to an entity that is not a Permitted Transferee;

(iii)   Upon a transfer of the corporate shares of Tenant which would entitle Landlord to exercise its remedies for Default under this Lease (regardless of whether Landlord actually exercises such remedies);

(iv)    If Tenant sells all or substantially all of its assets in any transaction other than a Permitted Transfer resulting in the assignment of Tenant's rights and obligations under this Lease to the Permitted Transferee; or

(v)     If Tenant ceases to lease and occupy at least 100,000 rentable square feet of space in the Building.

10.   Right of First Refusal. Tenant shall have the following right of first refusal:

(a)   *Grant of Right of First Refusal.* So long as this Lease is in full force and effect; no Monetary Default exists at the time Landlord must provide Tenant with the notice required hereunder; and not more than two (2) events of Monetary Default have occurred during the prior twelve (12) month period, Tenant shall have an ongoing right of first refusal ("**Right of First Refusal**") to lease any office space in the Building ("**Refusal Space**"), subject to the terms contained herein. The Right of First Refusal shall be subject and subordinate to the right of any existing tenant of the Refusal Space to renew or otherwise extend the term of its lease for such space, whether such right is granted before, on, or after the Effective Date of this Lease, and to any other rights of any other parties to lease all or any portion of the Refusal Space, if such rights were granted in writing prior to the Effective Date.

7



(b)     *Refusal Term.*   The term of the Right of First Refusal (the "**Refusal Term**") shall commence on the Commencement Date of this Lease and shall expire the earlier of (i) eighteen (18) months prior to the expiration of the Term, as the same may be extended from time to time; (ii) the date on which all portions of the Refusal Space have been leased by Tenant; or (iii) the date on which the Right of First Refusal is terminated as provided below.

(c)     *The Proposed Offer.*   In the event that, during the Refusal Term, Landlord engages in serious negotiations with any third party (other than any party to which Tenant's rights hereunder are subordinate) ("**Proposed Tenant**"), to lease all or any portion of the Refusal Space, and Landlord delivers a bona fide proposal to such Proposed Tenant to lease all or any portion of the Refusal Space, or Landlord receives from such Proposed Tenant an offer to lease all or any portion of the Refusal Space which offer Landlord desires to accept (such bona fide proposal or such offer being referred to herein as a "**Proposed Offer**"), then Landlord shall contemporaneously with the delivery or receipt of such Proposed Offer give Tenant written notice of the Proposed Offer, together with an offer by Landlord ("**Landlord's Offer**") to lease to Tenant the portion of the Refusal Space set forth in the Proposed Offer ("**Proposed Space**") on the same material terms and conditions as contained in the Proposed Offer.

(d)     *Exercise of the Right of First Refusal.*   If Tenant accepts Landlord's Offer, then Tenant shall do so by forwarding written notice of acceptance to Landlord, in accordance with the notices provision of this Lease (Tenant's "**Acceptance Notice**"), no later than ten (10) days following Tenant's receipt of Landlord's Offer. If Tenant accepts Landlord's Offer, then Landlord and Tenant shall execute an amendment to the Lease documenting the addition of the Proposed Space to the Premises in accordance with the terms of Landlord's Offer to Tenant (the "**Amendment**"). Unless set forth to the contrary in the Amendment, Tenant shall commence paying Rent for the Proposed Space on the date on which the Proposed Tenant was to commence paying rent to Landlord under the Proposed Offer. If Tenant does not provide its acceptance notice within such ten (10) day period, then Tenant shall be deemed to have rejected Landlord's Offer, and Landlord shall thereafter be entitled to lease the Proposed Space to the Proposed Tenant upon the material terms and conditions set forth in the Proposed Offer. If Landlord and the Proposed Tenant enter into a lease for the Proposed Space, then such Proposed Space shall be excluded from the Refusal Space during the term of such lease, as the same may be extended from time to time; however, if such Proposed Space should again become available to be leased during the Refusal Term, such Proposed Space shall, once again, become part of the Refusal Space. If Landlord and the Proposed Tenant do not enter into a lease for the Proposed Space, then such space shall continue to be subject to the Right of First Refusal.

(e)     *Right of First Refusal Personal to Tenant.*   The parties expressly agree that the Right of First Refusal granted to Tenant herein shall be "personal" to Tenant. The Right of First Refusal may only be exercised by Tenant or a Permitted Assignee; it may not be exercised by any subtenant of Tenant nor by any assignee other than a Permitted Assignee. Landlord shall have no obligation to deliver Landlord's Offer, as defined above, to Tenant if, at the time this Right of First Refusal would otherwise require Landlord to deliver Landlord's Offer to Tenant, Tenant is then negotiating with Landlord or a potential assignee or subtenant other than a Permitted Transferee to either assign Tenant's interest under the Lease or to sublet all or a portion of the Premises.

11.     <u>Termination and Contraction Options</u>. Tenant shall have the following option to terminate the Lease early, or reduce the size of the Premises:

(a)     *Grant of Termination and Contraction Options.*   So long as no Monetary Default exists at the time of notice to Landlord of Tenant's election to exercise an option set forth herein, and not more than two (2) events of Monetary Default have existed during the prior twelve (12) month period, Tenant is hereby granted the one-time option of (i) terminating the Lease (the "**Termination Option**"); or (ii) reducing the size of the Premises (the "**Contraction Option**"), as provided below, with the effective date of such termination (the "**Termination Date**") or contraction (the "**Contraction Date**") being June 30, 2021. If Tenant elects to exercise the Termination Option or the Contraction Option, Tenant must do so in strict compliance with the terms and conditions set forth herein.

(b)     *Conditions for exercise of the Contraction Option.*   If Tenant elects to exercise the Contraction Option, then Tenant shall designate in the Option Notice the space that is to be eliminated from the Premises, which shall consist of one (1) full floor of the Building contained within the Rentable Area of the Premises (the "**Contraction Space**"). The Contraction Space designated by Tenant shall be subject to Landlord's approval, which shall not be unreasonably withheld. If the Contraction Space specified by Tenant is not reasonably acceptable to Landlord, then Landlord may, by written notice ("**Landlord's Designation Notice**") forwarded to Tenant no later than thirty

8



(30) days after Landlord's receipt of the Option Notice, specify an alternative full floor of the Building contained within the Premises, and the parties shall thereafter negotiate in good faith to reach an agreement regarding the location of the Contraction Space. It shall not be unreasonable for Landlord to reject Tenant's determination of the Contraction Space if, in Landlord's reasonable determination, the Contraction Space designated by Tenant will be substantially more difficult to lease to a prospective tenant than comparable space of comparable size in the Building. If, despite their good faith efforts, the parties are unable to agree upon the location of the Contraction Space within thirty (30) days after Tenant's receipt of Landlord's Designation Notice, then, either party may institute arbitration in accordance with the Expedited Procedures of the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association, as amended and effective October 1, 2013, and as the same may be further amended and effective, to resolve such dispute. The cost of such arbitration will be evenly divided between the parties.

(c)      *Exercise of Option.*  In order to exercise either the Termination Option or the Contraction Option, Tenant must timely deliver the "**Option Notice,**" and timely pay the "**Option Fee,**" to Landlord  as provided below:

(i)      *Option Notice.*  If Tenant elects to exercise either the Termination Option or the Contraction Option, Tenant shall do so by delivering written notice of such election to Landlord (in either event, an "**Option Notice**"), in compliance with the notices provision of this Lease no sooner than eighteen (18) months, and no later than nine (9) months, prior to the Termination Date or Contraction Date. Tenant shall state in the Option Notice whether Tenant is exercising the Termination Option or the Contraction Option. If the Contraction Option is exercised by Tenant, then Tenant shall specify the Contraction Space to be surrendered by Tenant to Landlord.

(ii)      *Option Fee.*  In the event that Tenant elects to exercise the Termination Option or the Contraction Option, Tenant shall pay to Landlord a fee (the "**Option Fee**") to be calculated in accordance with the terms of this paragraph and to be paid at the time Tenant delivers the Option Notice to Landlord. The Option Fee shall be comprised of (a) an amount equal to the six (6) months of Base Rent that would be due from Tenant under the Lease for (i) the Premises for the six (6) months following the Termination Date, if it is the Termination Option that is exercised by Tenant; or (ii) the Contraction Space for the six (6) months following the Contraction Date, if it is the Contraction Option that is exercised by Tenant; plus (b) an amount equal to (x) the unamortized portion of Landlord's Costs, defined below, existing as of the Termination Date, if it is the Termination Option that is exercised by Tenant; or (y) the unamortized portion of Landlord's Costs existing as of the Contraction Date, multiplied by a fraction, the numerator of which is the rentable square footage of the Contraction Space, and the denominator of which is the Rentable Area of the Premises. As used herein, the term "**Landlord's Costs**" shall mean Landlord's costs incurred in connection with the transaction documented by this Lease, including the Abated Rent, the commissions to be paid by Landlord, and Landlord's reasonable legal expenses. For purposes of determining the Option Fee, the entire amount of Landlord's Costs, together with interest thereon calculated at the annual rate of nine percent (9%) compounded monthly, shall be amortized over the initial Term of this Lease, exclusive of the Abatement Period. The parties acknowledge and agree that the Option Fee does not constitute a penalty, but rather is the parties' reasonable pre-estimate of Landlord's probable loss in the event that Tenant elects to exercise the Termination Option or the Contraction Option. Within the six (6) month period following the expiration of the Cancellation Option Period, and upon the written request of Tenant, Landlord shall provide Tenant with Landlord's calculation of the amount of the Option Fee that will be applicable in the event that the Termination Option is exercised by Tenant, which amount shall be subject to adjustment if additional Landlord's Costs are thereafter incurred by Landlord.

If Tenant fails to deliver the Option Notice to Landlord within the time permitted hereunder, or fails to deliver the Option Fee to Landlord within the time required hereunder, or if Tenant does not effectively exercise the Termination Option or the Contraction Option in accordance with the terms hereof, or if all the terms and conditions set forth above for exercise of such options are not entirely satisfied, then (a) Tenant shall continue to be bound by the terms of the Lease as if the option purportedly exercised by Tenant had not been exercised; and (b) the Option Fee, or portion thereof, paid by Tenant, if any, shall be returned to Tenant, unless a Monetary Default then exists under the Lease, in which case Landlord may apply the Option Fee, or portion thereof, paid by Tenant toward the amount then due under the Lease and return the balance, if any, to Tenant.

(e)      *Effect of Exercise of Option.*  If Tenant exercises either the Termination Option or the Contraction Option in accordance with the terms hereof:  (a) Tenant shall be fully liable for the payment to Landlord of all Rent and



other charges owed under the Lease which shall become due through and including the Termination Date or the Contraction Date, and for the prompt and complete performance of all terms and conditions of the Lease, through and including such date; (b) if the Termination Option is exercised, Tenant shall surrender the Premises to Landlord, in accordance with the terms of the Lease regarding the surrender of the Premises upon the expiration of the Term, no later than the Termination Date; if Tenant shall remain in possession of the Premises beyond the Termination Date, then Tenant shall be a tenant holding over as provided in the Lease; and all obligations of the parties which would survive the expiration of the Lease shall also survive the early termination of the Lease; (c) if the Contraction Option is exercised, then Tenant shall surrender possession of the Contraction Space to Landlord in accordance with the terms of the Lease regarding the surrender of the Premises upon the expiration of the Term, no later than the Contraction Date, and if Tenant shall remain in possession of the Contraction Space beyond the Contraction Date, then Tenant shall be a tenant holding over as provided in the Lease as to such space; and (d) if the Contraction Option is exercised, then the parties shall execute an amendment to the Lease, to be prepared by Landlord, which amendment shall specify the rentable square footage of the Premises following the Contraction Date; the monthly Base Rent applicable to the Premises, as contracted, which shall be calculated at the same annual rates, and which shall be adjusted at the same times then applicable under this Lease, as specified in the second chart of Base Rent set forth in Section 1(j) of the Lease, but which shall be applicable to the Premises, as contracted; the adjustment to Tenant's Pro-Rata Share resulting from such contraction; and, except as set forth herein and in such amendment, Tenant's continued occupancy of the Premises, as reduced, shall be in accordance with the terms of Lease.

(f)     *Termination and Contraction Options Personal to Tenant.*  The Termination Option and Contraction Option set forth herein are not transferable.  The parties hereto acknowledge and agree that they intend for such options to be "personal" to Tenant and any Permitted Assignee, and that in no event shall any assignee or subtenant of Tenant other than a Permitted Assignee have any right to exercise such options, notwithstanding any prior approval by Landlord of the assignment of the Lease or the subletting of the Premises.

12.     <u>Extension Options</u>.  Tenant shall have the following options to extend the Term of this Lease:

(a)     *Grant of Extension Options.*  Tenant is hereby granted two (2) successive options (the "**First Extension Option**" and the "**Second Extension Option**"; individually, an "**Extension Option**," and collectively, the "**Extension Options**") to extend the Term of the Lease for successive periods of five (5) additional years (the "**First Extension Term**" and the "**Second Extension Term**"; individually, an "**Extension Term**," and collectively, the "**Extension Terms**"), with the First Extension Term to commence at the expiration of the Term of this Lease, and the Second Extension Term to commence at the expiration of the First Extension Term.  The extension of the Lease shall be upon the same terms and conditions of the Lease, except:  (i) the Base Rent and Additional Rent applicable during the Extension Terms shall be determined as set forth below; and (ii) Tenant shall have no option to extend the Lease beyond the expiration of the Second Extension Term.  Tenant may exercise an Extension Option only if this Lease is in full force and effect; not more than two (2) events of Monetary Default have occurred during the twelve (12) month period prior to Landlord's receipt of a Preliminary Notice, defined below; and no Monetary Default exists at the time of the exercise of either of the options set forth herein or at the commencement of the applicable extension term set forth herein.  Landlord shall have no obligation to improve or otherwise modify the Premises then leased to Tenant hereunder for Tenant's continued occupancy during the Extension Terms.

(b)     *Preliminary Notice.*  If Tenant intends to exercise the First Extension Option, Tenant shall provide Landlord with written notice, in accordance with the notices provision of this Lease (the "**Preliminary Notice**"), of such intention at least twelve (12) months, but no earlier than eighteen (18) months, prior to the expiration of the Term of this Lease.  If Tenant does not forward Preliminary Notice to Landlord, in accordance with the terms of this paragraph, that Tenant intends to exercise the First Extension Option, then the Extension Options set forth herein shall expire, and Tenant shall not thereafter have any right to exercise either of the Extension Options or otherwise acquire an interest in the Premises after the expiration of the Term of the Lease.  In the event that Tenant exercises the First Extension Option, and Tenant intends to exercise the Second Extension Option, Tenant shall provide Landlord with Preliminary Notice of such intention at least twelve (12) months, but no earlier than eighteen (18) months, prior to the expiration of the First Extension Term.  If, after exercising the First Extension Option, Tenant does not forward Preliminary Notice to Landlord that Tenant intends to exercise the Second Extension Option, then the Second Extension Option shall expire, and Tenant shall not thereafter have any right to acquire an interest in the Premises after the expiration of the First Extension Term.



(c)     *Rental Applicable During Extension Terms.*  Within thirty (30) days after Landlord's receipt of a Preliminary Notice from Tenant, Landlord shall provide Tenant with written notice (the "**Rent Notice**") of the Base Rent that will be applicable during the Extension Term to which such Preliminary Notice applies, and the Base Year that will be used for purposes of determining Tenant's Additional Rent during such Extension Term (collectively, the "**Extension Term Rent**").  The Extension Term Rent shall be determined by Landlord, and shall consist of Landlord's good faith determination of the renewal market rental rate for the Premises as of the commencement of the applicable Extension Term, taking into consideration such factors as rental for comparable premises in the Building; the applicable base year; rental for comparable premises in existing buildings in the same geographical area as the Building (taking into consideration, but not limited to, use, quality, age and location of the applicable building); the rentable area of the premises being leased; the length of the pertinent rental term; the quality and creditworthiness of the tenant; concessions then being offered by owners of Comparable Buildings for the renewal or other extension of leases for tenants of similar size and creditworthiness to Tenant leasing premises of similar size to the Premises for comparable extension periods, and other reasonably relevant factors.

(d)     *Extension Notice.*  If, after review of Landlord's determination of the Extension Term Rent, Tenant elects to exercise the Extension Option to which such rate applies, then, no later than the last to occur of (i) the date which is one year prior to the expiration of the Term of this Lease, and (ii) fifteen (15) days after Tenant's receipt of Landlord's Rent Notice, Tenant shall forward written notice of such election (the "**Extension Notice**") to Landlord in accordance with the Notices provision of this Lease.  Tenant shall, within thirty (30) days after presentation by Landlord, execute an amendment to this Lease, which amendment shall reflect the extension of the Term of the Lease through the expiration of such Extension Term, and the Extension Term Rent applicable to such Extension Term (including the specification of the base rent and the base year that will be applicable during such Extension Term).  If, after providing Landlord with a Preliminary Notice, Tenant does not, for whatever reason, provide Landlord with the Extension Notice required hereunder in order to exercise the applicable Extension Option, or an Arbitration Notice, as provided below, then such Extension Option shall expire; Tenant's Preliminary Notice exercising such Extension Option shall be of no further force or effect; and it shall be as if the Preliminary Notice had never been forwarded by Tenant to Landlord.  If, however, after Tenant forwards an Extension Notice to Landlord, Tenant fails to execute the amendment to the Lease as required by the terms of this paragraph, the Term of the Lease shall nonetheless be extended in accordance with the terms of the applicable Extension Option.

(e)     *Negotiation Period.*  If, after review of Landlord's determination of the Extension Term Rent, Tenant desires to exercise the Extension Option to which such determination applies, but Tenant objects to Landlord's determination of the Extension Term Rent, then no later than the last to occur of (i) the date which is one year prior to the expiration of the Term of this Lease, and (ii) fifteen (15) days after Tenant's receipt of Landlord's Rent Notice, Tenant may forward written notice to Landlord in accordance with the Notices provision of the Lease that Tenant elects to proceed with the arbitration procedure set forth below (the "**Arbitration Notice**").  Within the fifteen (15) day period following Landlord's receipt of an Arbitration Notice (the "**Negotiation Period**") from Tenant, Tenant and Landlord shall negotiate in good faith to determine and mutually agree upon the Extension Term Rent.  If Landlord and Tenant are unable to agree upon the Extension Term Rent during the Negotiation Period, which agreement would be evidenced by an amendment to the Lease executed by both Landlord and Tenant, then within five (5) business days after the last day of the Negotiation Period, Tenant may, by written notice to Landlord (the "**Notice of Exercise**"), irrevocably elect to exercise the Extension Option to which such determination applies, with the Extension Term Rent to be determined in accordance with the arbitration procedure set forth below, which determination shall be binding on Landlord and Tenant.  In the event that Tenant shall fail to deliver the Notice of Exercise on or before five (5) days after the last day of the Negotiation Period, then Tenant shall have waived any right to exercise such Extension Option, and any subsequent Extension Option shall expire.  In the event Tenant timely delivers the Notice of Exercise to Landlord, Landlord and Tenant shall each simultaneously present to the other party their final determinations of the Extension Term Rent (each, a "**Final Offer**," collectively, the "**Final Offers**") within ten (10) days after the last day of the Negotiation Period.  If the higher Final Offers is no more than five percent (5%) more than the lower Final Offer, then the Extension Term Rent shall be determined by averaging the Final Offers.  If the higher Final Offers is more than five percent (5%) greater than the lower Final Offer, then the Extension Term Rent shall be determined by arbitration, in accordance with the procedure set forth below.

(f)     *Arbitration.*  Arbitration shall follow the following procedures:

(i)     Within ten (10) days after Landlord's receipt of Tenant's Notice of Exercise, Tenant and Landlord shall each select an arbitrator ("**Tenant's Arbitrator**" and "**Landlord's Arbitrator**," respectively) who shall

11



be a qualified and impartial person licensed in the state where the Building is located as an MAI appraiser with at least five (5) years of experience in appraising the type of matters for which they are called on to appraise hereunder in the market where the Building is located.

(ii) Within twenty (20) days after their selection, Tenant's Arbitrator and Landlord's Arbitrator shall deliver to each other their separate written determinations of the Extension Term Rent. If the separate determinations of the Extension Term Rent made by the arbitrators vary by five percent (5%) or less, then the Extension Term Rent shall be determined by averaging such separate determinations. If, however, such separate determinations vary by more than five percent (5%), and Tenant's Arbitrator and Landlord's Arbitrator are not able to agree upon the Extension Term Rent within fifteen (15) days following the arbitrators' exchange of their separate determinations of the Extension Term Rent, then, within ten (10) days thereafter, a third arbitrator having the qualifications set forth above shall be selected by the initial two arbitrators. In the event that the initial two arbitrators are unable to agree on the identity of the third arbitrator, then either or both arbitrators shall apply to the nearest local office of the American Arbitration Association for the determination of such third arbitrator.

(iii) The third arbitrator shall, after due consideration of the factors to be taken into account under the definition of Extension Term Rent set forth above, and hearing whatever evidence the arbitrator deems appropriate from Landlord, Tenant, the initial arbitrators and others, and obtaining any other information the arbitrator deems necessary, in good faith, make its own determination of the Extension Term Rent for the Premises as of the commencement of the Extension Term (the "**Arbitrator's Initial Determination**") and thereafter select either Landlord's Final Offer or the Tenant's Final Offer, but no other, whichever is closest to the Arbitrator's Initial Determination (the "**Final Determination**"), such determination to be made within twenty (20) days after the appointment of the third arbitrator. The Arbitrator's Initial Determination, Final Determination and the market information upon which such determinations are based shall be in writing and counterparts thereof shall be delivered to Landlord and Tenant within such twenty (20) day period. The arbitrator shall have no right or ability to determine the Extension Term Rent in any other manner. The Final Determination shall be binding upon the parties hereto.

(iv) Landlord and Tenant shall each pay the costs and fees of their respective arbitrators. The actual reasonable costs and fees of the third arbitrator shall be paid by Landlord if the Final Determination shall be Tenant's Final Offer or by Tenant if the Final Determination shall be Landlord's Final Offer.

(v) If Tenant fails to appoint Tenant's Arbitrator in the manner and within the time specified above, then the Extension Term Rent shall be the rent contained in the Landlord's Final Offer. If Landlord fails to appoint Landlord's Arbitrator in the manner and within the time specified above, then the Extension Term Rent shall be the rent contained in the Tenant's Final Offer.

(vi) If Arbitration is invoked by Tenant, but for whatever reason, the Arbitration process is not completed and the Extension Term Rent has not been determined prior to the scheduled commencement of the applicable Extension Term, then Tenant shall continue to pay Rent for the Premises at the rate in effect during the last month of the Term immediately preceding such Extension Term until the Arbitration process is complete and Landlord has received written notice of the determination of the Extension Term Rent made by the arbitrators (the "**Determination Date**"); in such event, the difference, if any, between the Extension Term Rent owed by Tenant from the commencement of the Extension Term through the Determination Date and the amount of Rent paid by Tenant for such period shall be calculated by Landlord, and any deficiency shall be paid by Tenant within thirty (30) days after Tenant's receipt of Landlord's statement therefor forwarded to Tenant in accordance with the notices provision of this Lease, and any overpayment shall be credited by Landlord to the next installment(s) of Rent due thereafter from Tenant.

(g) *Extension Option Personal to Tenant.* The parties expressly agree that the Extension Option granted to Tenant herein shall be "personal" to Tenant and a Permitted Assignee. The Extension Option may only be exercised by Tenant; it may not be exercised by any subtenant of Tenant nor by any assignee that is not a Permitted Transferee.

13. <u>Right of First Offer to Purchase Project</u>. Provided that no Monetary Default exists at the time that Landlord would otherwise be required to provided Landlord's Purchase Offer, defined below, to Tenant, and no Monetary Default has



existed during the prior twelve (12) month period, Tenant shall have the following right of first offer to purchase the Project (the "**Right of First Offer**").

(a)   *Term of the Right of First Offer.* The term of the Right of First Offer (the "**Option Term**") shall commence on the Commencement Date of this Lease, and shall expire upon the expiration or earlier termination of the Term of the Lease.

(b)   *The Purchase Offer.* In the event that Landlord is actively negotiating with a potential Purchaser, defined below, to sell the Project, then prior to selling the Project to such Purchaser, Landlord shall provide Tenant with written notice that Landlord intends to sell the Project, and Landlord shall offer the Project to Tenant upon such terms and conditions as Landlord would find acceptable for the purchase of the Project by Tenant (the "**Purchase Offer**"). As used herein, the term "**Purchaser**" shall mean a third party in an arm's length transaction that is not affiliated with Landlord, and shall specifically exclude (i) any sale of the Project as part of a sale of the Project in conjunction with other properties owned by Landlord or an affiliate of Landlord; and (ii) any sale or other transfer of the Project as part of the sale of Landlord or any affiliate of Landlord. The Purchase Offer shall specifically include the purchase price for the Project, including the amount of any earnest money or escrow deposit required in conjunction with such purchase.

(c)   *Exercise of the Right of First Offer.* In the event that Tenant intends to exercise the Right of First Offer, Tenant shall do so by providing Landlord with notice of such intention (Tenant's "**Notice of Intent**") no later than five (5) days after Tenant's receipt of the Purchase Offer. If Tenant does not provide its Notice of Intent within such five (5) day period, then Tenant shall be deemed to have elected not to exercise the Right of First Offer, and the Right of First Offer shall be terminated.

(d)   *Execution of Purchase and Sale Contract.* If Tenant provides Landlord with the Notice of Intent within the timeframe stated above, then for a period of ten (10) days thereafter, the parties shall negotiate in good faith toward entering into a commercially customary purchase and sale agreement, which is reasonably acceptable in form and substance to the both parties, and which reflects the terms of the Purchase Offer. If the parties are unable to agree upon the terms of, and execute, a purchase and sale agreement within such ten (10) day period, then the Right of First Offer shall be terminated.

(e)   *Right of First Offer Personal to Tenant.* The parties expressly agree that the Right of First Offer granted to Tenant herein shall be "personal" to Tenant and a Permitted Assignee. The Right of First Offer may only be exercised by Tenant and a Permitted Assignee; it may not be exercised by any assignee (other than a Permitted Assignee) or subtenant of Tenant; and it may not be exercised by Tenant if Tenant is, at the time Landlord would otherwise be required to provide Landlord's Offer to Tenant, negotiating with Landlord or a potential assignee other than a Permitted Assignee to assign the Tenant's interest under the Lease.

*[End of Addendum of Special Stipulations]*

13



## EXHIBIT A
## FLOOR PLAN

MT-02

2 CORPORATE REAL ESTATE

RAYMOND JAMES®







**RAYMOND JAMES®**











6   CORPORATE REAL ESTATE

MT-07

RAYMOND JAMES®









**RAYMOND JAMES®**



MT-13

Case 2:26-cv-03039   Document 1-1   Filed 08/11/26   Page 50 of 78   PageID 85

10 CORPORATE REAL ESTATE

MT-14

RAYMOND JAMES®





11 CORPORATE REAL ESTATE

MT-15



RAYMOND JAMES®









13 CORPORATE REAL ESTATE

**RAYMOND JAMES®**

# MT-18



**RAYMOND JAMES®**



15 CORPORATE REAL ESTATE



MT-19

RAYMOND JAMES®



# MT-20



**RAYMOND JAMES**®

17 CORPORATE REAL ESTATE

**MT-21**

**RAYMOND JAMES®**



**EXHIBIT B**
**CLEANING AND JANITORIAL SERVICES**

*NIGHTLY*
*CLEANING*

1. Empty all waste receptacles, clean as necessary.
2. Vacuum all carpeted traffic areas and other areas as needed.
3. Dust furniture, files, fixtures, etc.
4. Damp wipe and polish all glass furniture tops.
5. Remove finger marks and smudges from vertical surfaces.
6. Clean all water coolers.
7. Sweep all private stairways nightly, vacuum if carpeted.
8. Damp mop spillage in office and public areas as required.

*WEEKLY*
*CLEANING*

1. Twice weekly, detail vacuum all rugs and carpeted areas.
2. Once weekly, dust all cleared surfaces of furniture, files, fixtures, etc.

*WASH ROOMS*
*(NIGHTLY)*

1. Damp mop, rinse and dry floors nightly.
2. Scrub floors as necessary.
3. Clean all mirrors, bright work and enameled surfaces nightly.
4. Wash and disinfect all fixtures.
5. Damp wipe and disinfect all partitions, tile walls, etc.
6. Empty and sanitize all receptacles.
7. Fill toilet tissue, soap, towel, and sanitary napkin dispensers.
8. Clean flushometers and other metal work.
9. Wash and polish all wall partitions, tile walls and enamel surfaces from trim   to floor monthly.
10. Vacuum all louvers, ventilating grilles and dust light fixtures monthly.

*FLOORS*

1. Ceramic tile, marble and terrazzo floors to be swept nightly and washed or scrubbed as necessary.
2. Vinyl floors and bases to be swept nightly.
3. Tile floors to be waxed and buffed monthly.
4. All carpeted areas and rugs to be detailed vacuumed twice weekly and all carpeted traffic areas and other areas as needed to be vacuumed nightly.
5. Carpet shampooing will be performed at Tenant's request and billed to Tenant.

*GLASS*

1. Clean inside of all perimeter windows as needed, but not more frequently than once every eighteen (18) months.
2. Clean outside of all perimeter windows as needed, but not more frequently than once every eighteen (18) months.
3. Clean glass entrance doors and adjacent glass panels nightly.

*HIGH DUSTING*
*(QUARTERLY)*

1. Dust and wipe clean all closet shelving when empty.
2. Dust all picture frames, charts, graphs, etc.
3. Dust clean all vertical surfaces.
4. Damp dust all ceiling air conditioning diffusers.
5. Dust the exterior surfaces of lighting fixtures.

*DAY SERVICE*

1. Check men's washrooms for toilet tissue replacement.
2. Check ladies' washrooms for toilet tissue and sanitary napkin replacements.
3. Supply toilet tissue, soap and towels in men's and ladies' washrooms.

Neither Landlord nor the janitorial company will be responsible for removing items from surfaces in order to dust them. It is understood that while dusting is completed nightly in the common areas, it is only completed in the Premises once a week and on no particular day. In addition, neither Landlord nor the janitorial company will be responsible for moving, dusting or cleaning any computer, copier, printer or other office equipment. Notwithstanding anything herein to the contrary, it is understood that no services of the character provided for in this Exhibit shall be performed on Saturdays, Sundays or Holidays.



**EXHIBIT C**
**RULES AND REGULATIONS OF BUILDING**

1.  No smoking shall be permitted within any portion of the Building or within twenty (20) feet of the Building's exterior doors, including tenant spaces and common areas.

2.  Landlord may provide and maintain a directory for all tenants of the Building. No signs, advertisements or notices visible to the general public shall be permitted within the Project without the prior written consent of Landlord. Landlord shall have the right to remove any such sign, placard, picture, advertisement, name or notice placed in violation of this rule without notice to and at the expense of the applicable tenant.

3.  Sidewalks, doorways, vestibules, halls, stairways and other similar areas shall not be obstructed by tenants or used by any tenant for any purpose other than ingress and egress to and from the leased premises and for going from one to another part of the Building.   At no time shall any tenant permit its employees, agents, contractors or invitees to loiter in common areas or elsewhere in or about the Building or Project.

4.  Corridor doors, when not in use, shall be kept closed.

5.  Plumbing fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags, food or other unsuitable material shall be thrown or placed therein.   Every tenant shall be responsible for ensuring that its employees, agents, contractors and invitees utilize Common Area restrooms in accordance with generally accepted practices of health, cleanliness and decency.

6.  Landlord shall provide all locks for doors into each tenant's leased area, and no tenant shall place any additional lock or locks on any door in its leased area without Landlord's prior written consent. Two keys for each lock on the doors in each tenant's leased area shall be furnished by Landlord. Additional keys shall be made available to tenants at the cost of the tenant requesting such keys. No tenant shall have any duplicate keys made except by Landlord.   All keys shall be returned to Landlord at the expiration or earlier termination of the applicable lease.

7.  A tenant may use microwave ovens and coffee brewers in kitchen or break areas.  Except as expressly authorized by Landlord in writing, no other appliances or other devices are permitted for cooking or heating of food or beverages in the Building. No portable heaters, space heaters or any other type of supplemental heating device or equipment shall be permitted in the Building. All tenants shall notify their employees that such heaters are not permitted.

8.  All tenants will refer all contractors, subcontractors, contractors' representatives and installation technicians who are to perform any work within the Building to Landlord before the performance of any work.  This provision shall apply to all work performed in the Building including, but not limited to installation of telephone and communication equipment, medical type equipment, electrical devices and attachments, and any and all installations of every nature affecting floors, walls, woodwork, trim, windows, ceilings, equipment and any other physical portion of the Building.

9.  Movement in or out of the Building of furniture or office equipment, or dispatch or receipt by a tenant of any heavy equipment, bulky material or merchandise which require the use of elevators, stairways, lobby areas or loading dock areas, shall be restricted to hours designated by Landlord.  A tenant must seek Landlord's prior approval by providing in writing a detailed listing of any such activity.  If approved by Landlord, such activity shall be performed in the manner stated by Landlord.

10. All deliveries to or from the Building shall be made only at such times, in the manner and through the areas, entrances and exits designated by Landlord.

11. No portion of any tenant's leased area shall at any time be used for sleeping or lodging quarters. No birds, animals or pets of any type, with the exception of guide dogs accompanying visually impaired persons, shall be brought into or kept in, on or about any tenant's leased area.

12. No tenant shall make or permit any loud or improper noises in the Building or otherwise interfere in any way with other tenants or persons having business with them.

13. Each tenant shall endeavor to keep its leased area neat and clean. Nothing shall be swept or thrown into the corridors, halls, elevator shafts, stairways or other common areas, nor shall tenants place any trash receptacles in these areas.

C-1



14.  No tenant shall employ any person for the purpose of cleaning other than the authorized cleaning and maintenance personnel for the Building unless otherwise approved in writing by Landlord.  The work of cleaning personnel shall not be hindered by a tenant after 5:30 PM  local time, and such cleaning work may be done at any time when the offices are vacant. Exterior windows and common areas may be cleaned at any time.

15.  To insure orderly operation of the Building, Landlord reserves the right to approve all concessionaires, vending machine operators or other distributors of cold drinks, coffee, food or other concessions, water, towels or newspapers.  No tenant shall install a vending machine in the Building without obtaining Landlord's prior written approval, which shall not be unreasonably withheld; provided, however, any vending machine installed in the Building shall not exceed the weight load capacity of the floor where such machine is to be installed.

16.  Landlord shall not be responsible to tenants, their agents, contractors, employees or invitees for any loss of money, jewelry or other personal property from the leased premises or public areas or for any damages to any property therein from any cause whatsoever whether such loss or damage occurs when an area is locked against entry or not.

17.  All tenants shall exercise reasonable precautions in protection of their personal property from loss or damage by keeping doors to unattended areas locked.   Tenants shall also report any thefts or losses to the Building Manager and security personnel as soon as reasonably possible after discovery and shall also notify the Building Manager and security personnel of the presence of any persons whose conduct is suspicious or causes a disturbance.  The tenant shall be responsible for notifying appropriate law enforcement agencies of any theft or loss of  any property of tenant or its employees, agents, contractors, or invitees.

18.  All tenants, their employees, agents, contractors and invitees may be called upon to show suitable identification and sign a building register when entering or leaving the Building at any and all times designated by Landlord form time to time, and all tenants shall cooperate fully with Building personnel in complying with such requirements.

19.  No tenant shall solicit from or circulate advertising material among other tenants of the Building except through the regular use of the U.S. Postal Service. A tenant shall notify the Building Manager or the Building personnel promptly if it comes to its attention that any unauthorized persons are soliciting from or causing annoyance to tenants, their employees, guests or invitees.

20.  Landlord reserves the right to deny entrance to the Building or remove any person or persons from the Building in any case where the conduct of such person or persons involves a hazard or nuisance to any tenant of the Building or to the public or in the event or other emergency, riot, civil commotion or similar disturbance involving risk to the Building, tenants or the general public.

21.  Unless expressly authorized by Landlord in writing, no tenant shall tamper with or attempt to adjust temperature control thermostats in the Building.  Upon reasonable request, Landlord shall adjust thermostats as required to maintain the temperature in the Premises within the ranges specified in Section 11(a) of the Lease.

22.  All requests for overtime air conditioning or heating must be submitted in writing to the Building management office by noon on the day desired for weekday requests, by noon Friday for weekend requests, and by noon on the preceding business day for Holiday requests.

23.  Tenants shall only utilize the termite and pest extermination service provided, designated or approved by Landlord.

24.  No tenant shall install, operate or maintain in its leased premises or in any other area of the Building, any electrical equipment which does not bear the U/L (Underwriters Laboratories) seal of approval, or which would overload the electrical system or any part thereof beyond its capacity for proper, efficient and safe operation as determined by Landlord, taking into consideration the overall electrical system and the present and future requirements therefor in the Building.

25.  Parking in the Parking Facility shall be in compliance with all parking rules and regulations including any sticker or other identification system established by Landlord.  Failure to observe the rules and regulations shall terminate an individual's right to use the Parking Facility and subject the vehicle in violation to removal and/or impoundment.  Parking stickers or other forms of identification supplied by Landlord shall remain the property of Landlord and not the property of a tenant and are not transferable. The owner of the vehicle or its driver assumes all risk and responsibility for damage, loss or theft to vehicles, personal property or persons while such vehicle is in the Parking Facility.

26.  Each tenant shall observe Landlord's reasonable rules with respect to maintaining standard window coverings at all windows in its leased premises so that the Building presents a uniform exterior appearance.  Each tenant shall ensure that to the



extent reasonably practical, window coverings are closed on all windows in its leased premises while they are exposed to the direct rays of the sun.

27.  Bicycles and other vehicles are not permitted inside or on the walkways outside the Building, except in those areas specifically designated by Landlord for such purposes and except as may be needed or used by a physically handicapped person.

28.  Subject to the terms of the Lease, Landlord reserves the right to rescind any of these rules and regulations and to make such other and further rules and regulations as in its judgment shall from time to time be needful for the safety, protection, care and cleanliness of the Building, the operation thereof, the preservation of good order therein and the protection and comfort of the tenants and their agents, employees and invitees, which rules and regulations, when made and written notice thereof is given to a tenant, shall be binding upon it in like manner as if originally herein prescribed.

C-3



EXHIBIT D TO LEASE
WORK LETTER

This Work Letter supplements the Lease to which this Work Letter is attached and, together with the Lease, governs the construction of the Initial Improvements to the Premises. All capitalized terms appearing in this Work Letter shall have the same meaning as those appearing in the Lease, except as expressly modified herein.

1.  <u>Refurbishments to be made by Tenant to Reduced Premises</u>. Tenant accepts the Premises in their as-is condition as of the Effective Date, with no improvements to be made by Landlord, and with no improvement allowance to be made available to Tenant from Landlord. All improvements or other refurbishments to the Premises shall be made by Tenant at Tenant's sole expense. As consideration for the Abated Rent provided to Tenant, Tenant agrees to spend at least Nineteen Dollars ($19.00) per rentable square foot of the Reduced Premises ("**Tenant's Refurbishment Contribution**") toward the hard and soft costs of refurbishing the Reduced Premises ("**Refurbishments**"; also referred to herein as the "**Initial Improvements**"). The Refurbishments shall be made by Tenant in accordance with the provisions of this Work Letter and the provisions of the Lease regarding the making of alterations or other improvements by Tenant in the Premises, and such Refurbishments shall be completed no later than March 31, 2016 (the "**Refurbishment Completion Date**," which is also the Surrender Date for the Relinquished Space). Landlord shall not assess a construction management or supervisory fee in connection with the Refurbishments. The Refurbishments shall include improvements and alterations made by Tenant to any portion of the Reduced Premises since January 1, 2013, and the removal of cabling from the Relinquished Space (and any Common Areas of the Building in connection with Tenant's surrender of the Relinquished Space), and the costs incurred by Tenant in connection with same shall be included in Tenant's Refurbishment Contribution. No later than ninety (90) days after the Refurbishment Completion Date, Tenant shall provide Landlord with copies of receipts or other documentation reasonably substantiating that Tenant's obligation for Tenant's Refurbishment Contribution has been fulfilled.

2.  <u>Construction Requirements</u>.

    a.  All contractors engaged by Tenant shall be required to comply with the Construction Rules and Regulations for the Building, a copy of which is attached as **Exhibit A** to this Work Letter.

    b.  All contractors performing any work in connection with the construction of the Initial Improvements, shall be required to provide evidence of insurance naming as additional insureds Landlord, and all other entities required to be named as additional insureds under the insurance policies Tenant is required to maintain under Section 20 of the Lease, and which satisfies the requirements of the Lease and this Work Letter relating to the construction of the Initial Improvements.

    c.  Under no circumstances will Tenant or Tenant's authorized representatives alter or modify, or in any manner disturb, any portion of a Building System not exclusively serving the Premises, unless Tenant obtains Landlord's prior written consent (which may be withheld in Landlord's discretion).

    d.  Tenant hereby waives all claims against Landlord for damage to any property or injury to, or death of any person in, on or about the Premises or the Building arising out of or in any way related to the construction of the Initial Improvements in the Premises by Tenant, unless solely caused by, or solely resulting from, the gross negligence or willful misconduct of Landlord, its employees, agents, contractors or representatives, and then only if such damage, injury, death or loss is not covered by insurance of the type required to be carried by Tenant or Tenant's contactor hereunder. Tenant shall, and hereby does agree to, indemnify, defend and hold Landlord harmless from and against any and all claims, causes of action, damages, costs and expenses arising out of the construction of the Initial Improvements, including, but without limitation, personal injury or property damage, the imposition of any lien against the Premises or the Building and matters arising out of the failure of the Initial Improvements to comply with applicable Laws. Any claim made by Tenant against Landlord whether under this Work Letter, the Lease or otherwise, shall be subject to the limitation of liability provisions of the Lease.

    e.  Landlord shall have the right at any time and from time to time to inspect the Premises during Tenant's construction of the Initial Improvements.

    f.  Landlord shall own all Building Standard Initial Improvements as part of the Building. All Above Standard Initial Improvements shall be and remain the property of Tenant, until the expiration or earlier termination of the Lease or Tenant's right to possession of the Premises under this Lease, at which time such Above Standard Initial Improvements shall become the property of Landlord and shall be surrendered to Landlord with the Premises,

D-1



unless Landlord specifies, at the time of the approval of the installation of such Above Standard Initial Improvements, that Landlord will require Tenant to remove same upon the expiration or earlier termination of the Lease or Tenant's right to possession of the Premises under the Lease. Any required removal of Above Standard Initial Improvements shall be at Tenant's expense, and upon such removal, Tenant shall repair any damage to the Premises resulting from such removal. Tenant shall, at Tenant's expense, be responsible for cleaning and maintaining any Above Standard Initial Improvements in good condition and repair throughout the Term of this Lease, and Tenant shall insure same as provided in Section 20 of the Lease.

g.    Upon completion of the Initial Improvements, Tenant shall provide Landlord with Material Safety Data Sheets for all materials used in the construction of the Initial Improvements, certified air balance reports from Tenant's HVAC contractor, if any modifications to the HVAC system were performed as part of the Initial Improvements; and such other documents as may be reasonably requested by Landlord in order to demonstrate that the Initial Improvements are complete; they have been constructed in accordance with any plans for the Initial Improvements submitted by Tenant for approval by Landlord and approved by Landlord; and any liens or potential liens that could be filed against the Building or any interest therein have been extinguished.



**EXHIBIT A TO WORK LETTER**
CONSTRUCTION RULES AND REGULATIONS
**Raymond James Tower**

**50 North Front Street**

**Memphis, TN 38103**

Parkway endeavors to provide its tenants at 50 North Front Street with a professional and peaceful work environment. It will take an effort by each contractor engaging in business at Raymond James Tower to promote this environment, and we expect this attitude from each individual employed by each such company. Each project manager should explain these issues to his crew and require adherence by all. Thank you for your understanding and cooperation in providing a professional attitude while participating in matters concerning the building. If you have any questions, please feel free to contact us at 901-575-0500 Parkway Realty Services on-site management office, Suite 110.

1. Prior to the commencement of any construction work in the building, each general contractor and/or independent contractor is required to submit a certificate of insurance, in limits acceptable to the building owner. Please see attached sheet for specifications.

2. Any work to the building's life-safety, electrical, or mechanical systems must be arranged in advance through Parkway Realty on-site management office, at 901-575-0500.

3. Any large deliveries, activities affecting the Customers of the building, access to electrical or telephone closets, mechanical rooms and the roof must be coordinated through Parkway.

4. Parkway reserves the right to stop and reschedule any work creating noise (i.e., concrete drilling, concrete chipping, etc.) that disturbs nearby Customers. In all cases, this work may have to be performed on weekends or before 7:30 am or after 5:30 pm Monday through Friday. **No core drilling is allowed without prior approval from Parkway, which approval will not be unreasonably withheld, conditioned or delayed.**

5. Carrying tools and equipment on the passenger elevator is strictly forbidden. The loading dock is for loading and unloading only. No parking is available in the loading dock or the building garage. Construction personnel should report to the Lobby Security Desk and sign in upon arrival and sign out upon departure.

6. In areas where there will be a large amount of dust generated, it is the contractor's responsibility to bag the smoke detector in the area commencing work and remove the bag at the end of the day. The main floor return air grills shall be covered with filter media before any demolition, construction, or cleaning of work area. The Building Engineer must approve filter media and will provide the locations of the return air grills to the contractor. The Building Engineer and Security will also be notified to ensure the fire alarm system is temporarily modified to prevent any false alarms at the beginning and end of each work day.

7. Construction personnel are prohibited from taking breaks/eating lunch in the public access areas of the building.

8. The contractor is totally responsible for protecting existing finishes, furniture, etc. from any work conducted in an occupied or unoccupied space or nearby Customer space. Any damage done in these spaces will be the sole responsibility of the contractor. Any damage done to common areas or the service elevator will be the sole responsibility of the contractor.

9. Parkway must be contacted at least two hours prior to any welding so that the fire alarm systems can be turned off.

10. All clean up of trash and trash removal from the building premises is the sole responsibility of the contractor. Placement of a dumpster in the loading dock area must be coordinated with Parkway. Use of building compactor is prohibited. All trash must be disposed of daily and not be present near windows.

11. The contractor shall be responsible for cleaning the interior of the windows and sills prior to Substantial Completion.

12. The building's standard hours of operation are from 7 am to 5:30 pm, Monday through Friday.

13. The Building Engineer's standard hours of operation are from 7:00 am to 4:30 pm, Monday through Friday.

14. It is the contractor's responsibility to provide masonite or safety runners to protect the common-area floors when bringing in materials or otherwise working in the building. It is to be removed at the end of each workday.

15. All common areas used by the contractor are to be cleaned and vacuumed at the end of each workday.

16. The contractor needs to provide a construction phone, if necessary.

17. Raymond James Tower is a nonsmoking building.

18. No hazardous chemicals or E.P.A. hazardous substances shall be used in the building in violation of Laws.



19. After hours work during the week and weekend must be approved ahead of time by the Parkway management office so a memo can be forwarded to the Lobby Security Desk.

20. Plans must be pre-approved by the Property Manager or Chief Engineer prior to commencement of work. (Management Office).

21. Contractors, sub-contractors, vendors, installers, include but not limited to:

| General Contractors | Telephone | Plumbing | HVAC | Cable/Data |
| Electrical | Moving | Sprinkler | Access Control | Roofers/Waterproofing |

**PARKWAY RESERVES THE RIGHT TO AMEND THESE CONSTRUCTION RULES AND REGULATIONS WITHOUT NOTICE.**



## EXHIBIT E
## LOCATION OF GENERATORS





**EXHIBIT F**
**SUPPLEMENTAL HVAC EQUIPMENT**

The provisions of this Exhibit shall govern the installation, maintenance and removal of all Supplemental HVAC Equipment installed in the Premises. The installation of Supplemental HVAC Equipment in the Premises shall be at Tenant's sole expense, and shall include the installation of a submeter to monitor the electricity used by the Supplemental HVAC Equipment. Prior to installing any Supplemental HVAC Equipment in the Premises, Tenant shall provide Landlord with plans and specifications for same and obtain Landlord's written approval, which shall not be unreasonably withheld or delayed. Upon receiving such approval, Tenant shall install the Supplemental HVAC Equipment in compliance with Laws, including all building, electrical, and safety codes, applicable to the Project. Prior to installing the Supplemental HVAC Equipment, Tenant shall obtain any permits or licenses that may be required in order to install and operate such equipment, and Tenant shall timely deliver copies of same to Landlord. In no event shall Tenant's installation of the Supplemental HVAC Equipment damage the Premises or the Building, or interfere with the maintenance of the Building, or any system currently serving the Building, and Tenant shall pay to Landlord upon demand the cost of repairing any damage to the Building caused by such installation. Tenant shall notify Landlord upon completion of the installation of the Supplemental HVAC Equipment, and Landlord shall within five (5) business days after installation of the Supplemental HVAC Equipment inspect its installation. Tenant shall not commence operation of the Supplemental HVAC Equipment until Landlord has approved its installation. Tenant shall be solely liable for any damages or injury arising out of the installation of the Supplemental HVAC Equipment, and Tenant's indemnity of Landlord contained in Section 26 shall specifically apply to the installation, operation, maintenance and removal of the Supplemental HVAC Equipment. During the Term of this Lease, as the same may be extended from time to time, Tenant shall be solely responsible for maintaining the Supplemental HVAC Equipment in good working order at Tenant's sole expense, and Tenant shall reimburse Landlord for all electricity consumed by the Supplemental HVAC Equipment, as additional Rent due hereunder, within fifteen (15) days after Tenant's receipt of Landlord's invoice for same. Upon the expiration or earlier termination of this Lease, Tenant shall remove the Supplemental HVAC Equipment from the Premises, and repair all damage to the Premises or the Building caused by the installation or removal of such equipment.



EXHIBIT G
FORM OF
SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

MassMutual Loan No._____

Massachusetts Mutual Life Insurance Company
c/o Cornerstone Real Estate Advisers
One Financial Plaza
Hartford, Connecticut  06103
Attention:  Mortgage Loan Administration

Re:  _____ *[Insert Property name and location]*

The undersigned, _____, ("**Tenant**") understands that Massachusetts Mutual Life Insurance Company ("**Lender**") has made or will be making a loan (the "**Loan**") to _____ ("**Landlord**") secured by a mortgage or deed of trust (the "**Mortgage**") encumbering the real property (the "**Property**") described in <u>Exhibit A</u>, attached hereto and made a part hereof.  Tenant and Landlord entered into a lease agreement (the "**Lease**") dated _____ by which Tenant leased from Landlord certain premises commonly known as _____ (the "**Leased Premises**"), and constituting a portion of the Property.  Tenant desires to be able to obtain the advantages of the Lease and occupancy thereunder in the event of foreclosure of the Mortgage and Lender wishes to have Tenant confirm the priority of the Mortgage over the Lease.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties hereto agree as follows:

1.  Tenant hereby subordinates the Lease to the lien of the Mortgage and any other mortgages (as the same may be modified and/or extended from time to time) now or hereafter in force against the Property, and to any and all existing and future advances made under such Mortgage and any other mortgages.

2.  Lender agrees not to name Tenant in any judicial or non-judicial foreclosure or other proceeding to enforce the Mortgage or exercise any power of sale, and the Lease will not be terminated by any such action.  In the event that Lender becomes the owner of the Property by foreclosure, deed in lieu of foreclosure, or otherwise, Tenant agrees to unconditionally attorn to Lender and to recognize it as the owner of the Property and the Landlord under the Lease.  The Lender agrees to assume the Lease and to be bound to Tenant under the terms of the Lease arising from and after the date that Lender becomes owner of the Property and agrees not to terminate the Lease or disturb or interfere with Tenant's rights under the Lease, or any extension or renewal thereof, so long as Tenant is not in default under the Lease beyond applicable notice, grace and cure periods, if any.

3.  Lender and any other subsequent owner of the Property, whether through foreclosure, deed in lieu of foreclosure, or any other means, or any other transfer or means after a foreclosure or a deed in lieu of foreclosure (a "**Subsequent Owner**") shall not be:

(a)  Personally liable under the Lease, its liability being limited solely to its ownership interest in the Property;

(b)  Liable for any act or omission of any prior landlord, including Landlord;

(c)  Subject to any offsets or defenses which Tenant might have against any prior landlord, including Landlord except as expressly provided under Section __ of the Lease in connection with Tenant's self-help remedies;

(d)  Bound by any prepayment of rent or deposit, rental security or any other sums deposited with any prior lessor, including Landlord, under the Lease, unless actually received by Lender or Purchaser;

(e)  Bound by any agreement or modification of the Lease made without Lender's or Subsequent Owner's prior written consent, which consent will not be unreasonably withheld;

(f)  Bound to commence or complete any construction or to make any contribution toward construction or installation of any improvements upon the Leased Premises or the Property required under the Lease, including, without limitation, for any expansion or rehabilitation of existing improvements thereon; or for the payment of any tenant allowance or incentive, or for restoration of improvements following any casualty not required to be insured under the Lease or for the costs of any restorations in excess of any proceeds recovered under any insurance required to be carried under the Lease; and

(g)  Bound by any radius restriction or other restriction on competition or use beyond the Property.

4.  Tenant certifies to Lender that the Lease is presently in full force and effect with no defaults thereunder by Landlord or by Tenant; the Lease is unmodified except as indicated hereinabove; that the Lease term thereof has commenced and the full



rental is now accruing thereunder; that Tenant has accepted possession of the Leased Premises and that any improvements required by the terms of the Lease to be made by Landlord have been completed to the satisfaction of Tenant; that any tenant allowances or other payments to be made by Landlord to Tenant have been paid; that no rent under the Lease has been paid more than thirty (30) days in advance of its due date; that the address for notices to be sent to Tenant is as set forth in the Lease; and that Tenant currently has no charge, lien, claim or offset under the Lease or otherwise, against rents or other charges due or to become due thereunder.

5.       Tenant agrees with Lender that from and after the date hereof, Lender will not be bound by any agreements amending the Lease without Lender's prior written consent and that Tenant will not terminate or seek to terminate the Lease by reason of any act or omission of the Landlord thereunder until Tenant shall have given written notice, by certified mail, return receipt requested, of said act or omission to Lender, which notice shall be addressed to Massachusetts Mutual Life Insurance Company, c/o Cornerstone Real Estate Advisers, One Financial Plaza, Hartford, Connecticut 06103, Attention: Mortgage Loan Servicing; with a copy sent to: Cornerstone Real Estate Advisers, One Financial Plaza, Hartford, Connecticut 06103, Attention: Paralegal, Finance Group, and for a reasonable period of time shall have elapsed following the giving of such notice, during which period Lender shall have the right, but not the obligation, to remedy such act or omission.

6.       Tenant covenants that it will not subordinate its interest in the Lease to any other mortgage or deed of trust without Lender's prior written consent.

7.       Tenant agrees to commence paying all rents, revenues and other payments due under the Lease directly to Lender after Lender notifies Tenant that Lender is the owner and holder of the Loan and is invoking Lender's rights under the Loan documents to directly receive from Tenant all rents, revenues and other payments due under the Lease. By making such payments to Lender, Landlord hereby acknowledges and agrees that Tenant shall be deemed to have satisfied all such payment obligations to Landlord under the Lease.

8.       This agreement shall inure to the benefit of Lender's affiliates, agents, co-investors, co-lenders and participants, and each of their respective successors and assigns (each a "**Lender Party**" and collectively, the "**Lender Parties**").

9.       This agreement shall inure to the benefit of and shall be binding upon Tenant, Landlord and Lender, and each of their respective heirs, personal representatives, executors, administrators, successors and assigns. This agreement may not be altered, modified or amended except in writing signed by all of the parties hereto. In the event any one or more of the provisions contained in this agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this agreement, but this agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. This agreement shall be governed by and construed according to the laws of the state where the Property is located, with regard for conflicts of laws rules. This agreement may be executed in multiple counterparts, each of which shall constitute an original agreement, and all of which shall together constitute one and the same agreement.



IN WITNESS WHEREOF, the parties hereto have caused this Subordination, Non-Disturbance and Attornment Agreement to be duly executed as of the _____ day of _____, 2014.

TENANT:

**RAYMOND JAMES & ASSOCIATES, INC.,**
a Florida corporation

By: _____
Derek S. Recer, Vice President,
Corporate Real Estate

LANDLORD:

**PARKWAY PROPERTIES LP,**
a Delaware limited partnership

By:     Parkway Properties General Partners, Inc.,
        a Delaware corporation, its sole general partner

        By: _____
            John V. Barton II, Senior Vice President
            and Managing Director

LENDER:

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**

By:  Cornerstone Real Estate Advisers LLC, its authorized agent

By:     _____
        Name:
        Title:




NOTARY ACKNOWLEDGEMENTS

STATE OF                 )
                          ) ss.
COUNTY OF          )

On this, the _____ day of _____ 20__, before me, the undersigned party, personally appeared _____ who acknowledged himself/herself to be the _____ of _____, a _____, and that he/she as such _____, being authorized to do so, executed the foregoing Subordination, Non-disturbance and Attornment Agreement for the purposes therein contained by signing the name of the _____ by himself/herself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

My Commissions Expires:_____

STATE OF                 )
                          ) ss.
COUNTY OF          )

On this, the _____ day of _____ 20__, before me, the undersigned party, personally appeared _____ who acknowledged himself/herself to be the _____ of _____, a _____, and that he/she as such _____, being authorized to do so, executed the foregoing Subordination, Non-disturbance and Attornment Agreement for the purposes therein contained by signing the name of the _____ by himself/herself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

My Commissions Expires:_____

STATE OF                 )
                          ) ss.
COUNTY OF          )

On this, the _____ day of _____ 20__, before me, the undersigned party, personally appeared _____ who acknowledged himself/herself to be the _____ of _____, a _____, and that he/she as such _____, being authorized to do so, executed the foregoing Subordination, Non-disturbance and Attornment Agreement for the purposes therein contained by signing the name of the _____ by himself/herself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

My Commissions Expires:_____



## EXHIBIT A TO SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

### LEGAL DESCRIPTION



**EXHIBIT H**
**SATELLITE EQUIPMENT**

(a)     *Grant of License.* Subject to the terms and conditions set forth in this Section, Landlord hereby grants to Tenant a license (the "**License**"): (i) to continue to maintain for its own use, and not for broadcasting to others for a fee any antennae that exist as of the Effective Date of this Lease on the roof of the Building that is owned, leased or controlled by Tenant, or which was installed for the benefit of Tenant (the parties will cooperate in good faith to determine determine the status of the antennae located on the roof of the Building as of the Effective Date hereof); and (ii) such additional antenna for its own use, and not for broadcasting to others for a fee, as Tenant may reasonably require to conduct business in the Premises, which shall, in each instance be subject to Landlord's prior written approval, not to be unreasonably withheld, delayed or conditioned,, including necessary wiring and cabling (collectively, the "**Satellite Equipment**"), on the roof of the Building, the specific location of which (the "**Antennae Site**") must receive Landlord's prior written approval; (ii) to use, in common with others, common utility conduits and shafts within the Building connecting the Premises to the Satellite Equipment (the Antennae Site and the common utility shafts and conduits being herein collectively called the "**Equipment Area**"), for the purpose of installing, operating and maintaining the Satellite Equipment, and for connecting the Satellite Equipment to the Premises by means of coaxial or other wire or cable through common utility shafts and conduits located in the Building. Landlord shall designate the portions or areas of the Building or the Common Areas to be used as the Equipment Area. In granting this License to Tenant, Landlord makes no representations or warranties as to the suitability of the Antennae Site for Tenant's intended use, either as of the Effective Date of this License or at any time in the future. Any interference with Tenant's ability to use the Antennae Site for Tenant's intended purposes that may result from any structure which may be erected on property adjacent to the Building shall not affect the validity of the Lease and Landlord shall have no liability to Tenant as a result thereof or with respect thereto.

(b)     *Non-exclusive Nature of License.* Subject to the terms hereof, Tenant's right to use the Antennae Site pursuant to the terms of this License shall be exclusive; however, the remainder of the License granted to Tenant hereunder is non-exclusive. Landlord expressly reserves the right to hereafter grant licenses for space on the roof of the Building, other than the Antennae Site, for the installation, maintenance and operation, of satellite and telecommunications equipment by other tenants and licensees, so long as the proper installation, maintenance and operation of such other equipment would not hinder or interfere with Tenant's installation, operation, maintenance, or repair of the Satellite Equipment.

(c)     *Term of License.* The term of this License shall commence upon the Effective Date hereof, and shall expire the earlier of (i) the expiration or earlier termination of the Lease, as the same may be extended by the written agreement of the parties; or (ii) the termination of this License pursuant to the terms hereof. The termination of the License prior to the expiration or termination of the Lease shall not terminate or otherwise affect the obligations of the parties under the Lease.

(d)     *Additional Rent.* Tenant shall pay to Landlord, as additional Rent, on a monthly basis, the cost, including any administrative expense, if any, incurred by Landlord in furnishing electric power for the operation of the Satellite Equipment. Landlord may install, at Tenant's sole cost, a meter to monitor Tenant's use of electricity furnished by Landlord in the operation of the Satellite Equipment. Except for charges expressly incurred by Tenant under this License, no other rent shall be charged in connection with the License granted to Tenant hereunder.

(e)     *Installation of the Satellite Equipment.* Not less than twenty (20) days prior to installing the Satellite Equipment, Tenant shall deliver to Landlord a detailed written description of the Satellite Equipment and Tenant's plans and specifications for the installation of the Satellite Equipment for review and approval by Landlord. Prior to installing the Satellite Equipment, Tenant shall obtain, and shall deliver to Landlord, copies of all required permits, licenses and consents to install and operate the Satellite Equipment. Tenant shall, at its sole cost and expense, and at its sole risk, install the Satellite Equipment in a good and workmanlike manner, utilizing a contractor for such installation that has been approved by Landlord, in compliance with the then applicable Project



Rules and all applicable Laws, including, without limitation, all regulations of the Federal Communications Commission (the "**FCC**"), or any successor agency having jurisdiction over radio or telecommunications. Unless consented to by Landlord at the time of the installation of the Satellite Equipment, in no event shall the installation of the Satellite Equipment penetrate the roof of the Building. In the event that the installation of the Satellite Equipment will penetrate the roof membrane, Tenant shall not install the Satellite Equipment unless and until Landlord receives confirmation that such installation will not void or impair any then-existing warranty on the roof. Tenant shall reimburse Landlord for all reasonable costs associated with obtaining such confirmation from the contractor responsible for maintaining the roof of the Building. If such confirmation is obtained, all work in connection with the roof penetration shall be performed by Landlord's contractor at Tenant's sole cost and expense. Tenant shall install the Satellite Equipment in an aesthetically acceptable manner and, if required by Landlord to do so, Tenant shall shield or screen the Satellite Equipment from public view; fence or screen the Satellite Equipment so as to minimize any safety risks and to ensure that the Satellite Equipment does not create a nuisance; and install lightning rods or air terminals on or about the Satellite Equipment. Tenant shall not commence installation of the Satellite Equipment without the prior written consent of Landlord which consent shall not be unreasonably withheld or delayed. All cabling installed in common utility conduits and shafts of the Building connecting the Satellite Equipment to the Premises shall be bundled and labeled as having been installed by Tenant. Landlord's review and approval of the plans and specifications for the installation of the Satellite Equipment and Landlord's supervision and inspection of such installation shall not be construed in any way as approval by Landlord of the adequacy or safety of the installation of the Satellite Equipment or a waiver of any of Landlord's rights hereunder, and Tenant shall be solely responsible for the adequacy and safety of the installation and operation of the Satellite Equipment and solely liable for any damages or injury arising out of such installation and operation. Tenant shall pay to Landlord upon demand the cost of repairing any damage to the Building caused by such installation. The Satellite Equipment shall be connected to Landlord's power supply in strict compliance with all applicable building, electrical, fire and safety codes. Tenant shall notify Landlord upon completion of the installation of the Satellite Equipment, and Landlord shall inspect such installation within ten (10) days after Tenant's notice. Tenant shall not commence operation of the Satellite Equipment until Landlord has approved such installation.

(f)    *Operation of the Satellite Equipment.*  Tenant shall operate the Satellite Equipment in strict compliance with the Project Rules and all applicable Laws and requirements of all federal, state, and local governmental boards, authorities and agencies including, without limitation, the FCC. Tenant shall operate the Satellite Equipment at its own risk, and Tenant shall be solely responsible throughout the Term of the License for maintaining, servicing and repairing the Satellite Equipment. Landlord shall not be liable to Tenant for any interruption of electrical power furnished to the Equipment Area because of any act, omission, or requirement of the public utility serving the Building, or the act or omission of any other tenant, licensee or contractor of the Building, or for any other cause beyond the reasonable control of Landlord, and Tenant shall not be entitled to any rental abatement for any such interruption of electrical power.

(g)    *Damage and Interference.*  In no event shall Tenant's installation of the Satellite Equipment damage the Building or existing structure of the Building, or interfere with the maintenance of the Building, any system currently serving the Building, any radio or telecommunications equipment being operated from or within the Building as of the date hereof or in any manner invalidate any existing warranties in place on the Building or the improvements to the Building. Tenant has evaluated the possibility of interference from or to such existing equipment and has determined that no such interference should occur if such existing equipment and the Satellite Equipment are properly and lawfully installed and operated. In the event that the operation of the Satellite Equipment would violate any of the terms or conditions of this subparagraph, Tenant agrees to either cure such violation or suspend operation of the Satellite Equipment within forty-eight (48) hours after Tenant's receipt of notice from Landlord of such violation, and not to resume operation of the Satellite Equipment until such operation is in strict compliance with all of the requirements of this subparagraph. In the event Tenant refuses to either cure such violation or suspend operation of the Satellite Equipment when so notified by Landlord, or in the event of an emergency, Landlord shall have the right to either cure such violation or suspend the supply of

H-2



electric power to the Satellite Equipment, and Landlord shall have no liability to Tenant, and Tenant shall have no right to a rental abatement, for such suspension. In the event that the Satellite Equipment interferes with communication receptions or transmissions from equipment currently located at or about the Building and belonging to or operated by any party to whom Landlord has, prior to the Effective Date hereof ("**Preexisting Equipment**"), granted rights similar to those granted to Tenant hereunder, Landlord will use commercially reasonable efforts to find a suitable alternative location for the Satellite Equipment. Tenant will indemnify, defend and hold harmless Landlord from and against any and all claims for damages caused by the Satellite Equipment, or the transmissions therefrom, which cause any such interference with Preexisting Equipment. Landlord will promptly notify Tenant of any claim from third parties of alleged interference with Preexisting Equipment created by Tenant's installation or from transmissions or receptions from such installations. Upon receipt of any notification from Landlord of any such claimed interference with Preexisting Equipment, Tenant will undertake the handling of such claim and shall indemnify, defend and hold harmless Landlord from and against any and all cost and expenses arising by reason of such claim. As part of the installation of its equipment, Tenant will appropriately filter and trap any and all byproducts or interference through existing broadcast installations and their signals or through other appropriate means. After installation of the Satellite Equipment, Landlord shall not license the right to any third party to install any equipment on the roof of the Building that would interfere with Tenant's operation, maintenance, repair or replacement of the Satellite Equipment in its then existing location, unless the Satellite Equipment can be relocated, at Landlord's expense, to another location on the roof of the Building that would permit Tenant to operate, maintain, repair and replace the Satellite Equipment without such interference.

(h)     *Maintenance*. Tenant, at its sole cost and expense, shall maintain the Satellite Equipment in a safe and orderly condition. Tenant may, upon reasonable prior written notice to Landlord and at Tenant's own cost, repair, replace, reorient or remove the Satellite Equipment or any portion thereof, or replace it with generally similar equipment, provided that: (i) any new equipment does not weigh substantially more than the Satellite Equipment and can be properly accommodated on the roof of the Building without placing materially greater demands upon the electrical, mechanical, structural or life safety or other systems of the Building; (ii) Tenant, at its cost, shall restore the roof of the Building to the condition in which it was prior to such repair, reorientation, removal or replacement, and all of such repair, reorientation, removal or replacement shall be performed in accordance with good engineering practice and by contractors or other persons approved by Landlord prior to such repair, reorientation, removal or replacement; and (iii) all plans and designs of Tenant relating to any such repair, reorientation, removal or replacement shall in any case be subject to the prior written approval of Landlord, which approval will not be unreasonably withheld, delayed or conditioned.

(i)     *Access to the Equipment Area.* Notwithstanding the License granted to Tenant hereunder, Landlord shall have access to the Equipment Area at all times for the purpose of operating, maintaining, repairing or improving the Building. Subject to the Project Rules in effect from time to time, Tenant shall also have continuous access to the Equipment Area for the purpose of installing, operating, maintaining, repairing and removing the Satellite Equipment; provided, however, that such access shall be limited to authorized engineers of Tenant, or persons under their direct supervision, and Tenant shall reimburse Landlord, as additional Rent due hereunder, for any costs incurred by Landlord in providing the services of the Building engineer or other employees of Landlord before or after Building Standard Hours. Tenant shall deliver to Landlord a list of Tenant's authorized representatives, repair, maintenance and engineering personnel prior to any access to the Equipment Area, and those persons shall be required to sign in and out with Landlord's security personnel when entering and exiting the Project. Landlord shall have no responsibility or liability for the conduct or safety of any of Tenant's representatives, repair, maintenance and engineering personnel while in any part of the Project, and Tenant shall be solely liable for any injury to or death of any such person from any cause resulting from the installation, operation, maintenance, repair, inspection, use or removal of such equipment by Tenant or its agents, employees, representatives, contractors or invitees.



(j)     *Relocation of the Satellite Equipment.*

    (i)    *Required relocation at Tenant's expense.*  In the event that Landlord reasonably determines that relocation of the Satellite Equipment is required (A) in the course of maintaining, repairing or replacing the roof of the Building or any other Building maintenance or remodeling; (B) due to the application of any Law or any governmental mandate, to comply with life-safety considerations, or to avoid interference with other telecommunications equipment located anywhere in the Project as of the date the Satellite Equipment was installed; or (C) due to or any act or omission of Tenant, including Tenant's failure to comply with the terms of this special stipulation, then, upon prior notice to Tenant, then Tenant shall relocate the Satellite Equipment, either temporarily or permanently as specified by Landlord, to other space designated by Landlord that does not impair the ability of the Satellite Equipment to function for its intended purpose hereunder.  A required relocation of the Satellite Equipment under the terms of this subparagraph shall be undertaken immediately, and completed within thirty (30) days after receipt of Landlord's notice of such required relocation, and all costs incurred in such relocation shall be paid by Tenant.  In the event that a relocation of the Satellite Equipment is required under (B) or (C) of this subparagraph, and other space on the roof of the Building, or elsewhere in the Project, is not available that does not impair the functioning of the Satellite Equipment, then the License granted to Tenant hereunder shall be terminated, and such termination shall not otherwise impair the rights and obligations of the parties under the Lease, nor shall such termination result in any liability of Landlord to Tenant.

    (ii)    *Required relocation at Landlord's expense.*  Landlord may, in the exercise of Landlord's reasonable discretion, upon reasonable prior written notice to Tenant, direct Tenant to relocate some or all of the Satellite Equipment, either temporarily or permanently as specified by Landlord, to other space designated by Landlord that does not impair the ability of the Satellite Equipment to function for its intended purpose hereunder.  A required relocation of the Satellite Equipment under the terms of this subparagraph shall be completed within thirty (30) days after receipt of Landlord's notice of such required relocation, and all costs incurred in such relocation shall be paid by Landlord.

    (iii)    *Permanent relocation.*  In the event that the Satellite Equipment is permanently relocated to other space pursuant to the terms of this subparagraph (j), such other space shall then become a part of the Equipment Area, and the space from which the Satellite Equipment was relocated shall cease to be a part of the Equipment Area.

(k)     *Removal of Satellite Equipment.*  All of the Satellite Equipment installed in the Equipment Area shall be and remain the property of Tenant, and Tenant shall, prior to the expiration or termination of this License, remove the Satellite Equipment (including all cabling and installation and anchoring hardware) installed in the Equipment Area and surrender the Equipment Area in substantially the same condition existing prior to the installation of the Satellite Equipment.  Tenant shall be liable for, and shall promptly reimburse Landlord for, the cost of repairing all damage done to the Antennae Site, the Equipment Area or the Building by such removal.  If Tenant fails to remove the Satellite Equipment in compliance with the requirements of this paragraph, and such failure shall continue for five (5) days after Tenant's receipt of written notice from Landlord of the existence of such failure, then Landlord may remove the Satellite Equipment from all portions of the Building in which it is installed, including but not limited to the Antennae Site; Tenant shall promptly reimburse Landlord for the cost of such removal as additional Rent due under the Lease; Landlord may thereafter dispose of the Satellite Equipment in any manner that Landlord deems appropriate;  Tenant hereby releases Landlord from any liability for loss or damage to the Satellite Equipment caused by such removal; and Tenant shall indemnify Landlord for and hold harmless Landlord from and against, any claim for injury or damage raised against Landlord by reason of such removal.

(l)     *Incorporation of terms of Lease.*  Unless modified by the terms of this License, all of the provisions of the Lease shall apply to the construction, installation, maintenance, repair, operation, replacement, substitution and use of the Satellite Equipment, specifically including but not limited

H-4

to the provisions of the Lease relating to insurance, indemnity, compliance with Laws, and Default, as if the Satellite Equipment were located in the Premises.

(m)    *Survival.*  All unfulfilled obligations of Tenant under this License shall survive the expiration of the term of the License granted hereunder and the expiration or earlier termination of the Lease.

*[End of Lease]*

H-5

